Pages 1 - 73

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION, et al., | ) ) ) | |
| Plaintiffs, | ) | |
| VS. | ) | **NO. C 19-05645 VC** |
| BIOCARDIA, INC., | ) ) | |
| Defendant. | ) | |
| BIOCARDIA, INC., | ) ) | |
| Plaintiff, | ) | |
| VS. | ) | **NO.  20-02829 VC** |
| nVISION MEDICAL CORPORATION, et al., | ) ) ) | |
| Defendants. | ) | |

San Francisco, California
Thursday, July 16, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS OF THE OFFICIAL**
**ELECTRONIC SOUND RECORDING 9:10 - 10:54 a.m. = 104 MINUTES**

**APPEARANCES** (via Zoom):

For Plaintiff Boston Scientific Corporation:

        FAEGRE DRINKER BIDDLE REATH LLP
        2200 Wells Fargo Center
        90 South Seventh Street
        Minneapolis, Minnesota  55402
   BY:  **TIMOTHY E. GRIMSRUD, ATTORNEY AT LAW**
        **KEVIN WAGNER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Transcribed By:    Marla F. Knox, RPR, CRR, RMR
           United States Official Court Reporter

**<u>APPEARANCES</u>:   (CONT'D)**

For Plaintiff Fortis Advisors LLC:

                     FREITAS ANGELL & WEINBERG LLP
                     350 Marine Parkway - Suite 200
                     Redwood Shores, California  94065
        BY:  **JESSICA N. LEAL, ATTORNEY AT LAW**
                     **ROBERT FREITAS, ATTORNEY AT LAW**

For Defendant/Plaintiff BioCardia, Inc., Surbhi Sarna and
eXXclaim Capital Partners I:

                     FEINBERG DAY KRAMER ALBERTI LIM
                     TONKOVICH & BELLOLI LLP
                     577 Airport Blvd. - Suite 250
                     Burlingame, California  94010
        BY:  **IAN N. FEINBERG, ATTORNEY AT LAW**
                     **MARGARET E. DAY, ATTORNEY AT LAW**
                     **NICHOLAS V. MARTINI, ATTORNEY AT LAW**

```
1  Thursday - July 16, 20202                      9:10 a.m.

2                    P R O C E E D I N G S

3                         ---oOo---

4       THE CLERK:  Calling case number 19-CV-5645, Boston

5  Scientific Corporation, et al. versus BioCardia, Inc. and

6  20-CV-2829 BioCardia, Inc. versus nVision Medical Corporation.

7       Counsel for Boston Scientific, please state your

8  appearances for the record.

9                  (Pause in proceedings.)

10       THE CLERK:  Is there Counsel for Boston Scientific?

11       MR. GRIMSRUD:  Good morning, Your Honor, Timothy

12  Grimsrud for Boston Scientific and nVision.

13       MR. WAGNER:  Kevin Wagner --

14       THE COURT:  Good morning.

15       MR. WAGNER:  Kevin Wagner is also on for Boston

16  Scientific and nVision.  Good morning.

17       THE COURT:  Morning.

18       THE CLERK:  And for BioCardia?

19       MR. FEINBERG:  Ian Feinberg and with me is Elizabeth

20  Day.

21       THE COURT:  Hello.  I don't see Elizabeth Day.

22       MR. FEINBERG:  She is not on video but she is sitting

23  about six feet to my left.

24       MS. DAY:  Good morning, Your Honor.

25       THE COURT:  All right.  There is Elizabeth Day.  All
```

 1   right.

 2          **THE CLERK:**  And for Fortis Advisors, et al?

 3          **MR. FREITAS:**  Good morning, Your Honor, Robert Freitas

 4   for Fortis Advisors.

 5          **THE COURT:**  Good morning.

 6          **MS. LEAL:**  Good morning, Your Honor, Jessica Leal also

 7   for Fortis Advisors.

 8          **THE COURT:**  Morning.

 9      Is that it?  What about for -- what about for the

10   shareholders?

11          **MR. FREITAS:**  Your Honor, this is Bob Freitas.

12   Ms. Leal and I also represent Surbhi Sarna and eXXclaim Capital

13   I, one of the shareholders that has moved to dismiss.

14          **THE COURT:**  Okay.  And what about the other -- weren't

15   there, like, 30 shareholders named or something like that?

16          **MR. FREITAS:**  There were 19, Your Honor, but the stay

17   order that the Court issued has made it so that they haven't

18   appeared at this point.

19          **THE COURT:**  What -- remind me of the stay order I

20   issued.

21          **MR. FREITAS:**  So when eXXclaim filed its motion to

22   dismiss, eXXclaim argued to the Court that the ruling on the

23   motion to dismiss would address all of the shareholders and

24   requested that the case be stayed except for the proceedings on

25   the motion to dismiss.  And the Court granted the motion.

1          **THE COURT:**  Got it.  Okay.  And I had forgotten that.

2    So do you represent the other shareholders or just eXXclaim?

3          **MR. FREITAS:**  We just represent eXXclaim at this

4    point, Your Honor.  It is possible we will represent others,

5    but we have not been retained by the others or appeared for

6    them.

7          **THE COURT:**  Okay.  And then can you explain to me

8    what -- exactly what Fortis is?  That was one of the questions

9    on my long list of questions.  So while I'm having this

10   discussion with you, maybe you can explain to me what Fortis is

11   and what it does.

12         **MR. FREITAS:**  Sure, Your Honor.  It is typical --

13         **THE COURT:**  And why it is in this case.

14         **MR. FREITAS:**  Well, that's a different question,

15   Your Honor --

16         **THE COURT:**  Right.

17         **MR. FREITAS:**  -- and I think Mr. Feinberg would have

18   to address that.

19         **THE COURT:**  We will hold off on that last question.

20         **MR. FREITAS:**  On the question of who Fortis is, it is

21   common in merger transactions like this one for there to be an

22   earn-out feature or something else that involves an escrow.

23       And it -- more or less what Fortis does is it serves as a

24   representative of the shareholders for the purpose of

25   processing various things that take place at the time of a

1  merger transaction and subsequently.

2       So it has no -- it has no horse in the race directly.

3  It's an administrative representative of the shareholders.

4       **THE COURT:**  And so the -- but -- and part of what

5  Fortis does as the administrative representative, is it, you

6  know, holds money in escrow that is going to the shareholders

7  from the -- from the -- as a result of the merger?

8       **MR. FREITAS:**  So literally, Your Honor, the money

9  is -- the escrow money is in a bank.  It is not held by Fortis.

10  But what Fortis does is there is a payment by Boston Scientific

11  in exchange for cancellation of the shares.  And some of the

12  money is paid at the time of the closing directly to the

13  shareholders, and the rest is paid into the escrow.

14       And according to the terms of the merger agreement, the

15  funds in escrow will or will not be released eventually to the

16  shareholders.

17       **THE COURT:**  And this is probably a question that will

18  reveal my ignorance about these sorts of financial

19  transactions, but why is -- why is the money held in escrow?

20       Is the idea that, you know, something may go south with

21  the merger?  There may be a discovery that, you know, that the

22  acquired company isn't as valuable as it was thought to be and

23  so that money should be held in escrow to -- just in case there

24  is a dispute about whether some of the money should go back to

25  Boston Scientific?

1          **MR. FREITAS:**  So I think there are a couple of

2     different models, Your Honor.  So for one, sometimes the

3     additional compensation may be contingent.  In a pure earn-out

4     situation, the selling shareholders would receive a bigger

5     amount in the event that certain good things happen in terms of

6     the performance of the company.  So that is one model where

7     there might be funds set aside.

8          And another has to do with expenses that are acknowledged

9     in the merger agreement being incurred.  So it is common in

10    many merger transactions that there will be indemnification

11    obligations, for example.

12         And the buyer will typically require an escrow to make

13    sure there is money available to fulfill indemnification

14    obligations.

15         So those are a couple of the reasons why there might be a

16    separate fund that would be set aside at the time.

17         **THE COURT:**  Okay.  And you -- and so you have been

18    named as a Defendant -- you when I say "you," I'm referring now

19    to Fortis, not to ex-- what is it -- ex--

20         **MR. FREITAS:**  EXXclaim.

21         **THE COURT:**  EXXclaim.  Fortis has been named as a

22    Defendant in the first lawsuit but not the second lawsuit?

23         **MR. FREITAS:**  So far that's right, Your Honor.

24         **THE COURT:**  And eXXclaim has been named in the second

25    lawsuit but not the first lawsuit?

1              **MR. FREITAS:**  Correct, Your Honor.

2              **MR. FEINBERG:**  Your Honor, may I speak for one second

3     just to correct the record?

4              **THE COURT:**  Sure.

5              **MR. FEINBERG:**  Fortis is A Counter-Defendant in the

6     first lawsuit.  It was actually the Plaintiff along with Boston

7     and one of Boston's entities Boston SciMed.

8              **THE COURT:**  Got it.

9              **MR. FEINBERG:**  It was in the first case because it

10    actually sued us for declaratory relief.

11             **THE COURT:**  Right.  I think -- you know, oftentimes

12    when you get a dec relief action and you get a subsequent suit

13    brought by the, you know, by the Defendants in the dec relief

14    action, or counterclaims by the Defendants in the dec relief

15    action, it becomes very difficult for the Judge and the parties

16    and the reader of opinions to keep track of who is who and what

17    side of the V they are on.

18        And so I am going to think of -- and I'm going to ask

19    everybody else to do the same thing -- I'm thinking of

20    BioCardia as the Plaintiff in these cases, and I'm thinking of,

21    you know, Boston Scientific and Fortis and eXXclaim and the

22    other shareholders and Sarna as the Defendants in these

23    actions; okay.

24        I just think that is the easiest way for everybody

25    involved and anybody who is going to be reading any opinions to

1   keep track of things.

2       All right.  So I have even -- I'm even having trouble

3   figuring out where is a good place to begin this discussion.

4   You know, we have made quite a mess for ourselves to clean up.

5       Part of that is certainly my fault.  You know, the

6   pandemic has -- has caused me to -- you know, neglect -- you

7   know, this case and the motions that have been filed along the

8   way in a way that I -- you know, I normally don't do.  So I

9   apologize for that.

10      Part of the problem, I think is that, you know, there --

11  you know, I don't think it is entirely my fault.  I think part

12  of it is that there has been some strange lawyering going on in

13  this case.

14      So I'm having a -- I'm having a hard time unraveling it in

15  deciding where to begin.  But part of me is wondering if there

16  may be value in the beginning -- well, let me just see if I --

17  let me just see if I can recite the basic chronology of what

18  has happened to make sure I at least have a grip on that.  And

19  anybody can jump in and correct me if I'm getting something

20  wrong.

21      And then after that, part of me wonders if it might be

22  worth starting to tackle some of these issues in reverse order.

23  In other words, to tackle the shareholder issue first in the

24  second lawsuit because it strikes me that, you know, one of

25  the -- it strikes me that one of the -- one of the major

1   overreaches in this litigation is the attempt to name the

2   shareholders as Defendants and the attempt to get a

3   constructive trust on the -- on the shareholders -- the

4   proceeds from -- the shareholders' proceeds from the merger.

5        And so it might just be worth knocking that out and then

6   sort of going backwards.  But let me see if I have got the

7   basic chronology right.

8        So Sarna leaves BioCardia.  She starts nVision.  She is --

9   she has nVision for, like, what, ten years or something like

10  that?  Is that right?

11       **MR. FEINBERG:**  (Inaudible).

12       **THE COURT:**  And then there is a merger with Boston

13  Scientific.  The merger with Boston Scientific causes BioCardia

14  to start sniffing around, and BioCardia makes a

15  determination -- whether it is right or wrong, we can -- you

16  know, maybe is, you know, not to be determined in this

17  discussion -- but BioCardia makes a determination that Sarna

18  has these patents that seem to stem from work that she was

19  doing at BioCardia and that -- and that she didn't disclose

20  that stuff to BioCardia and so she breached her contract and

21  she stole BioCardia's trade secrets.

22       And that stuff is being referred to as the technology or

23  the inventions that are embodied in those trade secrets are

24  being referred to as the Sarna patent family.  Am I right so

25  far?

1          **MR. FEINBERG:**  Yes, with one caveat.

2          **THE COURT:**  Yes.

3          **MR. FEINBERG:**  What you recited is actually what we

4    thought.  We now know --

5          **THE COURT:**  Wait.  I'm not talking about what you now

6    think you know.  I'm talking about what -- sort of the

7    chronology of what happened in the case; okay.

8          **MR. FEINBERG:**  I was trying to explain the chronology.

9          **THE COURT:**  And -- and so -- so that -- and so we are

10   talking right now about what you have described as the Sarna

11   patent family; right?  Is that correct?

12         **MR. FEINBERG:**  Correct.

13         **THE COURT:**  Okay.  And then -- and then so -- and by

14   the way, just parenthetically, we can get to it later and I

15   know it is not necessarily at issue right now -- but it seems

16   like BioCardia at least based on what I have seen so far in all

17   of the papers and all of the materials submitted in connection

18   with all of these briefs, seems like BioCardia has a very

19   strong case that -- that Sarna breached her contract and made

20   off with these trade secrets that should have been BioCardia's.

21         That's just sort of my initial reaction based on -- you

22   have to take it with a grain of salt, but it is my initial

23   reaction based on what I have read so far.

24         You know, and it seems like Sarna would have a

25   particularly difficult time arguing that this was not within

1   the scope of what BioCardia was doing given the lab notebook.

2        But, in any event, BioCardia sends a letter -- a demand

3   letter to Boston Scientific and who else, Sarna as well?

4        **MR. FEINBERG:**  Correct.

5        **THE COURT:**  And to Fortis?

6        **MR. FEINBERG:**  No.  We didn't --

7        **THE COURT:**  Not to Fortis.

8        **MR. FEINBERG:**  We didn't know who they were.

9        **THE COURT:**  All right.  And then -- and in response to

10  the demand letter, Boston Scientific and Sarna file a dec

11  relief action against BioCardia.

12        **MR. FEINBERG:**  Not correct, Your Honor.  Mostly

13  correct so it got weirder.  If you think this case is weird

14  just from your perspective, there was a side trip to both

15  arbitration and state court.

16        So everything you have said is correct.  Boston sued

17  BioCardia for declaratory relief.  BioCardia had demanded

18  arbitration against Ms. Sarna because her employment agreement

19  had an arbitration clause.  Her prior Counsel, not current

20  Counsel, her prior Counsel filed a superior art action in

21  Redwood City stating that the arbitration clause was

22  unenforceable for various reasons.

23        **THE COURT:**  Okay.  Can you hold on -- let me interrupt

24  you for one second.  All of this stuff you are describing you

25  are saying happened before the declaration relief action was

1  filed?

2         **MR. FEINBERG:**  About the same time.

3         **THE COURT:**  Okay.

4         **MR. FEINBERG:**  And, frankly, Your Honor, when Boston

5  filed the declaration relief action, I presume to preserve

6  venue.  They picked the venue we would have chosen.  The only

7  reason we didn't do it in the first place is we had an

8  arbitration agreement with Ms. Sarna.  Didn't think we could.

9      So the parties all said:  Well, we all rather be in

10  Federal Court in San Francisco so here we are with everything

11  else.

12         **THE COURT:**  Okay.

13         **MR. FEINBERG:**  This is the only stuff going on now.

14         **THE COURT:**  Okay.

15         **MR. FREITAS:**  Your Honor --

16         **THE COURT:**  I saw references to, you know, arbitration

17  and stuff; but I gather none of that matters at the moment

18  for --

19         **MR. FEINBERG:**  It will never matter.

20         **THE COURT:**  It will never matter, okay.

21         **MR. FREITAS:**  Your Honor, this is Bob Freitas for

22  Ms. Sarna.

23         **THE COURT:**  Yes.

24         **MR. FREITAS:**  One correction.  Ms. Sarna was not a

25  Plaintiff in the declaratory relief action filed by Boston

 1   Scientific, Boston Scientific SciMed and Fortis.

 2         **MR. FEINBERG:**  That's correct.

 3         **THE COURT:**  So Boston Scientific and Fortis that filed

 4   the dec relief action.  And you mentioned another entity.  What

 5   is that other entity?

 6         **MR. FREITAS:**  It is another Boston Scientific

 7   subsidiary called Boston Scientific SciMed, S-C-I-M-E-D.

 8         **THE COURT:**  Okay.  I can think of Boston Scientific

 9   and Boston Scientific SciMed as the same entity for purposes of

10   this discussion?

11         **MR. GRIMSRUD:**  Yes, you can, Your Honor.  For -- the

12   arbitration against Ms. Sarna was filed first, and part of that

13   was seeking ownership of patents in IT which Boston Scientific,

14   Boston Scientific SciMed now owns.  And so that was part of the

15   impetus for the declaratory judgment because it involves their

16   patents, but you can (inaudible garbled audio).

17         **THE COURT:**  Uh-oh, you are cutting out.

18         **MR. GRIMSRUD:**  -- for this discussion.

19         **THE COURT:**  I didn't -- I think I discerned what you

20   said, but you cut out a little bit.  The upshot is that it

21   wasn't -- it wasn't just the demand letter that was the impetus

22   for the dec relief action.  It was this arbitration that was

23   filed against Sarna, and Boston Scientific is the owner of the

24   Sarna patent family.  And so that -- that -- and so Boston

25   Scientific, that was part of the impetus -- that was a major

1    part of the impetus for the dec relief action.

2             MR. GRIMSRUD:  Correct.

3             THE COURT:  Okay.  So then -- so the dec relief action

4    gets filed and when was that filed, by the way?

5             MR. GRIMSRUD:  September of last year.

6             THE COURT:  Okay.  And then begins the process of,

7    like, identifying trade secrets or whatever; right.  And so

8    Boston -- sorry -- BioCardia identifies -- makes an attempt at

9    identifying its trade secrets, and it identifies the trade

10   secrets that are connected to the Sarna patent family; and it

11   also attempts to identify additional trade secrets.

12            MR. FEINBERG:  Correct.

13            THE COURT:  The additional trade secrets, I'm having a

14   hard time understanding exactly sort of what they are or what

15   they are linked to, if they are linked to any particular

16   patents or anything like that; but I gather that as we sit here

17   now, having received all of these motions, probably the best

18   attempt to describe -- BioCardia's best attempt to describe

19   those additional trade secrets is probably contained in the --

20   I think it is the first amended complaint in the second

21   lawsuit, with that chart because there was a division -- you

22   divided it up between -- you were describing the -- the

23   Sarna -- the Sarna patent family trade secrets, and then you

24   called it something like the additional BioCardia trade secrets

25   or something like that?

1          **MR. FEINBERG:**  Correct.

2          **THE COURT:**  And then you have that chart in the -- in

3    the latest iteration of the complaint in the second lawsuit and

4    that chart purports to describe the -- the -- what you are

5    calling the additional trade secrets; is that correct?

6          **MR. FEINBERG:**  It is correct.

7          **THE COURT:**  Okay.  And I realize that they weren't

8    described that way in the -- in the -- in the identification

9    back in December of 2019 or whatever it was, but that's -- to

10   the extent I want to develop an understanding of what those

11   alleged trade secrets are, additional trade secrets, that is --

12   that pleading in the second lawsuit is the best place to look;

13   is that right?

14         **MR. FEINBERG:**  Yes, for the Court because, you know,

15   30 years ago we stopped filing discovery responses in court.

16   So there -- the same chart is in some discovery responses, but

17   that's the only place it is in front of you, Your Honor.

18         **THE COURT:**  Got it.

19      So -- so you -- so BioCardia in around, I think it was,

20   December of 2019 made attempts to identify these additional

21   trade secrets; and I'm not positive about this, but I want

22   to -- I think you're -- I think what BioCardia says is that

23   these additional trade secrets are not linked to the lab

24   notebook; is that correct?

25         **MR. FEINBERG:**  That is correct.

1          THE COURT:  Okay.  Because.

2          MR. FEINBERG:  Certainly not the pages of the lab

3     notebook that are attached to the complaint.  We actually may

4     be able to link them to other parts of the lab notebook.

5          THE COURT:  Okay.  But you have identified these -- I

6     think you actually may refer to them in the second lawsuit.  I

7     can't remember for sure, but I think you may refer to them as

8     "the lab notebook trade secrets" and then the "additional trade

9     secrets;" is that right?

10          MR. FEINBERG:  Yes.

11          THE COURT:  Okay.  So in December of 2019 you have got

12     the lab notebook trade secrets, and then you have got the

13     additional trade secrets that you attempt to identify.  And

14     Boston Scientific comes back and says:  Hey wait a minute, what

15     is the deal with these additional trade secrets?  That is --

16     that is not part of the lawsuit.

17          And then in -- in -- I believe it's maybe January of 2020

18     a motion to dismiss the -- the operative complaint is filed by,

19     is it -- was it Sarna who filed the motion to dismiss?

20          MR. FEINBERG:  Yes, Your Honor.

21          MR. FREITAS:  Yes, Your Honor.

22          THE COURT:  Boston Scientific filed an answer?

23          MR. FEINBERG:  Correct.

24          THE COURT:  So Sarna files a motion to dismiss the

25     operative complaint and Boston Scientific has filed -- it is

1  not the operative complaint but the operative counterclaims.

2  And Boston Scientific files an answer.  Sarna files a motion to

3  dismiss and the motion to dismiss argues that it doesn't state

4  a claim for correction of inventorship.  And the additional

5  claims, there is a breach of contract claim and there is one

6  other claim.  Is it theft of trade secrets claim?  And that

7  those are barred by the statute of limitations as set -- you

8  know, the complaint shows that those are barred by the statute

9  of limitations.

10      **MR. FEINBERG:**  That is correct, Your Honor.  In the

11  interim about three days ago -- actually two days ago on

12  Tuesday -- the Federal Circuit came down with a new case on

13  correction of inventorship.

14      **THE COURT:**  Okay.  We don't need to talk about that

15  right now.  I'm still just trying to get the chronology down.

16      And then -- so that motion to dismiss is pending.  And at

17  some point while that motion to dismiss is pending -- maybe it

18  is like in April or something of 2020 -- BioCardia files a

19  motion to file amended counterclaims.

20      **MR. FEINBERG:**  Yes.  And a motion to amend the

21  scheduling order because the -- the scheduled deadline for

22  filing an amended pleading had passed.  And under the

23  prevailing wall, you have to first do the motion to amend the

24  scheduling order.  So we did.

25      **THE COURT:**  Okay.  So you filed a motion to amend the

1  scheduling order so that you could file amended counterclaims?

2          MR. FEINBERG:  Correct.

3          THE COURT:  You amended the proposed amended

4  counterclaims to one is -- I believe, it -- I believe the

5  proposed amended counterclaims attempted to address some of the

6  defects that were identified in the first -- in the motion to

7  dismiss that was filed in January.  I think particularly as it

8  relates to the statute of limitations; is that right?

9          MR. FEINBERG:  Correct.

10         THE COURT:  Okay.  And then -- and then you also

11 attempted to add the -- the additional trade secrets that you

12 had attempted to identify in December of 2019.

13     And then -- and there is that motion to amend the

14 scheduling order and then -- the motion is pending also.

15     So then at some point the second lawsuit a filed.  When

16 was the second lawsuit filed.

17         MR. FEINBERG:  It is either late April or early May.

18 I just lost track, Your Honor.

19         THE COURT:  After the motion to amend the scheduling

20 order --

21         MR. FEINBERG:  Yes.

22         THE COURT:  -- in the first lawsuit?

23         MR. FEINBERG:  Yes, yes.

24         THE COURT:  And the -- I think you have said that the

25 purpose of the second lawsuit is to kind of preserve

1   BioCardia's rights to the extent that the request to amend the

2   scheduling order is denied; is that correct?

3           **MR. FEINBERG:**  Only in part.  And actually in small

4   part.  So the -- as Ms. Sarna's Counsel had pointed out, the

5   first complaint was filed based on the assumption that what was

6   announced was actually a merger was actually what one might

7   call a conventional statutory merger whereby Boston Scientific

8   merged nVision into it and what used to be nVision is now just

9   a piece of Boston Scientific.

10      We realized -- and maybe we should have realized sooner --

11  but what we realized from what Ms. Sarna's Counsel was telling

12  us is that is not what happened.

13      Go back to corporate law and --

14          **THE COURT:**  Hold on.  Before you get into the details

15  of that, the upshot -- the upshot is that you didn't think you

16  needed to name nVision in the first lawsuit and then you

17  realized maybe you should have?

18          **MR. FEINBERG:**  Yes, because it still exists.  It was

19  acquired by --

20          **THE COURT:**  Right.  And you didn't know.  Maybe you

21  should have known.  Maybe you shouldn't have known.  You

22  already sort of said "maybe we should have figured that out

23  before."

24      So the upshot is you -- you filed a second -- second

25  lawsuit because you hadn't named nVision in the first lawsuit.

1           **MR. FEINBERG:**  Right.

2           **THE COURT:**  And you wanted to -- and I guess you made

3   a decision -- I guess one question I have is:  You know, when

4   you filed your -- you filed your motion to amend the scheduling

5   order in the first lawsuit; right.  And at that time you

6   proposed amended counterclaims; correct?

7           **MR. FEINBERG:**  Correct.

8           **THE COURT:**  And the amended counterclaims added the --

9   this -- this a-- these additional trade secrets that you

10  attempted to identify in December of 2019 and -- but why didn't

11  you also say:  Oh, by the way, we need to add nVision as a

12  Defendant?

13          **MR. FEINBERG:**  Because we hadn't figured that out yet.

14          **THE COURT:**  You hadn't figured that out yet.

15          **MR. FEINBERG:**  Right.

16          **THE COURT:**  Okay.  So then you --

17          **MR. FEINBERG:**  Let me say one more thing, Your Honor

18  there was an objection to us getting leave to amend.  We have a

19  statute of limitations issue --

20          **THE COURT:**  I understand that.

21          **MR. FEINBERG:**  So we didn't want to take the risk that

22  you would deny the --

23          **THE COURT:**  I understand.  I understand.  So you said:

24  Well, it may be that the Court concludes in the first lawsuit

25  that it's too late for us to -- for us to file amended

1   counterclaims adding these trade secrets, these additional

2   trade secrets; and the Court may also conclude -- this is what

3   I'm discerning from what you just said -- and correct me if I'm

4   wrong -- but you also conclude:  Well, it may also be too late

5   to add nVision.  We hadn't even figured that out by the time we

6   proposed our amended counterclaims.  We have only now figured

7   that out.

8        So if we go back now and try to add nVision in the first

9   lawsuit, that is probably going to get the Court to throw up

10  its hands.  So we are just going to file a second lawsuit

11  against nVision; and we are going to assert, you know, the

12  trade secret claims that are linked to the notebook -- and what

13  you call the Sarna patent family -- and we are also going -- we

14  are going to include what we are calling the additional trade

15  secrets that are -- that you attempted to disclose back in

16  December of 2019.  Is that all accurate?

17            **MR. FEINBERG:**  Yes.

18            **THE COURT:**  Okay.  And so the second lawsuit gets

19  filed against -- and the Defendants are nVision and the

20  shareholders.

21            **MR. FEINBERG:**  No.

22            **THE COURT:**  Oh, no, not yet.  Not yet.

23            **MR. FEINBERG:**  Yeah.

24            **THE COURT:**  Actually, the second lawsuit -- am I

25  remembering correctly that the second lawsuit includes nVision

1    initially; and am I right also that the second lawsuit

2    initially only includes the notebook -- lab notebook trade

3    secrets?

4         **MR. FEINBERG:**  No.  It includes everything, but it

5    doesn't include the shareholders.

6         **THE COURT:**  Oh, okay.  So the initial lawsuit -- I

7    thought you attempted -- okay.  So the initial lawsuit includes

8    both the lab notebook, trade secrets and the additional trade

9    secrets; but it only names nVision as a Defendant.

10        And then at some point you file an amended complaint, and

11   the amended complaint adds the shareholders.

12        **MR. FEINBERG:**  Right.

13        **THE COURT:**  And the new lawsuit you said was filed --

14   the second lawsuit was filed some time in May, and the

15   shareholders were added, what, some time in June?

16        **MR. FEINBERG:**  May/June.

17        **MR. GRIMSRUD:**  May 22nd, I believe.

18        **THE COURT:**  May 22nd.  And -- whoever said that, the

19   first -- the second lawsuit, when was it initially filed?

20        **MR. GRIMSRUD:**  The second lawsuit was initially filed,

21   Your Honor, on April 23rd.  And then the shareholders were

22   added May 22nd.

23        **THE COURT:**  Okay.  So the -- the purpose of the second

24   lawsuit is -- it is almost a -- sort of a prophylactic thing.

25   To the extent I'm unable to get the additional trade secrets in

1    the first lawsuit and to the extent I'm unable to get nVision

2    in the first lawsuit, I need to file the second lawsuit.

3           **MR. FEINBERG:**  It is really the latter.  It is really

4    the issue of do we have the right Defendants.

5           **THE COURT:**  It is really the issue of do we have the

6    right Defendants?

7           **MR. FEINBERG:**  Yeah.  Do we need to have nVision.  It

8    is less about beefing up the trade secrets because we are still

9    early in the case; more about do we need nVision because

10   nVision still exists.

11          **THE COURT:**  Okay.  And so from your standpoint the

12   first lawsuit and the second lawsuit are the same case other

13   than -- you know, and you have added nVision, but it's -- it's

14   the same case and then you have added the shareholders.

15          **MR. FEINBERG:**  Same case with pleadings that have

16   moved over time as our theories have evolved; but, yes, not

17   until we come to the shareholders and, of course, that's

18   different.

19          **THE COURT:**  Okay.  Okay.  So do I have -- I will

20   ask -- I mean, I have been speaking mostly with Mr. Feinberg

21   here.  Let me ask, I guess, Mr. Grimsrud or whoever, have I

22   basically described the chronology correctly?

23          **MR. GRIMSRUD:**  Yes, Your Honor, you have.  One

24   additional detail on the shareholders, though, was this issue

25   actually came up in January when Mr. Feinberg said he wanted us

1    to consent to add the shareholders to the first case.  This

2    was --

3              THE COURT:  Okay.

4              MR. GRIMSRUD:  -- before the February 10th deadline to

5    amend.  And we said that is not appropriate for a number of

6    reasons.  You shouldn't add them.  We won't consent.

7         And then that deadline came and past.  So by the February

8    deadline to amend, we thought the shareholder issue was gone,

9    off the table.  And then -- so that's why we were particularly

10   surprised when they were added to a new lawsuit on May 22nd

11   after having had this discussion back in January about not

12   having them in the case.

13        So that's the additional detail I would add on that.

14             THE COURT:  Okay.  All right.  So on the -- so -- but

15   there -- so the shareholders have moved to dismiss for failure

16   to state a claim.

17             MR. FEINBERG:  One shareholder.

18             THE COURT:  One shareholder, with the understanding

19   that the ruling on that question would affect all the

20   shareholders; right?

21             MR. FEINBERG:  That's my hope.

22             THE COURT:  And -- but have the shareholders also

23   argued -- I think the answer is no, but I want to make sure I

24   didn't miss it -- Mr. Freitas, did the shareholders ever

25   argue -- have you argued that this lawsuit against the

1    shareholders is sort of improper end-run around the scheduling

2    order in the first lawsuit?

3         MR. FREITAS:  So, Your Honor, that point has been made

4    in the joint submissions by Boston Scientific and the other

5    Defendants.

6         The point has not been -- it was not raised in the motion

7    to dismiss, but that's one of the arguments that we on the

8    Defense side have made in connection with the other matters

9    before the Court.

10        THE COURT:  Okay.  Could you have -- I mean, could you

11   have just -- I mean, maybe you didn't need to, but I'm just

12   curious.  I mean, could you have -- could you have moved to

13   dismiss the shareholders from the second lawsuit on the ground

14   that sort of claims are barred by the fact that -- BioCardia

15   failed to timely name them in the first lawsuit?

16        MR. FREITAS:  I think we could make that argument,

17   Your Honor.  And effectively, the Defendants have done so.

18        THE COURT:  What would it be?  I mean, what would

19   the -- if that had happened, if you had filed a motion to

20   dismiss on that ground?

21        MR. FREITAS:  I think it would be a Rule 16 argument,

22   Your Honor; that the Court had issued a scheduling order and

23   good cause wasn't shown for modifying the scheduling order; and

24   the action of effectively amending by adding new parties after

25   the deadline in the absence of good cause was not consistent

1   with the standards of Rule 16.

2         **MR. FEINBERG:**  Your Honor, this is argued by both

3   sides in the motion to consolidate.

4         **THE COURT:**  Right.  But sometimes you can add -- I

5   mean, sometimes, you know, when a Court -- if a Court denies a

6   motion to amend the pleadings to add a party, or what have you,

7   it is appropriate for the Plaintiff to file a second lawsuit

8   against that party; right.

9      I mean, sometimes the answer is:  Well, this is -- you

10   know, it is not that you are categorically barred from seeking

11   to vindicate that claim, but it is just that we are not going

12   to make it part of this lawsuit because it is too late to make

13   it part of this lawsuit; right.

14         **MR. FEINBERG:**  Yeah, Your Honor --

15         **MR. FREITAS:**  Certainly one of the.

16         **THE COURT:**  Hold on.  I'm talking to Mr. Freitas.  Go

17   ahead.

18         **MR. FREITAS:**  That is certainly one of the paradigms

19   that can fit a given situation, Your Honor.

20         **THE COURT:**  But -- and so -- but with that -- does

21   that fit here, I guess, is the question?

22         **MR. FREITAS:**  Your Honor, we don't think it does.

23   Mr. Grimsrud has pointed to one of the reasons why.  If we are

24   focusing on the shareholders, this issue was brought up before

25   the deadline.  There was a substantive dialogue.

1        Mr. Grimsrud explained that we responded that it wouldn't

2   be proper.  We didn't just say "it wouldn't be proper."  It was

3   an actual substantive dialogue on the point that involved some

4   of the discussion that is in the eXXclaim motion to dismiss.

5        So in this context, we think that the argument is

6   stronger.  It wasn't raised in the motion to dismiss.  It is

7   otherwise before the Court and --

8            THE COURT:  Yeah.  But it seems like if I agreed with

9   that argument, then the -- the solution to the problem is to

10  dismiss the shareholders from the second lawsuit on the ground

11  that it is an improper end-run around the scheduling order in

12  the first lawsuit; not to dismiss the shareholders on the

13  grounds that there is -- there can be no claim for a

14  constructive trust against them.

15           MR. FREITAS:  I think either ground would be viable,

16  Your Honor.  And this is -- I don't think this is one of those

17  things where there is a clear answer about what should happen.

18  I follow the logic the Court is expressing that before we get

19  into the content of the pleading, we have to know whether the

20  pleading is proper at all.  And certainly that has a logical

21  ring to it.

22       But I think that there is an aspect of discretion that is

23  associated with the Rule 16 issue, and I don't think that's

24  true with the Rule 12(b)6 issue.  A claim is stated or it's

25  not, and that is a black and white kind of thing.

1          On the other issues, the Court has to assess what has

2     happened and then exercise some judgment about it.  So it is a

3     different kind of inquiry.

4          **MR. FEINBERG:**  May I respond?

5          **THE COURT:**  Not quite yet.  But the problem is -- I

6     mean, you know, you filed this motion to dismiss on the ground

7     that there is a failure -- you know, that they can't get a

8     constructive trust and the -- their answer in part is well, you

9     need to -- if you dismiss, you should give us leave to amend.

10          And oftentimes it is hard -- I mean, maybe this is a case

11     where it would be appropriate to dismiss with prejudice right

12     now because it is so obvious that they can't get a constructive

13     trust against the shareholders -- but, you know, it would be

14     somewhat unusual to dismiss with prejudice without, you know,

15     without having -- you know, without giving them a chance to try

16     to amend if they want, whether it is to better explain why a

17     constructive trust is appropriate in a situation like this or

18     to assert some other theory for why they have an action against

19     the shareholders.

20          And so I guess I find myself wondering why you took us

21     down that road instead of saying, you know -- initially, you

22     know in the first instance you should dismiss us because the --

23     you know, because they had to -- if they wanted to pursue a

24     claim against us, they needed to name us in the previous

25     lawsuit.  And they -- and they didn't do that and they blew the

1  deadline and you shouldn't let them make an end-run around the

2  scheduling order.

3       And in the alternative, they don't even state a claim or

4  maybe you would say and another reason why you shouldn't let

5  them make an end-run around the scheduling order is because

6  they -- you know, they have not articulated any sort of claim

7  against the shareholders in their proposed -- I mean, in

8  their -- in their -- in their amended complaint in the second

9  lawsuit.

10       **MR. FREITAS:**  I think the simple answer, Your Honor,

11  is that on the end-run point, we weren't sure what the Court

12  would think.

13       On the other point, we felt very confident that no claim

14  was stated or could be stated.  And we were looking for

15  certainty.  We wanted to bring it to a conclusion.  We didn't

16  want anything to linger.  We don't want the shareholders with

17  this hanging over their heads, and we thought we had a real

18  clear way to take care of it, as a practical answer rather than

19  a legal one, Your Honor.

20       **THE COURT:**  So I will tell you that it seems like to

21  the -- to the extent you are requesting -- and maybe -- maybe,

22  you know, we can -- maybe a request for dismissal on the

23  end-run grounds is embedded in the papers on a motion to

24  consolidate.  I don't know.  I have to go back and sort of sift

25  through those.

 1          But, you know, I'm inclined to agree with you pretty

 2     strongly that they have not stated a claim against the

 3     shareholders.

 4          So the only question for you is what -- what is the

 5     argument for not giving them leave to amend?

 6          **MR. FREITAS:**  Our argument, Your Honor, is that an

 7     amendment would be futile.  And we base that both on the big

 8     picture, what the legal and factual context is, and on the

 9     things they offer in an attempt to obtain leave to amend.

10          And as we see it, they say a couple of things.  First,

11     they say:  Well, okay.  Constructive trust isn't going to work

12     out, but we think that we probably have alleged unjust

13     enrichment; and we want leave to amend to say that more

14     clearly.

15          Well, as we have explained in our papers, Your Honor, that

16     is the same salami in a new wrapper.  It is the same problem.

17     Unjust enrichment isn't a cause of action.  It is the same

18     problem that they haven't pleaded anything and they can't.

19          **THE COURT:**  Well, I mean -- let me add -- let me just

20     say that the reason I think you win on this motion -- you

21     should win on this motion to dismiss is because they haven't --

22     they haven't pled the elements of a constructive trust.

23          And I'm having a difficult time imagining that they will

24     be able to plead the elements of a constructive trust, but

25     whether you try to attach it to an unjust enrichment claim or

1  whatever, but -- you know, the question is why wouldn't I --

2  you know, why wouldn't I at least give them a chance to take

3  another crack at that?

4          **MR. FREITAS:**  So we understand the Court's obligation

5  under Rule 15 to think that issue through very carefully.  And

6  our view is that what has been put on the table by BioCardia to

7  explain the possibility of an amendment, is just as futile as

8  what is in the complaint.

9          They have thrown out these ideas about Delaware law.  They

10  have thrown out the idea of making a shareholder -- cost

11  shareholder liable for the acts in the company.  And they

12  dangled the idea that they might be able even to allege

13  wrongdoing, but they don't explain how.

14          And it's very clear that the pleading they filed was

15  premised on the idea that the shareholders did nothing wrong.

16          So the suggestion that somehow they might be able to say

17  they did something wrong, it's a significant departure from

18  what is pleaded.  It isn't backed up with anything.  There is

19  no allegation of a conspiracy or something like that.

20          They just simply say they want to drag the shareholders

21  into this.  And one way to do that would be to allege they did

22  something wrong, but they haven't (garbled audio) plausible

23  indication that they can do so within the bounds of Rule 11.

24          **THE COURT:**  Okay.  Give me -- hold on one quick second

25  I'm just reading something.

```
 1                    (Pause in proceedings.)

 2         THE COURT:  Okay.  So I guess what I will -- maybe I

 3    will turn to Mr. Feinberg on the constructive trust issue and

 4    just ask, you know, how do you think you have stated a claim

 5    for constructive trust against the shareholders?  And I also

 6    want to know to the extent that you haven't stated a claim,

 7    what would you -- what would you do to attempt to state a claim

 8    against the shareholders?

 9         MR. FEINBERG:  I will do that in a second.  Can I

10    respond to your end-run question?

11         THE COURT:  Sure.

12         MR. FEINBERG:  So we looked at all the cases, and I'm

13    sure the other side did too.  The cases that were raised by,

14    what we will call, the Defendants all have to do with claims

15    against the original Defendants.

16      I don't know of any case law that says you can violate a

17    scheduling order, which has a limitation for when you can bring

18    in new claims into case one, by suing other people in case two.

19    I have looked.  I couldn't find it.  I'm not saying a case

20    doesn't exist, but I couldn't find it.

21         THE COURT:  Well, I had a situation like that in a

22    case.  Let me see if I can remember it.  It was a case -- it

23    was a 1983 case.  It was a civil rights case.  And, you know,

24    it wasn't exactly the same fact -- it wasn't exactly the same

25    fact pattern but I will -- I think it is a useful example
```

1    anyways so I will describe it to you.

2           **MR. FEINBERG:**  Okay.

3           **THE COURT:**  The Defendant was the City of San Pablo.

4    And I can't remember the name of the Plaintiff now, but it

5    was -- it was a case where the -- there was a -- they sent a

6    dog in.  They sent a police dog into an apartment because

7    they -- there was a report of burglary, and it ended up being

8    the Plaintiffs' own apartment and the dog attacked him.  And he

9    sued.

10      And the Plaintiff's lawyer -- there was a lot of -- there

11    was a lot of sort of strange lawyering going on in that case as

12    well.  And the Plaintiff's lawyer never named the individual

13    officer who sent the dog in.  Never named that individual

14    officer as a Plaintiff.

15      And then pursued litigation against the City of San Pablo

16    and, I think, the police chief.  And discovery happened and

17    then it -- you know, I think the discovery cut-off passed.  And

18    there was summary judgment motions.

19      And at a very late hour the Plaintiff attempted to name

20    the police officer as a Defendant in the case.  Well, the

21    police officer had already been deposed, you know, as a

22    witness, thinking he is just a witness, I guess, probably.

23      And then the -- the Defendant -- the Plaintiff realized

24    that they had a real problem with their claims against the

25    City.  So they tried to amend -- to add the police officer.

1    And I, you know, I said absolutely not.

2        You know, the case was not similar in the sense that they

3    didn't try to file another lawsuit in federal court against the

4    police officer.  But you better believe that had they tried to

5    file another lawsuit against the police officer in federal

6    court, I would have dismissed that in a heartbeat because it

7    was an inappropriate end-run around their -- the scheduling

8    order in the first case and their total failure to name the

9    police officer in the first case.  That would have been totally

10   inappropriate to file a separate lawsuit.

11       And, in fact, they went on to try to file a separate

12   lawsuit against the police officer in State court.  And, you

13   know, I'm sure that the State court is going to dismiss that if

14   they haven't already because you -- the point is it's not res

15   judicata, right, because there is no judgment in the first

16   case; but it's -- you know, I think the concept that applies at

17   least in part -- it is a Rule 16 issue, like Mr. Freitas said;

18   but I think it is also like an issue of -- I think the concepts

19   from the improper claims splitting doctrine come into play;

20   right.

21       You should have -- you know, it is almost like you have

22   two actions pending, and you shouldn't have two separate

23   actions pending in two separate federal cases when you could

24   have brought the stuff from the second action in the first

25   action.

1        And, you know, now that the deadline has passed in the

2   firsts action, you are bringing the second action.  It seems

3   improper.

4        So, I mean, I will say that I haven't -- I haven't quite

5   wrapped my head around this yet.  I'm kind of thinking out loud

6   on this point, but it does seem like an improper end-run around

7   the -- to me, I guess I will put it this way:

8        It seems to me like what you should have done is said:  I

9   didn't name the shareholders in time, and I didn't name -- and

10  I didn't -- I didn't add these trade secret claims, these

11  additional trade secrets, in time.  And so I'm going to go hat

12  in hand to the Court and try to get this scheduling order

13  amended so I can add the shareholder as Defendants and so I can

14  add nVision as a Defendant and so that I can add these

15  additional trade secrets.

16       And if I'm not allowed to do that, you know, I guess,

17  that -- you know, I'm out of luck -- if the Court doesn't give

18  me permission to do that, I'm out of luck because I blew my

19  opportunity to assert these claims and to -- to assert claims

20  against these particular Defendants.

21       **MR. FEINBERG:**  If you are going to go that route, I

22  would like a chance to brief it because I think it is not

23  correct, Your Honor.

24       Claims has to be the same Defendant.  I don't think there

25  has ever been a case like -- I haven't found one -- where you

1    can be -- have improperly split a claim by suing two different

2    people.  There is -- the reason that people try to amend the --

3         **THE COURT:**  That may be right.  And I want to make

4    clear that the point -- the comments I just made, sort of

5    thinking out loud; right.  So I would -- I would give you an

6    opportunity to brief that before going down that road, but go

7    ahead.

8         **MR. FEINBERG:**  And I think the reason that you wind up

9    in -- with the amended pleading issue, as opposed to the new

10   lawsuit issue, is largely statute of limitations which we don't

11   think we have.

12        But if you are allowed to amend, you get your earlier

13   filing date; whereas, if you file a new case, you are stuck

14   with whatever the filing date that you have got now.  And we

15   just concluded there wasn't an intervening issue between the

16   two filing dates.  And, therefore, doing what we did and asking

17   the Court to consolidate was the most efficient way of trying

18   to get this thing all to a head.

19        The issue on whether we could allege wrongdoing.  I

20   think -- and now I'm trying to directly answer the question

21   that I diverted you from.

22        So, first, I think unjust enrichment, we have gone back

23   and forth with the parties saying it is or it isn't a separate

24   claim.  I do ask the Court to review the case law.  The

25   Defendant correctly cited --

1    **THE COURT:**  Let's assume it is a separate claim.

2    **MR. FEINBERG:**  Okay.

3    **THE COURT:**  How do you -- how do you meet the elements

4 of the constructive trust here?

5    **MR. FEINBERG:**  Okay.  So let's sort of look at the --

6 at what happens from our point of view.  From our point of

7 view, nVision is formed.  It actually turns to be formed in

8 2009 but we didn't know that.  She started working at BioCardia

9 in 2008.  She formed it in 2009 in Delaware and didn't register

10 it in California until after she left in 2012.  We didn't know

11 that even when we were filing these briefs.

12   We have only named institutional shareholders.  I think

13 that if you -- if we can show that the shareholders -- these

14 are professional investors.  And, in fact, they are more than

15 just professional investors they are professional investors in

16 the medical device field.  So they know a lot.  What they saw

17 or could have seen was unavailable to us because we were not an

18 investor and weren't offered the opportunity to invest.

19   What they could have seen is a -- and you reference this

20 at the beginning of the argument -- a whole bunch of at least

21 smoking guns, things that should have alerted these

22 professional investors that nVision might be based on

23 intellectual property that didn't belong to them.  And they

24 don't have to know it, but it might be based on intellectual

25 property that didn't belong to them.

1        And let's assume that we can prove that.  At least as to

2   some of them, maybe all.  But we -- and unless something is

3   very odd here, they did due diligence.  These are very

4   sophisticated investigators.  Some of them are world famous

5   like Kleiner.

6        So they are faced with an opportunity to invest in a

7   company.  Let's assume they do due diligence.  We don't know

8   yet.  And they discovered the red flags, warning bells,

9   whatever you want to call it.  And they proceed to invest

10  anyway.  They have taken the risk that it will turn out that

11  the -- that nVision has contaminated IP; okay.

12       Now, I want to pause -- it is always nervous making to go

13  to alternative universes, but indulge me here.  Assume that

14  BioCardia had found out about the -- the issues we are

15  trying -- that underlie this lawsuit before nVision was

16  purchased by Boston.

17       As a matter of economics, had we sued -- just sued at this

18  point, even before the Court entered judgment -- the value of

19  the shareholders' stock -- just plain economics -- would have

20  diminished by the value of the IP that it misappropriated.

21       So if nVision had been worth a dollar, when we sued them,

22  maybe the IP was half of the value, so -- it is just easy

23  numbers -- the company would drop to 50 cents.  And it turns

24  out that their stock in nVision would drop proportionally,

25  assuming economic principles actually apply in the real world.

1          So what happened here is they got out first; okay.  So the

2     shareholders sell their stock.  Again, assume that we can

3     prove -- we can certainly allege.

4          **THE COURT:**  When you say "the shareholders sell their

5     stock," what do you mean?  The shareholders get -- sell their

6     stock to Boston Scientific?  Is that what you are saying?

7          **MR. FEINBERG:**  Right.  Yes, that's -- what effectively

8     happened is that Boston Scientific created a merger subsidiary,

9     and that subsidiary bought all the stock of the investors.

10         So because of the timing issue the investors got to keep

11    the profits they made under our theory -- under our theory of

12    the facts -- that valued nVision as if its intellectual

13    property was its own.  Whereas if we managed to sue them before

14    that happened, presumably the value of the nVision stock, their

15    stock, would have been reduced by at least some, you know,

16    present value, risk adjusted, that the IP didn't belong to

17    nVision.

18         So the question here is from an equitable point of view,

19    and I'm just -- not unjust enrichment, if you read the cases,

20    constructive trust looked to be as broad as the deep blue sea.

21    They are designed to create equity.

22         And the question is can the shareholders on our -- and we

23    have suggested some of these facts in detail with -- not just

24    what we think we can allege but where we can tie it to -- is

25    it -- is it so far to say that a constructive trust can't be

posed on sophisticated investors who took a risk -- I know you
do patent litigation like everybody -- all of us in the
Northern District -- I suspect everybody here does.

Can they be willfully blind?  Can they say:  Okay.  There
is an issue here.  We are going to ignore it; and we got lucky
because by the time BioCardia discovered it, we had managed to
sell their stock.  We can argue the legal issues, and we can go
into whether -- I think --

THE COURT:  So what -- okay.  So I -- I understand
what you are saying.  What, though -- I mean, so when did --
when did nVision get founded?

MR. FEINBERG:  Well, we didn't know this; but
apparently it was founded in 2009.  We thought it was founded
in 2012.  It was 2009.

THE COURT:  Okay.  And Sarna leaves BioCardia when?

MR. FEINBERG:  Beginning of 2012.

THE COURT:  And she goes -- so she is not the founder
of nVision?

MR. FEINBERG:  She is.  She founded it in 2009.

THE COURT:  In secret?

MR. FEINBERG:  Yeah, well in secret.  She didn't tell
us.

THE COURT:  So nVision was founded -- she founded
nVision three years before she left BioCardia and --

MR. FEINBERG:  Two and a half.  Two and a half.

1           THE COURT:  And you never knew about that?

2           MR. FEINBERG:  We never knew about that.  She

3    registered in Delaware.  Nobody would have looked.  She

4    actually didn't register in California until after she left.

5    But if she -- how would you -- why would you look for that?  I

6    mean, I guess --

7           THE COURT:  So nVision -- so she founds nVision while

8    she is at BioCardia.  She leaves BioCardia in 2012.  And I

9    assume there is an announcement that she is leaving BioCardia

10   and going to nVision?

11          MR. FEINBERG:  I don't remember if there is an

12   announcement.  There were certainly --

13          THE COURT:  It was in the public realm, I assume;

14   right?  I mean, I assume she is involved in the sort of touting

15   of nVision at that point?

16          MR. FEINBERG:  I don't think there was a touting of

17   nVision.  We certainly knew she left.  And the facts are that

18   people at BioCardia knew she was interested in women's

19   gynecological health even before they hired her.

20      So eventually it becomes public.  Let's say 2013, '14, '15

21   I'm not exactly certain when.

22          THE COURT:  What becomes public?

23          MR. FEINBERG:  That she has nVision, and that it is a

24   company focused on female gynecological health, in fact.  So

25   somewhere in that timeframe --

1          THE COURT:  Okay.

2          MR. FEINBERG:  -- it becomes public.

3          THE COURT:  Okay.  So when does Boston Scientific buy

4     the company?

5          MR. FEINBERG:  If I recall correctly, April of 2018.

6          MR. GRIMSRUD:  That's correct.

7          THE COURT:  Okay.  Sorry, what?

8          MR. GRIMSRUD:  That's correct.  April of 2018.

9          THE COURT:  Okay.  And -- and what you are saying is

10    for the investors, who were obviously doing their due diligence

11    before April of 2018; right?

12         MR. FEINBERG:  They did it probably in 2012.  These

13    are investors in nVision.  These are -- nVision wasn't a pop-up

14    company.

15         THE COURT:  Right.

16         MR. FEINBERG:  These are private PCs who invest in the

17    beginning.

18         THE COURT:  So what are the -- oh, right.  So sorry

19    they are doing their due diligence on nVision, not on the

20    merger.  I got confused for a second.

21         So the investors are doing their due diligence on nVision.

22    And you are saying they should have seen at that time red flags

23    about -- about the possibility that the -- I think what you --

24    I think the way you put it is that the trade secrets were

25    contaminated.  Is that what you said?

1          **MR. FEINBERG:**  Yeah.  So I was -- many years before

2  having my own firm as Mr. Freitas has his, I was a Silicon

3  Valley lawyer and litigator, and we were brought in to do the

4  due diligence by the corporate guys precisely because of this

5  sort of issue.

6          And if I had seen that the patents were applied for while

7  she was still working for someone else and if I had known the

8  company was -- was founded, you know, six months or so after

9  she joined BioCardia, I would have at least wondered what's

10  going on and I would have asked some questions.

11          I mean, it doesn't necessarily mean that she did something

12  wrong, but it sure looks odd.

13          **THE COURT:**  And if you were doing your due diligence

14  and you had asked those questions, what questions would you

15  have asked and what would the answers have been?

16          **MR. FEINBERG:**  I would have brought --

17          **THE COURT:**  On your theory of the case -- on your

18  theory of shareholder wrongdoing.

19          **MR. FEINBERG:**  So in my theory of shareholder

20  wrongdoing, I -- and these guys are some pretty powerful

21  folks -- with billions of dollars at their disposal.  I would

22  have brought in an IP team.  And I would have said:  We need to

23  be certain that this -- before I throw millions of dollars into

24  this company, I need to be sure that the intellectual property

25  actually belongs to it.

1          And had I done the due diligence -- I think if Mr. Freitas

2     had done the due diligence.  I can't speak for others -- there

3     would have been concerns.

4          And you would have said:  Well, now wait a minute here.

5     She had a contract.  I would have assumed -- and it turns out

6     to be true -- that she had an employment agreement that had an

7     assignment of invention.  It turns out BioCardia was a willful

8     client.  It is the most common form of the assignment of

9     inventions.  And I think it covers it.  You know, there is

10    2870; but this is awfully close stuff; right.

11         I mean, and she had a duty to disclose the inventions to

12    BioCardia even if she claimed they weren't covered by her

13    assignment so that BioCardia could evaluate it for itself.  She

14    didn't do that.

15         So I would have sat her down and tried to figure out what

16    is going on here.  And if it were me, based -- without talking

17    to BioCardia because obviously that's problematic -- but if it

18    were me, I would have gone back to the investors and said:

19    There is something here.  I'm not sure how bad it is.

20         **THE COURT:**  Okay.  And so the reason -- what are the

21    reasons -- give me some -- the precise reasons why -- the

22    precise things that would have caused you to say "there is

23    something that might not be right here."

24         **MR. FEINBERG:**  Okay.  So I will start from the

25    beginning.  And I'm going to assume they know what we know

1    because they would have had access to Ms. Sarna.

2        So the first thing that I would have looked at is said:

3    Wait a minute.  She starts working for BioCardia in 2008.  She

4    forms this Delaware company in 2009.  It is very close

5    technology.  You know, the basic difference is whether the

6    catheters are focused for cardiac or gynecological purposes.

7        THE COURT:  Okay.  So you are saying that just by --

8    just by virtue of the fact that BioCardia is working -- it has

9    the device, the heart devices, and nVision is working on the --

10   on the fallopian tube devices and the devices are similar, you

11   would be able to tell that effectively BioCardia's devices are

12   being re-purposed for women's reproductive health?

13       MR. FEINBERG:  You are going further than I'm prepared

14   to go, Your Honor.

15       THE COURT:  Okay.  Okay.

16       MR. FEINBERG:  All I'm saying is I would look at the

17   fact that the company was founded two-and-a-half years before

18   she leaves BioCardia, which is extremely unusual.

19       I mean, it is very, very common in the valley for people

20   to start up companies while they are still leaving.  And, you

21   know, we have Business & Professions Code 16-600, which means

22   they have a right to compete.  So it is common.

23       It is not common that they start the company for

24   two-and-a-half years and never tell anyone.

25       Then -- then, I would have looked at -- the patent app

says there is a provisional application that is referenced in
our motion to amend.  We still haven't seen that.

        THE COURT:  Can I ask you one -- sorry to interrupt --
but is that an important fact in your narrative, that the --
that nVision was founded in 2009 versus 2012 or is it -- is it
the situation where when you are doing your due diligence, if
someone is leaving a company like BioCardia -- and let's say
they are simultaneously finding a new company, right -- and
they are using this product that seems kind of -- it seems like
there is at least a possibility that the product is being
re-purposed for a different use, would that itself put you
on -- sort of put you on notice that you need to drill down on
whether the trade secrets are contaminated or is it just
because the company happened to be founded in 2009?

        MR. FEINBERG:  No.  If the company was founded in 2009
and she founded a company and left it on the shelf and did
nothing, it's -- I suppose, it just shows that she can see far
ahead.  I mean, that is not itself actionable.

    The problem is because they should have known because we
got from Boston a document --

        THE COURT:  I'm saying change the story and say that
she did not found -- she did not establish the company in 2009.

    Let's say that she established the company around the same
time that she was leaving BioCardia in, what was it, 2012?

        MR. FEINBERG:  Yeah.  So the alarm bell --

1          **THE COURT:**  You are placing a lot of emphasis on the

2    fact that the company was founded in 2009.  And the question

3    I'm asking you is:  Does that really matter?  I mean, wouldn't

4    you want to do your due diligence even if she founded the

5    company around the same time that she was leaving BioCardia and

6    all the other facts are the same?

7          **MR. FEINBERG:**  Absolutely.  It is just the alarm bell

8    is ringing a bit louder.

9          **THE COURT:**  Okay.

10         **MR. FEINBERG:**  And then -- then I would have seen she

11   had already assigned what is called a provisional

12   application -- these are creatures of relatively new origin,

13   but it is a patent application.  You file it in secret.  It

14   doesn't have claims.  It is designed to get priority when you

15   file an actual patent application.  That is done in 2009.

16         At this point the alarm bells are ringing pretty loudly,

17   and I'm wondering where the fire is.  And then there is more of

18   it.  And then she is talking to VCs while she is still one of

19   our employees.

20         Do any one of -- probably the patent apps, if I had seen

21   the patent apps that are filed as early as 2009 -- and right --

22   so let's divide the world into two parts.  Before she leaves.

23   After she leaves.  Okay.

24         Before she leaves, the alarm bells are ringing.  I'm

25   assuming -- if I'm the due diligence leader, I assume there is

1    a problem because she is doing all this stuff while she still

2    works for us; and it is awfully close.  And we will have a

3    fight with Ms. Sarna's lawyers, who are excellent lawyers,

4    about how close is close enough.  But it is close.

5         The -- afterward, she has got, you know, the protections

6    of 16-600, right to compete -- but it would then -- I would

7    then start asking questions about how soon.

8         I will give you an example, a concrete example, in a case

9    I litigated years ago.  My client claimed to invent a device to

10   improve the capacity of an Applied Materials epitaxial reactor.

11   And his claim to me was he invented it three days after leaving

12   Applied; having worked on the reactors as a repair guy for a

13   decade.

14        And I said:  Gary, even if that's true, no one is going to

15   believe you; right.  It just sprung onto you the minute you

16   leave the company, and then you have the idea; and you form a

17   company?  That case was litigated.  It was settled.

18        But I would have alarm bells going off even if it is in

19   proximity to her departure; but while she is working for her

20   employer, this close, if I were a VC -- I'm a litigator,

21   Your Honor.  I'm kind of conservative by nature.  That's kind

22   of what we are -- I'm not sure I would have made the investment

23   at all as a litigator.  But it's not my call.  I'm just

24   advising the venture capital firm whether I think there is

25   risks.  And I would have said you bet.  And what is worse it is

1    not clear how we clear the risk; right.

2         I mean, you are looking at this.  You are looking at

3    BioCardia and what it does.  You are looking at when she

4    applies for patents.  You look at what nVision is doing.  And

5    you say:  I don't think you can ever clear the risk; right.

6    You can quantify the risk.  And you can -- many people, you

7    know, they -- there are a lot of people who are a lot braver

8    than I am, what investments they make.  Probably pretty much

9    everybody.

10        And people might say:  This is a risk we are willing to

11   take.  We think the company has enormous potential.  We are

12   getting a good deal on the price of the stock.  We now know the

13   risk.  We are going in anyway.

14        So let's assume that happened because these people are

15   really sophisticated.  Let's assume the facts turn out --

16             THE COURT:  Let me stop you there.  Okay.

17             MR. FEINBERG:  Yeah.

18             THE COURT:  At that point have they engaged in

19   wrongdoing?  I mean, you are saying:  Well, we are going to

20   invest in a company; and there is risk that there may be

21   problems with its IP.  I mean, assume that happens every day in

22   Silicon Valley.

23        I mean, if you are going to invest in the company and you

24   are concerned that there may be, you know, litigation about

25   the, you know, true ownership of the IP, that -- that alone

1    allows you to -- allows you to be hauled into court?

2          MR. FEINBERG:  So that's really the heart of it,

3    Your Honor.  It is not that alone; okay.

4       I agree that people take risks every day; all right.

5    Taking risks isn't unlawful.  It is -- we wouldn't --

6          THE COURT:  So then what is your theory of wrongful

7    conduct then?

8          MR. FEINBERG:  The wrongful conduct is -- the question

9    is:  Having decided to take the risk, are you responsible for

10   the consequences of that risk?  It is that simple.  In other

11   words, if I choose to take a risk, I know --

12         THE COURT:  But to me -- I mean, this is maybe just

13   too much of a layperson's reaction to it; but to me the risk is

14   that your -- you know, you are going to lose money.  And you

15   are a shareholder in this company.  And if you are -- you are a

16   shareholder in the company.  If there is litigation about the

17   ownership of the IP, you are going to lose money on your shares

18   because the company will be liable to the true owner of the

19   intellectual property.

20         MR. FEINBERG:  Okay.

21         THE COURT:  That's what it is really about, it seems

22   to me.

23         MR. FEINBERG:  So can I respond because I think you

24   have hit the key issue.  I think that is actually the key

25   issue.  So imagine that BioCardia had sued nVision before the

1    shareholders -- the institutional investors had sold the

2    company to Boston; okay.

3            **THE COURT:**  Okay.

4            **MR. FEINBERG:**  Economic theory, which you just

5    expressed, is that the value of their shares would have

6    diminished based on whatever the assessment was made of how

7    much the IP was impaired.

8        That shouldn't matter that they got their money out and

9    they made their profits before BioCardia sued, discovery claim

10   2.  Shouldn't matter.  The fact that they made money because

11   the wrongdoing hadn't been discovered when they sold the stock;

12   whereas, had it been discovered before they sold the stock,

13   they would have given up effectively the value in the company

14   because the company itself would be --

15           **THE COURT:**  I mean, that's a risk.  That is investment

16   risk.  I mean, I don't -- I guess I'm -- I'm not -- you know,

17   I'm not -- I mean, this may be an argument in favor of leave to

18   amend, you know, because -- you know, it may be that this

19   theory needs to be explored.  You know, more time needs to be

20   taken to explore the theory and to understand the theory.

21       But I guess my reaction right now is:  Well, so they --

22   they took a risk and -- that, you know, there may be dispute

23   about who owns this IP.  And the risk worked out for them and

24   sometimes it works out for investors and other times it

25   doesn't.

1     But it doesn't sound like what you are describing is

2  wrongdoing, the kind of wrongdoing that would result in the

3  imposition of the constructive trust on the money -- on

4  money -- and that is a separate issue that I'm not sure we need

5  to talk about right now -- but, you know, whether you were

6  seeking a constructive trust against the shareholders or

7  damages against the shareholders or whatever, I think the

8  question would be the same, which is what -- you know, why --

9  you know, how is it that the shareholders did anything wrong?

10     I mean, short of sort of plotting with Sarna to steal the

11  intellectual property of the company, which I don't think even

12  in this -- even in this scenario you have spun out here -- you

13  haven't said that -- I mean, I don't know.  Like, it's -- it

14  doesn't sound like you are describing wrongdoing to me.

15     **MR. FEINBERG:**  So the question -- the issue of

16  wrongdoing is -- would be recklessness; right.

17     So the question is whether the shareholders knew or should

18  have known that the company they were investing in and who they

19  hoped to profit from was based on someone else's IP; okay.

20     There is no question if this wasn't a corporation -- if

21  they had simply -- if they were the owners; right, if nVision

22  was owned by Ms. Sarna, sole owner -- and it wasn't a

23  corporation.  It was just nVision, LLC or -- not nVision, LLC.

24  It is nVision, a sole proprietorship, she sells it to Boston

25  for the same price.  Gets all the hundreds of millions of

1    dollars.   There is no question at that point you can get a

2    constructive trust on her; okay.   I don't think there is any

3    question; okay, on the proceeds, what Boston paid her because

4    we could track it directly to -- assuming we could -- we could,

5    as we allege, track it to the value of the IP, we can get it

6    from Sarna.

7        Why should it matter that the shareholders, knowing the

8    same thing, profited because the entity -- this isn't a

9    piercing the veil issue.   This is their direct knowledge.

10   They, as postulated, they knew or should have known that they

11   were investing in a company and they got lucky.   In fact, we

12   didn't sue until later.

13       Why should it matter that they managed to get out before

14   we sued?   And had we sued, their stock would have been devalued

15   by the same amount -- assuming economic theory is to be

16   believed, by the same amount on which we are seeking to impose

17   a constructive trust.   Why should it matter they got out first?

18           **THE COURT:**   At what point did -- at what point did

19   nVision start sort of advertising what it was working on?

20           **MR. FEINBERG:**   I'm not sure of the date but before --

21   before we sued, several years, I would guess to a degree.

22       I mean, there is a difference between advertising what you

23   are doing and in general terms and putting out enough

24   information that you would know that it was based on BioCardia

25   IP.

1    And that's going to be a fight.  There is going to be a

2  major fight in this case over statute of limitations and when

3  BioCardia knew or should have known.  That is going to be a

4  real fight.

5         **THE COURT:**  And it seems like a lot of -- it struck me

6  as you were talking that a lot of the stuff you were saying

7  about the -- you know, about the investors sort of being on

8  notice that there was a potential issue here is that

9  cross-purposes with the arguments you are going to be making at

10  the summary judgment stage on statute of limitations.

11         **MR. FEINBERG:**  They look like it, but they actually

12  aren't.  So let me explain why.

13    BioCardia didn't have access to all the information the

14  investors had.  I'm not talking about the investors who were

15  relying on public information.  I'm saying when you do due

16  diligence, the reason you do due diligence is so you can get

17  access to things that aren't public.

18    They had knowledge early on well before anything was

19  public -- we allege or we seek to allege -- they knew -- they

20  were not in the same position we were.  They were in the

21  position of insiders or investors that are doing due diligence.

22    BioCardia was in the same position as Your Honor was;

23  right.  It doesn't know what is actually going on inside the

24  company, inside nVision.  But these all are factual issues, and

25  they are going to be hairy.

1    I mean, I'm not saying, Your Honor, this if we are able to

2    properly plead the claim that, therefore, the claim prevails at

3    trial or even at summary judgment.  It is a hard claim.  But I

4    think it certainly -- it states a claim or we could state a

5    claim based on, at a minimum, that the shareholders -- the

6    institutional shareholders had the ability to do due diligence

7    knew or should have known.

8        And why should they profit you are saying?  Well, it's

9    a -- you said earlier:  Well, you know, investors take risks

10   and this risk panned out.  Why should they be held for it?  And

11   the answer is because the risk they were undertaking wasn't the

12   risk that the market was going to go down or someone else will

13   beat them to the market.  I mean, those are all risks you

14   undertake when you make an investment.

15       But this is a risk if we are right, that the companies IP

16   is based on someone else's.  That's a different kind of risk.

17   And the questions are:  Should they be able to profit from

18   taking that risk at the expense of the company whose IP it was.

19       **THE COURT:**  Okay.  Let me ask you -- give me a second.

20   I want to gather my thoughts here.

21                  (Pause in proceedings.)

22       **THE COURT:**  Let me ask you, Mr. Feinberg, let me ask

23   you one other question that -- about the end-run issue that we

24   have been talking about.  I sort of threw out the theory of

25   maybe we should think of the second lawsuit against nVision as

1   an improper end-run around the scheduling order in the first

2   lawsuit.  And your response to that was it is a different

3   party, and so we can't think of it that way.

4        What about, though, the addition of the -- the invocation

5   of the additional trade secrets in the second lawsuit?  Do you

6   read that, you know, to the extent that I concluded -- and I

7   haven't given you a chance to argue against this hypothetical

8   conclusion yet.  I understand that -- but if I did conclude

9   that it was inappropriate to add the additional trade secrets

10  in the first lawsuit because you blew the deadline, would it

11  follow from that conclusion that the additional trade secrets

12  cannot be part of the second lawsuit?  Or would you have the

13  same -- would you make the same argument that, you know, it

14  doesn't matter that -- it doesn't matter as it relates to the

15  second lawsuit?

16       **MR. FEINBERG:**  So I want to respond two ways.

17       **THE COURT:**  Do you understand -- do you understand the

18  question?

19       **MR. FEINBERG:**  Yes, completely.  So I'm going to

20  answer your first question.  I'm going to answer sort of the

21  embedded question.

22       They are two different lawsuits.  So the problem for us

23  would be that if the Court decided that we can't add additional

24  trade secrets to the first case, okay, and we win on the

25  additional trade secrets in the second case, we would win

1   against nVision and the shareholders, if they were still in the

2   case; but we wouldn't win against Sarna or Boston.

3        So that's the problem for us.  And, you know, as you can

4   see from the proposed two CMCs, which have exactly the same

5   schedule and the parties have agreed that the discovery will be

6   used in both cases and won't be duplicative and all the rest --

7   we are not due to close fact discovery until February, assuming

8   the Court adopts the proposed schedule.

9        So I think it would be perfectly appropriate for us to

10  adjust the disclosure.  Remember the trade secret disclosure is

11  designed to govern discovery.  I mean, these things

12  historically --

13          THE COURT:  Let me make sure I asked the question

14  right.  And so this is the -- this is a hypothetical that

15  I'm -- I'm sort of considering.

16       Let's say -- let's say the issue of consolidating the

17  cases is not on the table.  Let's say nobody wants the cases to

18  be consolidated.  And so we have these two -- we are sitting

19  here with these two separate lawsuits; okay.

20          MR. FEINBERG:  Uh-huh.

21          THE COURT:  And in the first lawsuit you have sued

22  BioCardia -- again, I'm treating it as yours for purposes of

23  discussion.

24          MR. FEINBERG:  Yes.

25          THE COURT:  Sorry.  You sued Boston Scientific.

1   And --

2                       (Pause in proceedings.)

3        **THE COURT:**  And in the second lawsuit you have sued

4   nVision or nVision, whatever you call it.  And in the first

5   lawsuit you blew the deadline on adding the trade secrets --

6   adding the additional trade secrets.  And I say I'm not

7   excusing that.

8     In that scenario -- you have already said that filing the

9   second lawsuit against nVision cannot be thought of as an

10  improper end-run around the scheduling order.

11        **MR. FEINBERG:**  Correct.

12        **THE COURT:**  And so is it -- is it your position also

13  that you could -- assuming the lawsuit always stayed separate.

14  There is no consolidation -- that you could proceed against

15  nVision on the additional trade secrets that you attempted

16  to -- unsuccessfully to add to the first lawsuit?

17        **MR. FEINBERG:**  Yes.  In fact, let's just take your

18  scenario further.  Let's assume that the first case goes to

19  trial, and then the second case goes to trial.  I think there

20  probably would be collateral estoppel issues, maybe both ways,

21  as to things that were asserted in the first case that were

22  also asserted in the second case; not res judicata because you

23  have different parties.

24     But in the second case I think we could and should -- and

25  as I read the law -- are able to raise the new issues unless

```
 1    you say that they can't be asserted in the second case for some

 2    reason.  But, again, we could have both sides could have --

 3          THE COURT:  But if you are saying that the first case

 4    goes to trial and there is a judgment in the trial, then the

 5    question would be:  Could these claims have been asserted in

 6    the -- you know, because the res judicata or issue preclusion

 7    applies to the claims that were -- but issue preclusion applies

 8    to issues that were actually litigated in the first case.

 9          MR. FEINBERG:  Yes.

10          THE COURT:  Preclusion applies to claims that were

11    brought or could have been brought.

12          MR. FEINBERG:  Yes.  And because they are different

13    parties, I don't think it applies.  So, I apologize, this is --

14          THE COURT:  What if the parties are in privity?

15          MR. FEINBERG:  I don't think it matters.  Different

16    entities.  I think nVision --

17          THE COURT:  Well, if the parties are in privity, then

18    claim preclusion applies.

19          MR. FEINBERG:  Boston decided to hold nVision out as a

20    separate company.  If it had merged it, it would be a different

21    story.

22          THE COURT:  Is that another way of just saying that

23    Boston Scientific and nVision are not in privity?

24          MR. FEINBERG:  Yeah.  Boston is the owner of nVision.

25    It owns the stock.  That's it.
```

1          **THE COURT:**  Okay.  Okay.  Let me tell you -- let me

2     tell you how we are going to proceed.

3          We are going to stop this hearing in about ten minutes to

4     11:00, and we are going to continue the hearing next week -- on

5     my law and motion calendar next week, assuming everybody can

6     make it.  I'm very hopeful that you can.

7          This is a very interesting case.  It is a very complicated

8     problem, and I want to talk -- I want to spend more time --

9     probably a lot more time talking about it.

10         And I have, you know, barely gotten to hear from the other

11    side.  It's been mostly Mr. Feinberg.  And I want to spend more

12    time thinking about it and talking to you about it.

13         So first question is:  Can you all -- can you all appear

14    on my civil law and motion calendar next Thursday at 10:00 a.m?

15         **MR. FEINBERG:**  I will -- hold on -- I don't dare check

16    my calendar on the computer because I don't know what will

17    happen to the Zoom conference.  So let me try.

18                    (Pause in proceedings.)

19         **MR. GRIMSRUD:**  We are --

20         **THE COURT:**  Sorry, what?

21         **MR. GRIMSRUD:**  For Boston Scientific, that works,

22    Your Honor.

23         **MR. FEINBERG:**  For BioCardia that works too.  We are

24    talking about the 23rd?

25         **THE COURT:**  Yeah.

1          **MR. FEINBERG:**  Yes, it works for us too.

2          **MR. FREITAS:**  And for Ms. Sarna, Fortis and eXXclaim,

3    that works as well, Your Honor.

4          **THE COURT:**  Okay.  And then what I -- what I think I

5    would like from you-all is I would like letter briefs on this

6    end-run question that we have been talking about.  And I'm

7    happy to try to articulate it again if anybody -- you know, if

8    anybody needs me to; but, you know, both as it relates to the

9    filing against the -- against the -- against -- is the second

10   lawsuit is it -- can we think about the second lawsuit as just

11   an entirely -- an end-run around the scheduling order in the

12   first lawsuit; both as it relates to the addition of nVision as

13   a Defendant and as it relates to the addition of the

14   additional, what the -- what BioCardia is calling the

15   additional trade secrets?

16       Does that -- do people get that from the -- you get the

17   question from the discussion that we have been having?

18          **MR. FEINBERG:**  Yes.

19          **MR. GRIMSRUD:**  Yes, Your Honor.

20          **MR. FREITAS:**  Yes, Your Honor.

21          **THE COURT:**  Okay.  I would like a letter brief before

22   the hearing -- before the continued hearing next week.

23          **MR. FEINBERG:**  How many pages and when do you want it?

24          **THE COURT:**  No more than ten pages.  And why don't we

25   say Tuesday of next week.

1          **MR. FEINBERG:**  Hopefully close of business,

2   Your Honor.

3          **THE COURT:**  Tuesday at 5:00 p.m.

4          **MR. GRIMSRUD:**  Yes, Your Honor.

5          **MR. FEINBERG:**  Thank you.

6          **THE COURT:**  So with that said -- and I think this is

7   the kind of situation where it is so complicated and there are

8   so many different balls in the air and it is a little bit like

9   a Rubik's Cube, that is worth everybody sort of stepping back

10  and sort of pondering all of this for a while and coming back

11  and talking about it next week.

12       I'm trying to think if I -- and I want to give at least a

13  few minutes now to what I'm calling the Defendants to respond

14  to any of this stuff.  And there will be more opportunity next

15  week.  But first let me just think if there is anything else --

16  any other thoughts that I have or questions that I have that

17  could be useful to you to ponder.

18                    (Pause in proceedings.)

19         **THE COURT:**  I mean, I will -- I will say this:  I

20  mean, this relates -- I think this is relevant to the end-run

21  question.  It is relevant to the -- you know, to the question

22  of whether the scheduling order in the first case should be

23  amended.  I don't think that the -- that the Plaintiff -- that

24  BioCardia has successfully stated a claim for misappropriation

25  of trade secrets as it relates to the additional trade -- what

1    is described as the additional trade secrets.

2        Whether I read -- whether I read the proposed amended

3    counterclaims in the first lawsuit or whether I read the --

4    the -- the first amended complaint in the second lawsuit, it

5    does not appear to me that BioCardia has stated a claim for

6    theft of those additional -- additional trade secrets, and it

7    seems to me that that may affect the decision about whether,

8    you know, on this end-run question and it certainly could

9    affect the decision about whether to grant the motion to amend

10   the scheduling order.

11       I'm not certain if this matters but I will share it

12   anyway.  As it relates to the motion to dismiss that was filed

13   back in January, I -- to the extent -- if it is not mooted by

14   the filing of an amended complaint, my -- my very strong view

15   is that the motion as it relates to the statute of limitations

16   claims would be denied.  This is a summary judgment fight; not

17   a -- not a motion to dismiss fight.

18       And it strikes me that it could very well -- you know, if

19   you put a gun to my head and made me bet, I would say it's a --

20   it's a summary judgment fight that the Defendants are going to

21   have a very good chance of winning at the end of the day.  But

22   it's not a -- it's not a motion to dismiss fight.  And that is

23   something, by the way, to the extent it remains relevant, I

24   don't need to hear argument on that -- on that issue.

25       It struck me probably that the motion to dismiss would be

1    granted with leave to amend.  That initial motion to dismiss to

2    the extent it were still relevant would be granted with leave

3    to amend on the correction of inventorship counterclaim.

4        And let me see.  Are there any other thoughts that I have

5    floating around in my head that would be worth sharing with

6    you-all?

7                        (Pause in proceedings.)

8            THE COURT:  I think that's probably it for now.  Do

9    the -- do you want to -- do the Defendants want to get some

10   airtime before we continue the hearing until next week?

11           MR. FREITAS:  Your Honor, I would just like to make a

12   couple brief points in response to Mr. Feinberg's remarks.

13           THE COURT:  Sure.

14           MR. FREITAS:  So as the Court pointed out, nothing --

15   or seemed to be pointing out, nothing that Mr. Feinberg

16   described amounted to a legal claim.  He was saying they took

17   some risks, and he thinks that he wouldn't have taken the risk

18   or he would have told his client not to take the risk.  But

19   that's not a cause of action.

20       Second --

21           THE COURT:  But why wouldn't it be -- why wouldn't it

22   be prudent to give -- even though it strikes me that you may

23   very well be right about that, why wouldn't it be prudent to

24   give him leave to amend?

25           MR. FREITAS:  So that is a much tougher fight for me,

1    Your Honor.  And the most that I can say about it is that

2    Mr. Feinberg's articulation of the state of affairs that might

3    exist is not the same thing as the articulation of something

4    that does exist in the real world.

5            THE COURT:  And something that they could allege

6    consistent with Rule 11.

7            MR. FREITAS:  That's right, Your Honor.  And so that's

8    my fundamental point that we could all --

9            THE COURT:  But -- right.  I hear what you are saying

10   but -- but the question for me is:  Can I conceive of any

11   possible thing that could add, you know, to state a claim

12   against the shareholders?  Not what will they add; right.

13           MR. FREITAS:  Along the lines that Mr. Feinberg is

14   describing, I think the answer is no because his legal theory

15   has no substance.  But there is some other important things

16   that probably aren't real important right now, but I wanted to

17   mention them because --

18           THE COURT:  Okay.

19           MR. FREITAS:  -- this issue about Ms. Sarna's

20   background and what she did, the Court got a one-sided

21   presentation about it; and there is a whole -- there is a whole

22   other story.

23       When Ms. Sarna showed up to interview at BioCardia, they

24   asked her what are you going to be doing and how do you see

25   yourself in five years.  And what she told them -- and this is

1   in an interview for her first job after college, her first

2   permanent job.  She said:  I will be running a women's health

3   company.  So right off the bat it was very clear about who she

4   was and where she was headed.

5        And all of that derives from an experience in her life,

6   something that happened to her when she was 13 and she had a

7   cancer scare, which has been highly publicized over the years.

8   And we cited these -- some of these articles in our motion to

9   dismiss back in January.  She was Forbes 40 under 40.  Highly

10  publicized.

11       And there is additional evidence that will come out about

12  her engagement with BioCardia on an ongoing basis.  The CEO,

13  Peter Altman, of BioCardia reached out to Ms. Sarna after she

14  was gone to link in with her.  The two of them were members of

15  a CEO group.  One of the senior executives of BioCardia

16  attended a presentation at which Ms. Sarna described nVision

17  and what the company was doing.

18       So there is a whole host of facts about what they knew at

19  the beginning, and what they knew at all times.

20       Now, the --

21       **THE COURT:**  What does that have to do with -- I

22  understand that that relates to your statute of limitations

23  issue -- you know, argument.  What does it have to do with,

24  though, whether she breached her contract?

25       **MR. FREITAS:**  So specifically, Your Honor, the fact

```
 1   that they knew about a breach of contract wouldn't mean there

 2   wasn't a breach; assuming there was one.

 3            THE COURT:  Right.

 4            MR. FREITAS:  But it does relate very directly to the

 5   statute of limitations and also to some of the flavor here;

 6   that she was doing something in secret.

 7        And that's the other point I wanted to make.  It was --

 8   the idea that the BioCardia -- BioCardia, referring to the

 9   heart, is in the same business as nVision, dealing with women's

10   health, is quite a stretch.

11            THE COURT:  Wait a minute.  I mean, but we know from

12   the lab notebook that BioCardia was working on this concept;

13   right.

14            MR. FREITAS:  Actually --

15            THE COURT:  Altman is the -- he is the CEO; is that

16   right?

17            MR. FREITAS:  He is the CEO, Your Honor.

18            THE COURT:  You have got the CEO showing pages of his

19   lab notebook.  You have got the CEO -- I mean, what is he doing

20   this as a hobby?

21            MR. FREITAS:  No, Your Honor.

22            THE COURT:  Have a lab notebook about how to

23   re-purpose the technology for, you know, detecting ovarian

24   cancer?

25            MR. FREITAS:  No, that's not what happened.  So, first
```

1  of all, Your Honor, it is disputed what happened with the lab

2  notebook.

3       **THE COURT:**  Okay.

4       **MR. FREITAS:**  So that is a bit of a leap but that's

5  their story.

6       **THE COURT:**  Okay.

7       **MR. FREITAS:**  So for now --

8       **THE COURT:**  And that is the story that I have to

9  assume is true.

10      **MR. FREITAS:**  Sure.

11      **THE COURT:**  For purposes of the initial stage of the

12  case.

13      **MR. FREITAS:**  But the lab notebook was prepared

14  something like ten years before this alleged dialogue took

15  place between Ms. Sarna and Dr. Altman.

16      So it's dated back around '99, 2000.  And the dialogue

17  allegedly took place in '11, '12, in that sort of range.  So it

18  was not in any respect a reflection of what was taking place.

19  And there is an overall context; parts of which are not really

20  disputed.

21      What happened was Dr. Altman was aware of Ms. Sarna's

22  interest in women's health, and there was a brief suggestion he

23  made that she should take on a project.  And there was an

24  interaction where this occurred.

25      However, he made it clear that her direct supervisors

1  would have to prove -- approve her taking on something that was

2  outside of her normal work at BioCardia.

3       And the evidence is pretty undisputed on this, I believe.

4  The supervisor said no, she is too busy with her day job.  And

5  the project never got under way.

6       **THE COURT:**  Okay.  All right.  I hear what you are

7  saying.  I mean, but that is sort of the question for another

8  day.

9       **MR. FREITAS:**  I agree, Your Honor.

10      **THE COURT:**  The question is what really happened is a

11 question for another day.

12      **MR. FREITAS:**  Yes, Your Honor.  I just wanted to point

13 out that the suggestion that there was something insidious

14 under way is something --

15      **THE COURT:**  Okay.

16      **MR. FREITAS:**  -- that is disagree with very

17 vigorously.

18      **THE COURT:**  Fair enough.  Fair enough.

19      **MR. GRIMSRUD:**  Your Honor, if I may for a moment.

20      **THE COURT:**  Yeah.

21      **MR. GRIMSRUD:**  From Boston Scientific's perspective,

22 you know, we do view this second lawsuit as an end-run around

23 and we appreciate the letter briefing and the continued hearing

24 next week.  We will talk more about that in a lot more detail.

25      And on the motion to consolidate, we just think it is

premature at this point given all the balls up in the air.  And
we will continue that discussion as well.

Just to paint the full picture -- because I know we were
going through kind of the history of things -- this is not
particularly relevant to, you know, what we are actually
talking about.

But just to give you the full picture, since Boston
Scientific acquired nVision, funding for nVision has stopped
and the clinical trials has stopped.  And this has been
publicly announced, you know, it is not going anywhere.  So I
just wanted to paint that full picture that this is not a case
either where there is going to be a product coming out from
nVision.

THE COURT:  What about as it relates to what the
Plaintiffs are calling -- what BioCardia is calling the
additional trade secrets?

MR. GRIMSRUD:  And that -- so I'm glad you asked that
too.  The 2011 patents that we have been talking about, those
were never used by nVision.  So nVision never developed a
prototype based on those products or if it did, it was, you
know, very much a true prototype.  It didn't go anywhere.

It was years later that Ms. Sarna and others at nVision
developed what I will call kind of a -- the nVision product
called Mako.  And our theory is that these additional trade
secrets they are trying to add in is a way to try to somehow

1    get to the Mako product, that is our best guess.

2        And these patents are from like 2016, '17, '18, much later

3    in time.  So we don't see any connection between Ms. Sarna's

4    work at BioCardia, any patent filings that happened while she

5    was also employed at BioCardia and nVision Mako device.

6        **THE COURT:**  So let me leave you with this -- and

7    unfortunately, I really do have to go now -- but from reading

8    their chart describing the additional trade secrets in the

9    second -- in the -- in the operative complaint in the second

10   lawsuit, I was having a hard time understanding just how

11   different those trade secrets are from what they describe as

12   the lab notebook trade secrets.

13       So that's something I'm going to want your help next week

14   wrapping my brain around.  At least from a layperson's

15   standpoint, a lot of the same sort of relevant sounding words

16   are used in both -- the description of both, you know, type --

17   both categories of trade secrets.

18       So with that, unless anybody has anything super burning

19   they need to add right now, I will say that we will see you

20   again on the civil law and motion calendar next Thursday at

21   10:00 o'clock.  And I will look forward to receiving those

22   letter briefs.

23       **MR. FEINBERG:**  Can I just confirm?  The letter briefs

24   are limited to the end-run issue?

25       **THE COURT:**  Yes.

1          **MR. FEINBERG:**  Okay.  Thank you.

2          **THE COURT:**  Yes.  For -- you know, and we will have --

3    I mean, I understand that this is a complicated case with a lot

4    of issues; and everybody will get a chance to air, you know,

5    the issues to the extent that they haven't -- you know, they

6    haven't done so in the briefs or at the hearings already.

7    Okay.

8          **MR. FEINBERG:**  Thank you.

9          **MR. GRIMSRUD:**  Thank you, Your Honor.

10          **MR. FREITAS:**  Thank you.

11          **THE COURT:**  Thanks.

12          **THE CLERK:**  Court is adjourned.

13               (Proceedings adjourned at 10:54 a.m.)

14                    ---oOo---

1

2                      **<u>CERTIFICATE OF REPORTER</u>**

3          I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the official

5    electronic sound recording provided to me by the U.S. District

6    Court, Northern District of California, of the proceedings

7    taken on the date and time previously stated in the

8    above-entitled matter.

9          I further certify that I am neither counsel for, related

10   to, nor employed by any of the parties to the action in which

11   this proceeding was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15   DATE:   Wednesday, July 22, 2020

16

17

18

19   _____

20          Marla F. Knox, RPR, CRR, RMR
            United States Court Reporter

21

22

23

24

25