IAN N. FEINBERG (SBN 88324)
ifeinberg@feinday.com
M. ELIZABETH DAY (SBN 177125)
eday@feinday.com
MARC BELLOLI (SBN 244290)
mbelloli@feinday.com
NICHOLAS MARTINI (SBN 237687)
nmartini@feinday.com
**FEINBERG DAY KRAMER ALBERTI LIM TONKOVICH & BELLOLI LLP**
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Tel: 650.825.4300

*Attorneys for Defendant/Counterclaimant*
BioCardia, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION, BOSTON SCIENTIFIC SCIMED, INC. AND FORTIS ADVISORS LLC,<br>Plaintiffs,<br>v.<br>BIOCARDIA, INC.,<br>Defendant. | CASE NO. 3:19-05645-VC<br>**BIOCARDIA, INC.'S SECOND AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS**<br>**JURY TRIAL DEMANDED**<br>Hon. Vince Chhabria |
| BIOCARDIA, INC.,<br>Counterclaimant,<br>v.<br>BOSTON SCIENTIFIC CORPORATION, BOSTON SCIENTIFIC SCIMED, INC. AND FORTIS ADVISORS LLC, AND SURBHI SARNA,<br>Counterdefendants. | |

Defendant BioCardia, Inc. ("Biocardia") hereby answers the Complaint of Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively "Boston Scientific") and Plaintiff Fortis Advisors LLC, as Securityholder Representative for the former securityholdcrs of nVision Medical Corporation (the "Securityholders;" "Plaintiffs" together with Boston Scientific). BioCardia also asserts Counterclaims as alleged below against Plaintiffs and Surbhi Sarna ("Ms. Sarna;" "Counterdefendants" together with Plaintiffs).

**BIOCARDIA'S ANSWER TO COMPLAINT**

**NATURE OF THE ACTION**

1. BioCardia admits the allegations of paragraph 1.

2. BioCardia admits the allegations of paragraph 2.

3. BioCardia admits the allegations of the first sentence of paragraph 1 of paragraph 3, lacks sufficient information or belief to respond to the second sentence of paragraph 3, and denies the remaining allegations of paragraph 3.

4. BioCardia denies the allegations of paragraph 4.

5. BioCardia denies the allegations of the first two sentences of paragraph 5, admits the allegations of the remaining allegations of paragraph 5, and alleges that (a) Ms. Sarna did not develop the invention of the '571 Family "entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information;" and (b) the '571 Family related "at the time of conception or reduction to practice of the invention to [BioCardia's] business, or actual or demonstrably anticipated research or development of [BioCardia]," within the meaning of California Labor Code § 2870.

6. BioCardia denies the allegations of paragraph 6.

7. BioCardia denies the allegations of paragraph 7.

8. BioCardia denies the allegations of paragraph 8.

10. BioCardia admits the allegations of paragraph 10.

11. BioCardia admits that Plaintiffs bring this action for various declaratory judgments and other relief. Except as thus expressly admitted, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 11 and on that basis

denies them.

## PARTIES

12. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 12 and on that basis denies them.

13. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 13 and on that basis denies them.

14. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 14 and on that basis denies them.

15. BioCardia admits the allegations of paragraph 15.

## JURISDICTION AND VENUE

16. BioCardia admits that Plaintiffs purport to assert claims under the referenced statutes. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 16.

17. BioCardia admits the allegations of paragraph 17.

18. BioCardia admits the allegations of paragraph 18.

19. BioCardia admits the allegations of paragraph 19.

## FACTUAL BACKGROUND

### A. BioCardia

20. BioCardia admits the allegations of paragraph 20.

21. BioCardia denies the allegations of paragraph 21. BioCardia alleges that Ms. Sarna started consulting with BioCardia on September 15, 2008 pursuant to a Consulting Agreement executed on August 27, 2008, and Ms. Surbhi started as a full time employee of BioCardia on November 3, 2008 pursuant to the BioCardia standard Employment Agreement which she signed on October 29 (the "Sarna Agreement").

### B. Ms. Sarna Employment at BioCardia

22. BioCardia denies the allegations of paragraph 22.

23. BioCardia denies the allegations of paragraph 23.

24. BioCardia denies the allegations of paragraph 24.

25. BioCardia denies the allegations of paragraph 25.

**C. nVision**

26. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 26 and on that basis denies them.

27. BioCardia admits that Ms. Sarna began working at BioCardia in 2008. Except as thus expressly admitted, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 27 and on that basis denies them.

28. BioCardia admits the allegations of the first sentence of paragraph 28. Except as thus expressly admitted, denies the allegations of paragraph 28.

29. BioCardia denies that it had knowledge of Ms. Sarna's alleged activities. Except as thus expressly denied, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 29 and on that basis denies them.

30. BioCardia denies the allegations of paragraph 30.

31. BioCardia denies the allegations of the second and last sentences of paragraph 31. Except as thus expressly denied, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 31 and on that basis denies them.

32. BioCardia denies the allegations of the last sentence of paragraph 32. Except as thus expressly denied, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 32 and on that basis denies them.

33. BioCardia denies the allegations of paragraph 33.

34. BioCardia admits that Ms. Sarna left BioCardia on January 4, 2012. Except as thus expressly denied, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 34 and on that basis denies them.

35. BioCardia admits that Mr. MacKenzie heard Ms. Sarna speak at a conference about nVision and he subsequently emailed Ms. Sarna. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 35.

36. BioCardia admits that it was aware of Ms. Sarna's goal of developing a company in the field of women's health while she was an employee of BioCardia, and that BioCardia CEO was emailed by Ms. Sarna that she had become an entrepreneur in a short cryptic email after her

departure from the Company. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 36.

37 . BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 37 and on that basis denies them.

38. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 38 and on that basis denies them.

39. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 39 and on that basis denies them.

40. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 40 and on that basis denies them.

41. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 31 and on that basis denies them.

42. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 42 and on that basis denies them.

43. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 43 and on that basis denies them

44. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 44 and on that basis denies them

45. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 45 and on that basis denies them.

46. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 46 and on that basis denies them.

47. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 47 and on that basis denies them.

**D. The Dispute**

48. BioCardia admits the allegations of the first sentence and that in June 2013 Andrew MacKenzie heard Ms. Sarna speak about nVision and subsequently emailed her. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 48.

49. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 49 and on that basis denies them.

50. BioCardia admits the allegations of paragraph 50.

51. BioCardia admits the allegations of paragraph 51.

52. BioCardia admits that Boston Scientific so-informed BioCardia of its belief. Except as this expressly admitted, BioCardia denies the allegations of paragraph 52.

53. BioCardia admits that it sent another letter on May 20, 2019 generally reiterating its previous allegations. BioCardia admits it suggested the parties engage in "pre-litigation mediation." BioCardia alleges that Boston Scientific expressly stated that it would only mediate before a mediator of its choosing in Chicago, Illinois, a venue having no connection to the dispute. BioCardia alleges it did not respond to Boston Scientific's offer of mediation because the preconditions put on mediation by Boston Scientific were preposterous and not in good faith. Except as thus expressly admitted and alleged, BioCardia denies the allegations of paragraph 53.

54. BioCardia admits that it filed the Arbitration against Ms. Sarna on August 6, 2019 because Ms. Sarna's agreement with BioCardia requires arbitration. Except as thus expressly admitted, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 54 and on that basis denies them.

55. BioCardia admits that Plaintiffs bring an action for declaratory judgments and other relief. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 55.

**COUNT I**

**(INVENTORSHIP OF '571 PATENT IS CORRECT)**

56. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

57. BioCardia denies the allegations of paragraph 57.

58. BioCardia neither admits nor denies the allegations of paragraph 58 as it states a conclusion of law.

59. BioCardia admits the allegations of paragraph 63.

60. BioCardia admits the first sentence of paragraph 60. Except as thus expressly

admitted, BioCardia denies the allegations of paragraph 60.

61. BioCardia denies the allegations of paragraph 63.

62. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 62 and on that basis denies them.

63. BioCardia denies the allegations of paragraph 63.

**COUNT II**

**(BOSTON SCIENTIFIC OWNS THE '571 PATENT FAMILY)**

64. BioCardia incorporates its responses it to the allegations of the proceeding paragraphs.

65. BioCardia denies the allegations of paragraph 65.

66. BioCardia alleges that California Labor Law Section 2870 speaks for itself. Except as thus expressly alleged, BioCardia denies the allegations of paragraph 66.

67. BioCardia denies the allegations of paragraph 65.

68. BioCardia denies the allegations of paragraph 68.

69. BioCardia denies the allegations of paragraph 69.

70. BioCardia denies the allegations of paragraph 70.

71. BioCardia denies the allegations of paragraph 71.

72. BioCardia admits the allegations of the second sentence of paragraph 72. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 72.

73. BioCardia denies the allegations of the second sentence of paragraph 73. Except as thus expressly denied, BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 31 and on that basis denies them.

74. BioCardia admits the allegations of the third sentence of paragraph 74. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 74.

75. BioCardia denies the allegations of paragraph 75.

76. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 76 and on that basis denies them.

77. BioCardia alleges that it lacks sufficient information or belief to respond to the

allegations of paragraph 77 and on that basis denies them.

78. BioCardia denies the allegations of paragraph 78.

**COUNT III**

**(BOSTON SCIENTIFIC OWNS THE 120 PROVISIONAL FAMILY)**

79. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

80. BioCardia denies the allegations of paragraph 80.

81. BioCardia alleges that California Labor Law Section 2870 speaks for itself. Except as thus expressly alleged, BioCardia denies the allegations of paragraph 81.

82. BioCardia denies the allegations of paragraph 82.

83. BioCardia denies the allegations of paragraph 83.

84. BioCardia denies the allegations of paragraph 84.

85. BioCardia denies the allegations of paragraph 85.

86. BioCardia admits the allegations of the second sentence of paragraph 86. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 86.

87. BioCardia denies the allegations of paragraph 87.

88. BioCardia admits the allegations of the third sentence of paragraph 88. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 88.

89. BioCardia denies the allegations of paragraph 89.

90. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 90 and on that basis denies them.

91. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 91 and on that basis denies them.

92. BioCardia denies the allegations of paragraph 92.

**COUNT IV**

**('571 FAMILY IS NOT BASED ON MISAPPROPRIATED TRADE SECRETS)**

93. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

94. BioCardia denies the allegations of paragraph 94.

95. BioCardia admits the allegations of all but the last sentence of paragraph 95. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 95.

96. BioCardia denies the allegations of paragraph 96.

97. BioCardia denies the allegations of paragraph 97.

98. BioCardia denies the allegations of paragraph 98.

99. BioCardia denies the allegations of paragraph 99.

100. BioCardia denies the allegations of paragraph 100.

101. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 101 and on that basis denies them.

102. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 102 and on that basis denies them.

103. BioCardia denies the allegations of paragraph 103.

**COUNT V**

**('120 "PROVISIONAL FAMILY IS NOT BASED ON MISAPPROPRIATED TRADE SECRETS)**

104. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

105. BioCardia denies the allegations of paragraph 105.

106. BioCardia admits that it alleges that the inventions in the '120 Provisional Family are based on trade secrets of BioCardia and filed by Ms. Sarna while she was an employee of BioCardia. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 106.

107. BioCardia denies the allegations of paragraph 107.

108. BioCardia denies the allegations of paragraph 108.

109. BioCardia denies the allegations of paragraph 109.

110. BioCardia denies the allegations of paragraph 110.

111 BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 111 and on that basis denies them.

112. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 112 and on that basis denies them.

113. BioCardia denies the allegations of paragraph 113.

**COUNT VII**

**(NO TRADE SECRET MISAPPROPRIATIONS BY NVISION UNDER CUTSA)**

114. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

115. BioCardia admits the allegations of paragraph 115.

116. BioCardia denies the allegations of paragraph 116.

117. BioCardia admits the allegation that in June 2013 Andrew MacKenzie heard Ms. Sarna speak about nVision and subsequently emailed her. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 117.

118. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 118 and on that basis denies them.

119. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 119 and on that basis denies them.

120. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 120 and on that basis denies them.

121. BioCardia denies the allegations of paragraph 121.

**COUNT VII**

**(NO TRADE SECRET MISAPPROPRIATION BY NVISION UNDER FEDERAL LAW)**

122. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

123. BioCardia admits that the DTSA was effective May 11, 2016. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 123.

124. BioCardia admits the allegations of paragraph 124.

125. BioCardia denies the allegations of paragraph 125.

126. BioCardia denies the allegations of paragraph 126.

127. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 127 and on that basis denies them.

128. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 128 and on that basis denies them.

129. BioCardia denies the allegations of paragraph 129.

**COUNT VIII**

**(N0 TRADE SECRET MISAPPROPRIATION BY BOSTON SCIENTIFIC UNDER CUTSA)**

130. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

131. BioCardia admits the allegations of paragraph 131.

132. BioCardia denies the allegations of paragraph 132.

133. BioCardia denies the allegations of paragraph 133.

l34. BioCardia admits the allegation that in June 2013 Andrew MacKenzie heard Ms. Sarna speak about nVision and subsequently emailed her. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 134.

135. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 135 and on that basis denies them.

136. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 136 and on that basis denies them.

137. BioCardia denies the allegations of paragraph 137.

**COUNT IX**

**(NO TRADE SECRET MISAPPROPRIATION BY BOSTON SCIENTIFIC UNDER FEDERAL LAW)**

138. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

139. BioCardia admits that it alleges that nVision was built on misappropriated trade secrets of BioCardia. Except as thus expressly alleged, BioCardia denies the allegations of

paragraph 139.

140. BioCardia denies the allegations of paragraph 140.

141. BioCardia denies the allegations of paragraph 141.

142. BioCardia denies the allegations of paragraph 142.

143. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 151 and on that basis denies them.

144. BioCardia denies the allegations of paragraph 144.

145. BioCardia denies the allegations of paragraph 145.

**COUNT X**

**(NO UNJUST ENRICHMENT BY NVISION)**

146. BioCardia incorporates its responses to the allegations of the proceeding paragraphs.

147. BioCardia admits the allegations of paragraph 147.

148. BioCardia denies the allegations of paragraph 148.

149. BioCardia denies the allegations of paragraph 149.

150. BioCardia admits that it was aware in 2012 that Ms. Sarna left BioCardia. BioCardia admits the allegation that in June 2013 Andrew MacKenzie heard Ms. Sarna speak about nVision and subsequently emailed her. Except as thus expressly admitted, BioCardia denies the allegations of paragraph 150.

151. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 151 and on that basis denies them.

152. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 152 and on that basis denies them.

153. BioCardia alleges that it lacks sufficient information or belief to respond to the allegations of paragraph 153 and on that basis denies them.

154. BioCardia denies the allegations of paragraph 154

## BIOCARDIA, INC.'S COUNTERCLAIMS

("BioCardia") alleges the following counterclaims against Counterdefendants Boston Scientific Corporation ("Boston Scientific"), Boston Scientific Scimed, Inc. ("Boston Scientific Scimed"), Fortis Advisors LLC ("Fortis") and Ms. Surbhi Sarna ("Ms. Sarna").

## NATURE OF THE ACTION

1. BioCardia brings these counterclaims seeking correction of inventorship on certain patents, seeking damages, including damages for Counterdefendants' unjust enrichment measured by, among other things, the amount Boston Scientific paid for nVision Medical Corporation ("nVision"), for Counterdefendants misappropriation of trade secrets and Ms. Sarna's breach of contract, and seeking imposition of constructive trusts on the patents belonging to and rightfully naming BioCardia as assignee, and the proceeds flowing from Counterdefendants' misappropriation of trade secrets and Ms. Sarna's breach of contract and all other appropriate relief that may be afforded in light of Counterdefendants' liability.

2. On August 6, 2019, BioCardia filed a request for arbitration (the "Arbitration Request") with the American Arbitration Association ("AAA") seeking, among other things, a declaration of ownership of various patents on which Ms. Sarna is a purported inventor and unjust enrichment in the amount Boston Scientific paid for nVision Medical (the "Arbitration").

3. On August 12, 2019. Ms. Sarna, through her previous attorney, requested an extension to respond to the Arbitration Request because Ms. Sarna was 33 weeks into a high risk pregnancy, which BioCardia immediately granted.

4. On September 6, 2019, Boston Scientific Corporation, Boston Scientific Scimed, Inc. and Fortis Advisors LLC filed the instant Action.

5. On September 13, 2019, after having requested an extension to respond to the Arbitration Request, Ms. Sarna instead filed a complaint in the Superior Court of California in and for the County of San Mateo, Action No. 19CLJ05413 (the "State Court Action") seeking to enjoin the Arbitration on various grounds.

6. BioCardia and Counterdefendants subsequently agreed that they would resolve all of their disputes in this Action, that BioCardia would withdraw the Arbitration Request, that Ms.

Sarna would dismiss the State Court Action, and that BioCardia would asserts its claims against Counterdefendants in this Action, including against Ms. Sarna.

7. BioCardia subsequently withdrew the Arbitration Request with the AAA and is informed and believes and on that basis alleges that Ms. Sarna dismissed the State Court Action, both in favor of resolving BioCardia's claims in this Action.

**PARTIES**

8. BioCardia is a corporation organized and existing under the laws of Delaware with its principal place of business at 125 Shoreway Road, Suite B, San Carlos CA 94070.

9. BioCardia is informed and believes and on that basis alleges that(a) Counterdefendant Boston Scientific Corporation is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 300 Boston Scientific Way, Marlborough, MA 01752-l 234 and that (b) notwithstanding Boston Scientific's allegation in the complaint that it merged with nVision Medical Corporation ("nVision"), in fact Boston Scientific acquired all of the stock in nVision through a reverse triangular merger with a wholly-owned subsidiary Boston Scientific created for that purpose, Boston Scientific Clarity Merger Corp, that was completed on April 13, 2018, whereupon Boston Scientific Clarity Merger Corp. changed its name to nVision.

10. BioCardia is informed and believes and on that basis alleges that Counterdefendant Boston Scientific Scimed, Inc. is (a) a corporation organized and existing under the law of the state of Minnesota with its principal place of business at One SciMed Place, Maple Grove, Minnesota 55311; (b) a wholly-owned subsidiary of Boston Scientific Corporation; and (c) is the current assignee of record for all patents that were previously held by nVision Medical Corporation for which it paid no consideration.

11. BioCardia is informed and believes and on that basis alleges that Counterdefendant Fortis Advisors LLC is a Delaware limited liability company with its principal place of business in San Diego, California, and is sued in its capacity as the Stockholders' Representative for the Former Stockholders of nVision Medical Corporation and as indemnitor with respect to breaches of any representations or warranties regarding nVision's intellectual

property pursuant to the terms of an Agreement and Plan of Merger, dated April 13, 2018, by and among Boston Scientific Corporation, Clarity Merger Corp., nVision Medical Corporation and Fortis Advisors LLC as StockHolders' Representative. A true and correct copy of the Agreement and Plan of Merger, dated April 13, 2018 is attached hereto as **Exhibit A**.

12. BioCardia is informed and believes and on that basis alleges that Counterdefendant Surbhi Sarna is an individual residing at 249 Randall Street, San Francisco, CA 94131, within this District.

## JURISDICTION AND VENUE

13. BioCardia's counterclaims arise under the patent laws of the United States, U.S.C. §§ 101 et seq. and the laws of the State of California.

14. This Court has subject matter jurisdiction over BioCardia's patent law counterclaims under 28 U.S.C. §§ 1331 and 1338(a), and has supplemental jurisdiction over BioCardia's state law claims under 28 U.S.C. § 1367.

15. This Court has personal jurisdiction over Counterdefendants other than Ms. Sarna because, among other reasons, they filed this Action in this District, and personal jurisdiction over Ms. Sarna because she is a resident of this District.

16. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

***Ms. Sarna's Employment Agreement with BioCardia***

17. The facts and claims at issue in this case begin with Surbhi Sarna's employment with Defendant BioCardia, Inc. Ms. Sarna started consulting with BioCardia on September 15, 2008 pursuant to a Consulting Agreement executed on August 27, 2008. On November 3, 2008, Ms. Sarna started working as a full-time employee of BioCardia pursuant to the BioCardia standard Employment Agreement which she signed on October 29 (the "Sarna Agreement"). A true and correct copy of the Sarna Agreement with Ms. Sarna's signature is attached hereto as **Exhibit B**.

18. In Section 2(a) of the Sarna Agreement, Ms. Sarna agreed "at all times during the term of my employment and thereafter, to hold in the strictest confidence, and not to use, except

for the benefit of [BioCardia], or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of [BioCardia]." Ms. Sarna also agreed that "Confidential Information" meant any BioCardia "proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of [BioCardia] on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering hardware configuration information, marketing, finances or other business information disclosed to me by [BioCardia] either directly or indirectly ***in writing, orally or by drawings or observation of parts or equipment***." (Emphasis added.)

19. In section 3(a) of the Sarna Agreement, Ms. Sarna agreed to complete Exhibit A, which was to contain a complete description of all inventions, original works of authorship, developments, improvements, and trade secrets which were made by her prior to her employment at BioCardia. Ms. Sarna executed Exhibit A and did not identify any inventions, original works of authorship, developments, improvements, and trade secrets which were made by her prior to her employment at BioCardia. Ms. Sarna also explicitly stated that she had "No inventions or improvements" to identify.

EXHIBIT A

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

✓ No inventions or improvements

___ Additional Sheets Attached

Signature of Employee: [signature]

Print Name of Employee: Surbhi Sarna

Date: 10/29/2008

Highly Confidential BC-BSC_0000518

20. Ms. Sarna agreed in Section 3(b) of the Sarna Agreement to "promptly make full written disclosure to the Company . . . and hereby assign to [BioCardia], or its designee, all my right, title and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets" Ms. Sarna conceived of, developed or reduced to practice during the time period Ms. Sarna was a BioCardia employee. Ms. Sarna never disclosed, in writing or in any other form, any inventions, original works of authorship, developments, concepts, improvements or trade secrets, that she conceived of, developed, or reduced to practice during her employment at BioCardia. The first time BioCardia heard of any of these patents or applications was in January 2019, when it became aware of, and began investigating the extent of, Ms. Sarna's misappropriation of BioCardia's intellectual property.

21. The only exception to Ms. Sarna's contractual duty to assign inventions to BioCardia in Section 3(b) of the Sarna Agreement was provided by Section 3(f), which stated "the provisions of this Agreement requiring assignment of Inventions to [BioCardia] do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870" ("Section 2870"). Exhibit B to the Sarna Agreement sets out Section 2870 as follows:

EXHIBIT B

CALIFORNIA LABOR CODE SECTION 2870
EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Highly Confidential BC-BSC_0000519

Section 2870 does not apply to the intellectual property Ms. Sarna developed during her employment at BioCardia because (a) she used BioCardia resources as part of the development including, but not limited to, BioCardia trade secret information, BioCardia testing equipment, BioCardia computers, BioCardia's email system, and time she spent during normal business hours developing the intellectual property; and (b) as explained in the sections describing "BioCardia's Business Activities" and the "Meeting Between Dr. Altman and Sarna," the intellectual property Ms. Sarna developed during her BioCardia employment related to BioCardia's business and to actual or demonstrably anticipated research and development by BioCardia. BioCardia engaged in extensive efforts to develop Dr. Peter Altman's ideas relating to women's pelvic health, including, but not limited to, conducting extensive discussions with several doctors about developing this technology, creating products like the Morph and Helix catheters that could be adapted to be used to address women's pelvic health issues, obtaining several patents that explicitly indicate they relate to women's pelvic health, and attempting to get Ms. Sarna to further develop the technology Dr. Altman disclosed to her into additional BioCardia product offerings. Dr. Altman's conversations with doctors and with Ms. Sarna reflect

"actual and demonstrably anticipated research or development" of BioCardia.

22. Under Section 3(f) of the Sarna Agreement, Ms. Sarna agreed to "advise [BioCardia] promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed in Exhibit A." As noted above, Ms. Sarna did not disclose any inventions in Exhibit A to the Sarna Agreement. Ms. Sarna also never disclosed, in writing or any other form, any inventions she believed fell under Section 2870.

23. Ms. Sarna also agreed, in Section 3(d) of the Sarna Agreement, to "keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the [BioCardia]." Ms. Sarna agreed that "the records will be in the form of notes, sketches, drawings and any other format that may be specified by [BioCardia]" and "will be available to and remain the sole property of [BioCardia] at all times." Ms. Sarna did not maintain the information set out in Section 3(d) for the inventions she made during the term of her employment with BioCardia. Furthermore, Ms. Sarna did not make adequate and current written records of the inventions she made during her BioCardia employment available to BioCardia despite numerous requests for these materials.

24. In Section 3(e) of the Sarna Agreement, Ms. Sarna agreed to "assist [BioCardia], or its designee, at [BioCardia's] expense, in every proper way to secure [BioCardia's] rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to [BioCardia] of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which [BioCardia] deems necessary in order to apply for and obtain such rights and in order to assign and convey to [BioCardia], its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Invention." Ms. Sarna further agreed that her "obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement." Ms. Sarna never assisted BioCardia to secure the rights in the inventions, copyrights, patents, mask work rights or other intellectual property rights she developed during her employment at BioCardia.

25. Under Section 4(a) of the Sarna Agreement, Ms. Sarna agreed that during her employment with BioCardia she would not "engage in any other employment, occupation, consulting or other business activity directly related to the business in which [BioCardia] is now involved or becomes involved during the term of [Ms. Sarna's] employment." Nonetheless, Ms. Sarna founded nVision Medical Corporation ("nVision"), and worked as an employee and/or consultant of nVision while she was still employed by BioCardia. During her employment at BioCardia, Ms. Sarna devoted significant time and effort to nVision, often at the expense of her work for BioCardia, which nVision work was directly related to the business of BioCardia and was based on BioCardia confidential information disclosed by Dr. Peter Altman to her so that she would use that information for the benefit of BioCardia.

26. Section 4(b) of the Sarna Agreement required Ms. Sarna, during the term of her employment with BioCardia, to "not accept or perform any outside consulting work without first reporting the nature of and proposed time commitment of any such proposed outside consulting work." Ms. Sarna never informed BioCardia of her work with nVision, nor of the time commitment of this work.

27. Ms. Sarna agreed, under Section 5 of the Sarna Agreement, that "at the time of leaving the employ of [BioCardia], I will deliver to [BioCardia] (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with [BioCardia] or otherwise belonging to [BioCardia]." Despite this, on at least eleven separate dates Ms. Sarna emailed BioCardia confidential information to her personal Gmail account: (1) April 29, 2009; (2) July 7, 2009; (3) November 20, 2009; (4) September 8, 2010; (5) October 24, 2010 (two emails); (6) December 29, 2010; (7) February 14, 2011; (8) March 11, 2011; (9) May 9, 2011; (10) September 8, 2011; and (11) December 19, 2011. Among the BioCardia confidential information were template documents for risk analysis, product specifications, labeling verification, and document change order procedures.

28. In Section 8 of the Sarna Agreement, Ms. Sarna agreed "to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D" to the agreement. Exhibit D set out several "potentially compromising situations which must be avoided." Furthermore, "any exceptions must be reported to the President and written approval for continuation must be obtained." Ms. Sarna never reported any potentially compromising situation to the President of BioCardia, and she never received written approval to engage in any such action.



EXHIBIT D

BioCardia, Inc.
CONFLICT OF INTEREST GUIDELINES

It is the policy of BioCardia, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations which must be avoided. Any exceptions must be reported to the President and written approval for continuation must be obtained.

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The Employment, Confidential Information and Invention Assignment Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

Highly Confidential BC-BSC_0000521



11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions which are the subject of patent claims of any other person or entity.

13. Engaging in any conduct which is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

Highly Confidential BC-BSC_0000522

29. Throughout her employment with BioCardia, Ms. Sarna received periodic reminders of her continuing duty to assign inventions to BioCardia. For example, on at least three occasions, Ms. Sarna received a company-wide email from Gulshan Sharver reminding employees of BioCardia's inventor incentive program and requesting submission of invention disclosure forms. Ms. Sarna received these emails from Ms. Sharver at least on April 4, 2010; May 27, 2010; and August 24, 2010. Despite these reminders, Ms. Sarna never disclosed any invention to BioCardia during or after her employment at BioCardia.

30. Not only did Ms. Sarna fail to disclose any of the inventions she patented on behalf of nVision, she also affirmatively and falsely represented that she did not have any

inventions to report to BioCardia. Exhibit C to the Sarna Agreement was a "Termination Certification," which Ms. Sarna executed on January 4, 2012, the last day she worked for BioCardia. In this document, Ms. Sarna certified that she "complied with all the terms of the Company's Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement." At no point during or after her employment with BioCardia did Ms. Sarna identify any invention she made during the time when she was a BioCardia employee.



**EXHIBIT C**

**BioCardia, Inc.**
**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to BioCardia, Inc., its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not hire any employees of the Company and I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Date: 01/04/2012

(Employee's Signature)

(Type/Print Employee's Name)

Highly Confidential BC-BSC 0000520

31. Ms. Sarna's Termination Certification also represented that she did not have in her possession, nor had she failed to return, "any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items bellowing to BioCardia." Ms. Sarna made this representation despite that barely two weeks earlier she forwarded an email to her personal Gmail account attaching a BioCardia template for a verification test plan for the

Helix catheter. BioCardia is informed and believes and on that basis alleges that corresponding nVision documents adopt the structure, format, and even language of this BioCardia template.

32. Ms. Sarna's Termination Certification also represented that she "will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of" BioCardia.

***BioCardia's Business Activities***

33. BioCardia's product portfolio and marketing efforts focus on the use of its diagnostic strategies, biotherapeutics, and catheter technologies like its Morph and Helix products. The intellectual property Ms. Sarna claimed as her own and assigned to nVision Medical Corporation, and the products that Ms. Sarna and nVision developed based on that intellectual property, all relate to catheter products. As a result, Ms. Sarna's patents, and patent applications, and alleged inventions, all relate to BioCardia's "business" as that term is used in California Labor Code Section 2870. Contrary to Ms. Sarna's, Boston Scientific Corporation's, and Boston Scientific Scimed's allegations, the relevant business for purposes of Section 2870 is catheter medical devices, not women's pelvic health.

34. Regardless, BioCardia also has devoted considerable resources and effort to the treatment of other conditions, including women's pelvic health issues. The treatment of women's pelvic health conditions is a part of BioCardia's "business" and "actual and demonstrable research or development" (as those terms are used in California Labor Code Section 2870).

35. Almost from its inception, BioCardia investigated whether the catheter technology it was developing could be used to treat gynecological conditions. Dr. Simon Stertzer, one of the most renowned cardiologists in the world, has continuously served as a consultant for BioCardia and its predecessor from 1999 to the present. Among his many accomplishments, Dr. Stertzer pioneered interventional cardiology in the 1970s, performed the first angioplasty, founded Arterial Vascular Engineering (which he later sold to Medtronic for nearly $5 billion), and currently is a Professor Emeritus at Stanford University. In the years following his

groundbreaking work, Dr. Stertzer observed several doctors adapting the devices and procedures he developed for the heart for other parts of the body. Recognizing the enormous business opportunity this presented, Dr. Stertzer began searching for opportunities to develop BioCardia cardiovascular applications for other parts of the body.

36. That is why in March 2000, Dr. Stertzer called Dr. Peter Altman, the CEO of BioCardia, to discuss the possibility of adapting BioCardia's catheter offerings for gynecological applications. Dr. Stertzer believed that there was a need to improve the ability to diagnose pre-cancerous and cancerous cysts in a less invasive fashion, as well as new ways to treat them. At the time, the only way to test for ovarian cancer was to perform surgery or an invasive transcutaneous or transvaginal biopsy, which were, burdensome for the patient, and carry a host of risks. In Dr. Stertzer's opinion, BioCardia's Helix and Morph catheter technologies and interactive design enabled sufficient control and flexibility to navigate fallopian tubes and contribute to providing this less invasive diagnosis.

37. Dr. Altman, intrigued by the idea, recorded Dr. Stertzer's idea as the first paragraph of a March 23, 2000 lab notebook entry ("the lab notebook disclosure"). In the following pages of the entry, Dr. Altman set out the details of how the Helix and Morph catheters could be adapted for gynecological applications. As depicted in the images in the lab notebook disclosure, and described in the accompanying text, smaller versions of BioCardia's Morph and Helix catheters could be inserted into a vagina and guided to the fallopian tubes, fimbria, and ovaries. By adding imaging, diagnostic, and treatment capabilities at the distal end of the catheter, practitioners could observe, test, and treat ovarian state.




38. The lab notebook disclosure detailed "optional **imaging capabilities**," such as ultrasound technology or a fiber optic camera, to steer the catheter and take images inside the vagina. For example, the notebook notes that "rotating ultrasound probes could be used to guide the catheter to obtain [a] high resolution view of [the] ovarian cyst." It also notes that "intrafallopian ultrasound" could be used "to determine if further intervention is required." The notebook also noted that fiber optic imaging could also be used to steer the catheter and capture images within the vagina.




The **diagnostic capabilities** described in the lab notebook included both "a fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst." The notebook also noted that solid biopsies, such as "material core" samples, could also be obtained by the described catheter device.




39. The lab notebook disclosure also described a variety of **treatment capabilities** administered at the end of the catheter. For example, the catheter could "be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally." In addition, the notebook notes that when the catheter is in position it may be used to advance "therapeutic probes."

40. In addition to a variety of imaging, biopsy, and treatment capabilities, the lab notebook disclosure also noted different locations where the catheter could collect images, diagnose conditions, and administer treatment. For example, the notebook notes that the catheter can be used for "intrafallopian" diagnosis and treatment:

> Dermoid, cystadenoma, endometrial polycystic disease, pre-cancerous and cancerous cysts may be viewed w/ intrafallopian ultrasound to determine if further intervention is required.

Later, the notebook explains that the catheter can be directed to the fallopian tube, where it can diagnose conditions and administer treatments:

> The steerable guide gains access through the vagina to the fallopian tube and may be [facilitated] by fiber optic imaging. The steerable guide once position[ed] may be used to advance imaging probes such as rotating ultrasound transducers, biopsy probes, therapeutic probes, or combinations of these.

The lab notebook also describes advancing the catheter to the fimbria of the fallopian tubes (i.e., the fingerlike structures at the end of the fallopian tube that surround the ovaries).







The March 2000 lab notebook also describes extending past the fimbria to the ovaries for imaging, diagnosis and treatment. For example, rotating ultrasound probes could be used to determine if an ovarian cyst is functional or "another type that requires therapy." The lab notebook also discusses extending a biopsy probe into the ovary to obtain a sample of a cyst.







41. As Dr. Stertzer suggested, much of the technology BioCardia develops and markets can be adapted for use in the applications disclosed in the lab notebook. Both the Morph and Helix catheters, which BioCardia spent decades developing and refining, are catheters like the one described in in the lab notebook. That these catheters are used for cardiovascular treatments does not negate their equal applicability to gynecological treatments. Of course catheters that are used in the heart would have to be resized and modified before they could be used in smaller anatomical structures like fallopian tubes.

42. BioCardia also devoted significant resources to developing technology that would deliver therapeutic substances for the treatment of cancer at the distal end of a catheter, another feature of the inventions and trade secrets discussed in the March 2000 lab notebook entry. For example, on December 6, 2005, BioCardia filed a patent application for local catheter-based therapy for cancer including delivery of leading blockbuster agents at the distal tip of the catheter. For the next eight years, BioCardia prosecuted this application until it issued as U.S. Patent No.

8,529,550 ("the '550 patent") on September 10, 2013. The '550 patent included a claim for:

> A catheter system comprising: a catheter having a proximal end and a distal end; a drug delivery structure disposed on the distal end of the catheter, where the structure is a hollow structure with one or more apertures communicating from the interior to the exterior of said hollow structure, and a reservoir of a therapeutic agent within said drug delivery structure, said therapeutic agent comprising one of antagonists to angiogenic agents, cytotoxic agents, anti-Her-2, and anti CD20, and tumor necrosis factors; said drug delivery structure being disengageable from the distal end of the catheter; a mechanism at the proximal end of the catheter for disengaging said drug delivery structure from the distal end of the catheter; and a fixation means on said drug delivery structure that may be used within a body of a patient to implant the drug delivery structure to a depth within an intended tissue within the body of a patient.

43. The day after the '550 patent issued, Dr. Altman reached out to Dr. Manuel Rodriguez, a Vice President at Genentech involved with the commercial development of Avastin, one of the most valuable cancer treatment drugs in the world. In that email, Dr. Altman mentioned that BioCardia had just received the '550 patent, and that this invention together with BioCardia's catheter technology could "enable local delivery of therapeutic agents with ease into the ovary." Dr. Rodriguez responded favorably to this email, and suggested meeting to discuss the following week. In the following weeks Drs. Altman and Rodriguez engaged in several conversations about the possibility of further developing BioCardia technology to deliver therapeutic agents as part of treatments for ovarian cancer.

44. The same day that Dr. Altman emailed Dr. Manuel Rodriguez, he sent a nearly identical email to Dr. Ian McNiece, a professor at the University of Texas MD Andersen Cancer Center, the largest cancer center in the United States. Just as with Dr. Rodriguez, this email began an extensive dialogue between Drs. Altman and McNiece about collaborating to further develop BioCardia catheters for gynecological applications. In fact, Dr. McNiece was so intrigued by the possibilities of this collaboration that he invited Dr. Altman to visit him at MD Andersen for a day-long meeting to discuss this topic. Dr. Altman flew to Texas for this meeting, and the two had several follow-up discussions about using BioCardia technology in gynecological applications.

45. BioCardia also engaged in extensive communications with Dr. Camran Nezhat

about further adapting BioCardia technology for gynecological applications. Drs. Nezhat and Altman had longstanding communications on this topic from the present all the way back to 2008. In fact, in December 2008, Dr. Stertzer connected Dr. Altman with Dr. Nezhat to begin this development. Dr. Altman reached out to Dr. Nezhat to see if they could "connect on local delivery aspects of [BioCardia's] business as it relates to OB GYN." BC-BSC_0385881. Dr. Nezhat's response was swift and enthusiastic:

**From:** Camran Nezhat [ mailto:cnezhat@stanford.edu]
**Sent:** Friday, December 12, 2008 2:45 PM
**To:** Peter Altman
**Cc:** Simon H. Stertzer; nezhatreception2@yahoo.com
**Subject:** Re: BioCardia

Hello Peter,

Thank you for your email.

Simon's suggestion is excellent to use your technology in Reproductive Medicine. It would be a pleasure to meet with you.

I would be happy to make time whenever you are available and you are in the Palo Alto area. Just let me know.

I have copied this to my assistant Erin so she is aware of it. As I might not be in the office when you send your email.

Happy Holidays,

Camran

Camran Nezhat, M.D., F.A.C.O.G., F.A.C.S
Deputy Chief, Dept. of OB/GYN
Clinical Professor of Surgery
Clinical Professor of OB/GYN
Stanford University Medical School
Stanford University
Clinical Professor of OB/GYN
University of California at San Francisco
Fellowship Director
Center for Special Minimally Invasive Surgery
900 Welch Road, Suite 403
Palo Alto, CA 94304
650-327-8778
cnezhat@stanford.edu

*Id.* Drs. Altman and Nezhat participated in an hour-long meeting the following week, and had several follow-up conversations from that meeting. BC-BSC_0385880-81. Dr. Nezhat was so excited about the possibilities BioCardia's catheters presented in the OB GYN space, that, in January 2009, he attempted to set up a presentation where he and Dr. Altman could discuss the options BioCardia catheters offered with reproductive endocrinologists at Stanford University.

**From:** Lori Arnone <nezhatnursing@yahoo.com>
**Sent:** Friday, January 23, 2009 3:33 PM
**To:** Peter Altman <paltman@biocardia.com>
**Subject:** RE: Dr Nezhat

Dr. Altman

I am still working on getting the Stanford REI doctors information on your product and perhaps trying to get a time for them to get together with you and Dr. Nezhat for a presentation.

Do you have something you can send me via email that is a brief summary of your product that I can include in my email to them?

Thank you

Lori Arnone CMA-C, CNA
Clinic Supervisor
Patient Care Manager
Surgical Coordinator

Dr. Altman continued to discuss collaboration opportunities in the OB GYN space with Dr. Nezhat, as evidenced by Dr. Altman's May 2010 invitation for Dr. Nezhat to visit BioCardia:

**From:** Peter Altman
**Sent:** Wednesday, May 19, 2010 12:51 PM
**To:** Camran R Nezhat MD.FACOG.FACS. <cnezhat@stanford.edu>
**Subject:** BioCardia

Dear Camran,
I would like to extend an invitation for you to visit us at BioCardia and talk about applications of our technologies in OB/GYN. Andrew Mackenzie is here as VP of OPS and I would invite him to join us. Alternatively, Andy and I could take you to EVVIA for dinner to discuss.

Best regards,
Peter

Peter Altman, PhD
President and CEO
BioCardia, Inc.
125 Shoreway Rd. Ste B
San Carlos, CA 94070
650-226-0121 direct
650-255-4532 cell
650-226-0120 main
650-631-3731 fax
www.biocardia.com

46. BioCardia also engaged in extensive communications with other practitioners about adapting BioCardia technology for gynecological applications, including Dr. Mark Lovitch, Dr. John Urquhart, and senior management at CareDx.

47. Over the years, BioCardia has spent considerable time and resources on obtaining several patents that described applications in the women's pelvic health space based on work that was occurring at BioCardia when Ms. Sarna was employed there. For example, BioCardia filed

U.S. Patent Application No. 13/965,807 on August 13, 2013 and prosecuted the application until it issued as U.S. Patent No. 9,078,994 on July 14, 2015. BioCardia also filed U.S. Patent Application No. 13/915,516 on June 11, 2013 and prosecuted the application until it issued at U.S. Patent No. 9,022,977. On August 13, 2013, BioCardia filed U.S. Patent Application No. 13/965,789, which it prosecuted until the application issued as U.S. Patent No. 9,017,284 on April 28, 2015. BioCardia filed U.S. Patent Application No. 13/965,800 on August 13, 2013 and prosecuted the application until it issued as U.S. Patent No. 9,011,373 on April 21, 2015. On July 22, 2008, BioCardia filed U.S. Patent No. 12/177,338, which it prosecuted until the application issued as U.S. Patent No. 8,939,960 on January 27, 2015. BioCardia also filed patent applications which described women's pelvic health applications before Ms. Sarna joined BioCardia. For example, BioCardia filed U.S. Patent Application No. 11/016,448 on December 17, 2004, and prosecuted the application until it issued as U.S. Patent No. 7,402,151 on July 22, 2008. Each of these patents explicitly discusses their application to the field of women's pelvic health, in particular to "uterine fibroid biopsy and ablation." Collectively, these patents alone represent a sustained effort over more than a decade and substantial financial outlay by BioCardia.

***BioCardia's Disclosure of Trade Secrets to Ms. Sarna***

48. In addition to BioCardia's considerable efforts in the women's pelvic health space, conceiving new methods, developing new catheter-based technology, conferring with several practitioners and companies about the development of women's pelvic health products, and obtaining at least seven patents which described applications in the women's pelvic health space, it also attempted (though unsuccessfully) to get Ms. Sarna to work on these efforts for BioCardia.

49. Ms. Sarna was not a model employee during her time at BioCardia. She was often absent from work, citing a repertoire of excuses that BioCardia is informed and believes and on that basis alleges were often untrue and pretextual to give Ms. Sarna more time to work on her own projects while an employee of BioCardia. She had such difficulty getting to work by 9:00 a.m. that her supervisors modified her work schedule to start at 9:30 a.m. and end at 5:30 p.m. On at least two occasions she was reprimanded in writing for tardiness. Co-workers complained that she would disappear for long stretches during the day, causing delays in projects. Even when

Ms. Sarna was at work, she had trouble focusing on the tasks assigned to her, and would often make costly mental errors

50. Thinking she needed additional motivation, and knowing of her desire to work on women's health applications, Dr. Altman arranged a meeting with Ms. Sarna, in or around May 2009, where he spent well over an hour explaining BioCardia inventions and trade secrets in the hope that she would devote a significant portion of her worktime to further development of these technologies. In particular, Dr. Altman showed Ms. Sarna the March 2000 lab notebook entry, showed her other pages in the lab notebook describing relevant technology, and provided additional trade secrets based on his considerable knowledge and experience with gene expression profiling, all of which was intended to help Ms. Sarna further develop a catheter system for a less invasive method for testing and treating ovarian cancer on behalf of BioCardia.

51. During that meeting, Dr. Altman discussed the potential for early diagnostic and local therapy for ovarian cancer with Ms. Sarna because BioCardia anticipated research and development regarding the ovarian diagnostic/therapy approach detailed in the lab notebook. Without early diagnosis, local therapy for the treatment of ovarian cancer is ineffective because of metastasis. This concept underlines why BioCardia's core efforts focused on pre-metastasis diagnostics to identify the disease state.

52. BioCardia intended that Ms. Sarna herself was going to participate in that research and development, which is why Dr. Altman disclosed the BioCardia trade secrets to her during the meeting in or around May 2009. That is also why Dr. Altman shared additional laboratory notebook pages with her in the same meeting session relating to the potential ramifications of early diagnosis and the potential for local therapy. The images in the March 2000 lab notebook entry clearly show BioCardia's Morph and Helix products passing through the uterus to be used for fallopian tube procedures. The Morph and Helix were products Ms. Sarna worked on a daily basis, albeit for cardiovascular applications. Further, at least three other employees of BioCardia—including David Snow, David Sanderson, and Andy Mackenzie—were aware that Dr. Altman had spent time with Ms. Sarna proposing that she work on a women's health project.

53. During the course of the meeting with Ms. Sarna in or around May 2009, Dr.

Altman disclosed dozens of BioCardia inventions and trade secrets through his explanation of the March 2000 lab notebook entry, other pages of the lab notebook, including pages 1-4 of the lab notebook setting out inventive concepts about controlled-release drug delivery matrices, and his explanation of cutting-edge technical developments in gene expression profiling which enabled detection of cancer from the small number of cells collected from a fallopian tube by the catheter. While the list below sets out specific aspects of the inventions and trade secrets that Dr. Altman disclosed to Ms. Sarna, this intellectual property as a whole, and the subject matter discussed during Dr. Altman's meeting with Ms. Sarna, generally describes a method of obtaining a tissue sample from a fallopian tube for determining ovarian state, including:

a. Diagnostic method of using a catheter inserted into a fallopian tube to obtain a solid or liquid biopsy of potentially diseased ovarian tissue or cells by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter and obtaining a sample of tissue through the second catheter that is from the ovary which may be analyzed biologically;

b. Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and sampling for biologic analysis;

c. Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capabilities to enable navigation and sampling for biologic analysis;

d. Diagnostic method of inserting a catheter with imaging capability, such as

cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter, using the imaging capabilities to enable navigation and imaging of ovarian cysts or tumors;

e. Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter, using the imaging capability to enable navigation and imaging of ovarian cysts or tumors;

f. Diagnostic method of inserting a catheter imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors;

g. Diagnostic method of inserting a catheter imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capability to enable navigation and imaging of ovarian cysts or tumors and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors;

h. Diagnostic method and devices for advancing a tissue-sampling element to the fallopian tube, fimbria, or ovary to take a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of

a fallopian tube, advancing a second catheter system having a tissue-sampling element through the guide catheter and advancing the tissue-sampling element to obtain a liquid or solid sample for biologic analysis;

i. Diagnostic method and devices to be used for tissue-sampling from the fallopian tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a penetrating element through the guide catheter and advancing the penetrating element consisting of a hollow helical needle into the fallopian tube, fimbria, or ovary to obtain a liquid or solid sample for biologic analysis;

j. Diagnostic method and devices to be used for tissue-sampling from the fallopian tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a tissue-sampling element through the guide catheter and advancing the tissue-sampling element into the fallopian tube, fimbria, or ovary to obtain a liquid or solid sample for biologic analysis;

k. Therapeutic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube to advance a therapy, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capability, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) ablating regions of the ovary, (2) delivering controlled release drug delivery matrices to relevant tissue in and around the ovary, or (3) draining the tissue mass penetrated by the hollow penetrating element;

l. Therapeutic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube to advance a therapy, consisting of

advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) ablating regions of the ovary using radiofrequency energy or (2) ablating the regions of the ovary by the delivery of alcohol;

m. Therapeutic method and devices to be used through the vagina, uterus, and fallopian tube to advance a hollow element from a catheter to assist with tissue sampling, where, for example, the hollow element is connected to a fluid conduit within the catheter system that is connected to a reservoir outside of the body;

n. Therapeutic strategy for identifying precancerous and cancerous growths based on a diagnosis performed from a locally-obtained sample before evidence of metastasis has appeared by, for example, obtaining a local biological sample derived from the ovary or adjacent fluids to determine that the ovary has a significant possibility of having a malignant cancer, and using this information to determine appropriate treatments;

o. Therapeutic strategy for delivering ablative compounds such as alcohol or ablative energy through a catheter system passed through a vagina, uterus, and fallopian tubes to treat disease or a condition of the ovary in which a penetrating element is advanced into the fallopian tubes, fimbria, or ovary; and

p. The existence of a market need to improve the ability to diagnose precancerous and cancerous cysts minimally invasively with details on the ramifications for therapy with early diagnosis, and strategies for doing so that align with new biological measurement technologies in gene expression and genetic analysis that enable a small sample to identify the presence of disease, including details on the players in the gene diagnosis space looking at blood (CareDx), solid tumor tissues (Genomic health), and cells sloughing from within a body lumen conduit such as that of a bowel movement which passes through the colon (EXACT Sciences).

54. Although Ms. Sarna has admitted that Dr. Altman met with her, at least David Sanderson, Andrew Mackenzie, and David Snow knew that Dr. Altman met with Ms. Sarna to discuss a BioCardia project related to women's health. BioCardia is informed and believes and on that basis alleges that Mr. Sanderson, Mr. Mackenzie, and Mr. Snow will corroborate that this meeting took place.

55. BioCardia also disclosed trade secrets to Ms. Sarna through her day-to-day work for the company. In particular, BioCardia internally developed a testing instrument that used a ball and spring assembly to test the internal diameter of catheters. The particulars of this testing device are set out in the 04960-A TSPEC, titled "Ball Fixture, 0.0710" Internal Inspection," which was produced at BC-BSC_0000379-381. Ms. Sarna used this device as part of her work for BioCardia, and later incorporated the ball-and-spring feature in nVision patents and/or patent applications. In particular, BioCardia shared the following trade secret with Ms. Sarna by allowing her to use the ball-and-spring testing instrument: a catheter system which includes a distal spring element on its end and having a round spherical ball mounted on the spring to avoid damage to the lumen through which it is passed, by, for example, having of a catheter shaft with a hollow lumen, containing a fluid conduit, which passes through a helical metal spring on its distal end attached to a small ball attached to the distal-most end.

56. Finally, BioCardia disclosed trade secrets to Ms. Sarna in the form of template documents that Ms. Sarna used as part of her work on behalf of BioCardia. BioCardia strictly controlled access to these documents, and only used them internally. Ms. Sarna forwarded many of these templates to her personal Gmail account. BC-BSC_0002529-44; BC-BSC_0002944-3001; BC-BSC_0011792-802; BC-BSC_0013063-119; BC-BSC_0013557-84; BC-BSC_0013585-600; BC-BSC_0014062-63; BC-BSC_0014176-77; BC-BSC_0014339-40; BC-BSC_0014509-14; BC-BSC_0014798-819; BC-BSC_0015207-238. BioCardia is informed and believes and on that basis alleges that corresponding nVision documents adopt the structure, format, and even language of these BioCardia template documents. In particular, BioCardia shared the following trade secret with Ms. Sarna by allowing her to use BioCardia template documents: BioCardia template documents sent to Ms. Sarna's personal email account,

consisting of the following templates: Risk Analysis, Product Specification, Labelling Verification, and Document Change Order procedures.

***Ms. Sarna's Misappropriation of BioCardia Trade Secrets During Her Employment at BioCardia***

57. While it turned out that Ms. Sarna did further develop the BioCardia intellectual property Dr. Altman shared with her, she did not do so on behalf of BioCardia.

58. On Monday, September 28, 2009, approximately four months after Dr. Altman described to Ms. Sarna the women's pelvic health intellectual property in his lab notebook, Ms. Sarna engaged Pacific Crest Law Partners, LLP. That same day, Pacific Crest Law Partners incorporated nVision Medical Corporation ("nVision") in Delaware on Ms. Sarna's behalf. Ms. Sarna never informed BioCardia that she had formed her own corporation.

59. On Tuesday, September 29, 2009, the day after incorporating nVision, Ms. Sarna called in sick. Later that same day, Ms. Sarna filed a provisional patent application in the United States Patent and Trademark Office ("USPTO") that she assigned to nVision in a December 26, 2009 Technology Transfer Agreement. Ms. Sarna never informed BioCardia that she filed this provisional patent application. Even when BioCardia finally learned of the provisional patent application in 2020, and requested production of the application and any other related documents as part of discovery in the present litigation, Ms. Sarna did not produce the materials. This is despite Ms. Sarna's promise, in Section 3(d) of the Sarna Agreement, to "keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with [BioCardia]" and her agreement that "the records will be in the form of notes, sketches, drawings and any other format that may be specified by [BioCardia]" and "will be available to and remain the sole property of [BioCardia] at all times."

60. On Tuesday, February 9, 2010, Ms. Sarna took another day off. Later that same day, Ms. Sarna signed an "Action by Sole Director of nVision Medical Corporation," which gave Pacific Crest Law Partners, LLP a warrant to acquire 40,000 shares in exchange for up to $15,000 in legal fees.

61. On Friday, December 3, 2010, Ms. Sarna emailed David Snow and Miranda Peto

to inform them that she would be working from home. Later that same day, Ms. Sarna emailed Anula Jayasuriya, then a member of the Board of Trustees of Astia and later the Founder and Managing Director of eXXclaim Capital, to thank her for an introduction to Linda Greub, then a partner at LMN Ventures, LLC.[1] The date on the email is "Sat 12/4/2010 12:02:36 AM Coordinated Universal Time," which corresponds to 5:02 p.m. on Friday, December 3, 2010. Because Ms. Sarna could not arrive at work by 9:00 a.m., BioCardia allowed her work day to span from 9:30 a.m. to 5:30 p.m. Consequently, this email not only was sent using BioCardia's email service, but was also sent during Ms. Sarna's normal working hours. In that same email, Ms. Sarna also asked Ms. Greub for help "conceptualizing a product which will diagnose fallopian tube occlusion in the office of the reproductive specialist." BioCardia found this email among Ms. Sarna's <u>deleted emails</u>.

**Sent:** Sat 12/4/2010 12:02:36 AM Coordinated Universal Time

Anula,

Thank you for the introduction.

Linda,

Pleasure to e-meet you. I'm currently conceptualizing a product which will diagnose fallopian tube occlusion in the office of the reproductive specialist. I would love to run the idea by you and get your thoughts. I currently work in San Carlos and would be happy to meet you wherever it is most convenient.

Thanks for your time,
Surbhi
cell 408.655.3577

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

62. Although the email references an earlier email introduction to Ms. Greub by Ms. Jayasuriya, that email is nowhere to be found in Ms. Sarna's BioCardia email account.

63. BioCardia is informed and believes and on that basis alleges that Ms. Sarna deleted Ms. Jayasuriya's email introducing Ms. Greub and emptied her deleted email folder to permanently eliminate that email, but forgot to empty the folder after she deleted her email requesting assistance from Ms. Greub. These communications with Ms. Jayasuriya and Ms.

[1] eXXClaim Capital and LMN Ventures were both shareholders in nVision and are named defendants in *BioCardia, Inc. v. nVision Medical Corporation et. al.,* Case No 3:20-cv-02829-VC.

Greub were not to develop products on BioCardia's behalf. Ms. Sarna never disclosed this product, or any efforts to develop it, to BioCardia.

64. BioCardia is informed and believes and based on the foregoing alleges that Ms. Sarna took many steps to actively conceal her use of BioCardia resources to advance nVision, including deleting other emails sent to and from her BioCardia email account relating to nVision.

65. On Thursday, January 6, 2011, almost exactly a year ***before*** Ms. Sarna left BioCardia, she executed the "nVision Medical Corporation Common Stock Purchase Agreement," whereby Anula Jayasuriya purchased 510,640 shares at $0.001 per share. Ms. Sarna formalized this agreement on Wednesday, January 12, 2011, when she executed an "Action by Sole Director of nVision Medical Corporation" selling the shares to Ms. Jayasuriya.

66. On Tuesday, January 25, 2011, a little less than a year before Ms. Sarna left BioCardia, Bedi Harmonhinder filed United States Provisional Patent Application No. 61/435,945 ("the '945 provisional application") with the USPTO, naming Ms. Sarna as the sole inventor. The '945 provisional application is almost certainly the subject of Ms. Sarna's December 2010 email to Anula Jayasuriya and Linda Greub and any subsequent communications, since both that email and the application discuss "a product which will diagnose fallopian tube occlusion in the office of the reproductive specialist." The '945 provisional application is a very close reproduction of the March 2000 lab notebook entry describing BioCardia's women's pelvic health inventions and trade secrets. Just like the March 2000 lab notebook, the '945 provisional application describes inserting a catheter that has imaging, diagnostic, and treatment capabilities into a vagina. According to the '945 provisional application:

> Another solution is to use a commercially available guidewire, but to have a catheter that contains both the illumination and imaging fibers within it in addition to the biopsy or injection needles.

The provisional application goes on to describe:

> The invention relates to a novel technology and technique to diagnose, sample and treat occlusions of the fallopian tube and other fallopian tube diseases .... More specifically, the present invention relates to the fimbria end of the fallopian tube and facilitates the in-office visual examination of the fallopian tube, further allows diagnostic procedures such as taking a biopsy, and injection of regional therapy, such as but not limited to a biotherapeutic.

For the **imaging capabilities**, the ’945 provisional application discloses the same fiber optic and ultrasound techniques disclosed in the March 2000 lab notebook:

> For the visualization portion of the catheter, several methods are presented including but not limited to using a fiber optics bundle, sound waves such as an ultrasound-related technique, and light scattering techniques, such as optical coherence tomography (OCT).

In addition to imaging capabilities, the ’945 provisional application discusses providing **diagnostic** and **treatment capabilities** in the same catheter:

> The working lumen of the device provides a passageway for the physician to have guidance through the fallopian tube via guidewire as well as provide access to the tube for biopsy or local therapeutic delivery.

Like the March 2000 lab notebook describing BioCardia’s inventions and trade secrets in the women’s pelvic health space, the ’945 provisional application also describes accessing the fallopian tubes, with particular emphasis on the fimbria surrounding the ovaries. In fact, the title of the ’945 provisional application is “A Transvaginal Device and Technique to Access the Fimbria of the Fallopian Tubes Via the Uterotubal Ostium in Order to Both Diagnose and Treat Occlusions and Disease.” The application goes on to state that “the present invention relates to the fimbria-end of the fallopian tube.”

67. Despite its clear relevance to BioCardia’s business, and to the actual and demonstrably anticipated research and development that Dr. Altman wanted Ms. Sarna to perform for BioCardia, Ms. Sarna never informed BioCardia that she filed the ’945 provisional application.

68. On August 20, 2011, some five months before leaving BioCardia, Ms. Sarna executed a “Written Consent of the Stockholders of nVision Medical Corporation,” which identified Anula Jayasuriya as holding 510,640 shares of common shares and 316,056 seed preferred shares, and LMNVC, LLC (where Linda Greub was a principal) as holding 1,264,223 seed preferred shares.

69. On November 13, 2011, some two months before Ms. Sarna left BioCardia, Kim Rubin filed United States Provisional Patent Application No. 61/559,120 (“the ’120 provisional application”) with the USPTO, naming Ms. Sarna as the sole inventor. Although not as similar to

the March 2000 lab notebook as the '945 provisional application, the '120 provisional application nevertheless divulged BioCardia inventions and trade secrets. In particular, the '120 provisional application disclosed a catheter that is inserted into a vagina and directed to the fallopian tube where it is used to take images. Just as with the March 2000 lab notebook, and the '945 provisional application, the '120 provisional application's "visualization portion of the catheter include but are not limited to using a fiber optics bundle" and "sound waves such as an ultrasound-related technique, such as Intravascular ultrasound (IVUS)." Also like the March 2000 lab notebook and the '945 provisional application, the '120 provisional application "invention may be used to access the entire length of the fallopian tube."

70. Despite its clear relevance to BioCardia's business, and to the actual and demonstrably anticipated research and development that Dr. Altman wanted Ms. Sarna to perform for BioCardia, Ms. Sarna never informed BioCardia that she filed the '120 provisional application.

71. During Ms. Sarna's employment with BioCardia, she repeatedly sent confidential BioCardia documents to her personal email account, including a testing plan for the Helix catheter sent just a few working days before she resigned from BioCardia. Below is a list of these confidential materials that BioCardia has been able to ascertain to date:

a. Morph Target Sheath Packaging Verification Protocol (April 29, 2009)
b. HIC (Helical Infusion Catheter)/UGC (Universal Guide Catheter) Packaging Procedure (April 29, 2009)
c. Pouch Seal Operational Qualification (April 29, 2009)
d. Morph AccessPro Risk Management Plan & Report (July 7, 2009)
e. Morph AccessPro Risk Management Plan & Report (longer version) (July 7, 2009)
f. Morph Access Pro Risk Analysis Worksheet (July 7, 2009)
g. Morph Target Sheath Verification Matrix (July 7, 2009)
h. Morph Target Sheath Risk Management & Report (July 7, 2009)
i. BioCardia Engineering Change Order Form (November 20, 2009)

j. Morph 895 (AD) Catheter Label Verification Protocol (November 20, 2009)

k. Helical Infusion Catheter 953 Label Verification Protocol (November 20, 2009)

l. Dekra review of "technical file for the CE marking of the system comprising of Helical Infusion Catheter and Universal Deflectable Guide Catheter" (September 8, 2010)

m. Generic BioCardia quality assurance procedure for risk management (October 24, 2010)

n. A presentation analyzing complaints against BioCardia's Morph catheter and explaining BioCardia's response to these complaints (October 24, 2010)

o. "Complaint 0070 – Summary of Initial Observations of 6F Morph Device" (October 24, 2010)

p. "02364-A (DH) Essential Requirements UGC [Universal Guide Catheter]" (December 29, 2010)

q. Spreadsheet tracking failures and responses for BioCardia catheter (February 14, 2011)

r. "02045-B (REG) Essential Requirements HIC [Helical Infusion Catheter]" (March 11, 2011)

s. Generic BioCardia Labeling Verification Procedure (May 9, 2011)

t. "Long HIC [Helical Infusion Catheter] risk analysis" (September 8, 2011)

u. "Helical Infusion Catheter Risk Management Plan & Report" (September 8, 2011)

v. "Verification Test Plan for Helix Model 02772" (December 19, 2011)

72. On January 4, 2012, Ms. Sarna ended her employment with BioCardia and executed the BioCardia, Inc. Termination Certification, where she: (1) indicated that she had not retained any BioCardia materials; (2) certified that she had complied with BioCardia's invention

assignment agreement, including “reporting of any inventions” she conceived; and (3) agreed to preserve all BioCardia trade secrets, confidential knowledge, proprietary information, products, processes, know-how, designs, and developmental or experimental work, among other things.

73. BioCardia is informed and believes and on that basis alleges that at the time of her departure, Ms. Sarna retained all the materials identified in paragraph 73 of these counterclaims and used some or all of those documents for the benefit of nVision.

74. At no time did Ms. Sarna inform BioCardia that she had filed several patent applications, and Ms. Sarna did not assign those applications to BioCardia but instead to nVision.

75. By the time of her departure, but unbeknownst to BioCardia, Ms. Sarna had misappropriated BioCardia trade secrets, confidential knowledge, proprietary information, products, processes, know-how, designs, and developmental or experimental work for the benefit of nVision and nVision’s future assigns.

76. At no time prior to her departure from BioCardia did Ms. Sarna inform BioCardia that she had already incorporated a competing medical device company to develop catheters similar to BioCardia’s Helix and Morph catheters, or that she had engaged in significant rounds of funding for this competing business.

***Ms. Sarna’s Misappropriation of BioCardia Trade Secrets Upon Leaving BioCardia***

77. After Ms. Sarna left BioCardia, she continued to file patent applications covering BioCardia’s confidential intellectual property, and developed catheter products similar to BioCardia’s Morph and Helix catheters for gynecological applications.

78. After leaving BioCardia, Ms. Sarna filed several domestic and foreign patent applications that claimed priority to the ’945 provisional application (collectively referred to as “the ’945 Provisional Application Family”) and which were based on the intellectual property described in Dr. Altman’s March 2000 lab notebook and disclosed to Ms. Sarna by Dr. Altman during their meeting in or around May 2009, including but not limited to: PCT/US Patent Application No. 12/022,619 (filed January 25, 2012), which was published as WO 2012/103,266 (August 2, 2012); U.S. Patent Application No. 13/979,691 (filed January 25, 2012), which was published as 2013/0296686 (Nov. 7, 2013)); U.S. Patent No. 9,173,571; U.S. Patent Application

No. 14/929,989 (filed November 2, 2015), which was published as 2016/0151011 (June 2, 2016)); U.S. Patent No. 10,610,149; U.S. Patent Application No. 15/605,407 (filed May 27, 2017), which was published as 2017/0258392 (Sept. 14, 2017)); U.S. Patent Application No. 16/813,117 (filed March 9, 2020), which was published as 2020/0205722 (July 2, 2020); and several foreign counterparts. By claiming priority to the '945 provisional application, the members of the '945 Provisional Application Family all incorporate BioCardia inventions and trade secrets and all should have been assigned to BioCardia.

79. Ms. Sarna also filed additional patent applications that claimed priority to the '120 provisional application (collectively referred to as "the '120 Provisional Application Family"), including but not limited to: PCT/US Patent Application No. 12/064,834 (filed November 13, 2012), which was published as WO 2013/071293 (May 16, 2013); U.S. Patent Application No. 14/357,875 (filed May 13, 2014), which was published as 2014/0323859 (Oct. 30, 2014)); and any foreign counterparts. By their reliance on the '120 provisional application, the members of the '120 Provisional Application Family all incorporate BioCardia inventions and trade secrets and all should have been assigned to BioCardia.

80. In or around 2013, Ms. Sarna began collaborating with Dr. Albert Chin to further refine the inventions and trade secrets she misappropriated from BioCardia. Through her collaboration with Dr. Chin, Ms. Sarna developed an everting balloon catheter as the means of obtaining a biopsy in a fallopian tube. However, the collaboration by Ms. Sarna and Dr. Chin still relied on, and used, BioCardia's inventions and trade secrets in the form of a catheter-based approach to obtain a biological sample from a fallopian tube to determine ovarian state.

81. Ms. Sarna, Dr. Chin, and a few additional nVision employees filed several foreign and domestic patents on the everting balloon refinement. The patent applications that claim priority to PCT/US Patent Application No. 14/014472 (collectively referred to as "the '472 Application Family") include, but are not limited to: U.S. Patent Application No. 14/764,710 (filed July 30, 2015), which was published as 2015/0351729 (December 12, 2015)); U.S. Patent No. 10,646,209; U.S. Patent Application No. 15/053,568 (filed February 25, 016), which was published as 2016/0278747 (September 29, 2016); U.S. Patent No. 10,639,016; U.S. Patent

Application No. 16/834,507 (filed March 30, 2020), which was published as 2020/045983 (August 6, 2020); U.S. Patent Application No. 15/998,501 (filed August 16, 2018), which was published as 2018/0353161 (December 13, 2018); U.S. Patent Application No. 15/998,507 (filed August 16, 2018), which was published as 2019/0000429 (January 3, 2019); U.S. Patent Application No. 16/834,480 (filed March 30, 2020), which was published as 2020/0245981 (August 6, 2020); PCT/US Patent Application No. 17/019700 (filed February 27, 2017), which was published as WO 2017/147586 (August 31, 2017); PCT/US Patent Application No. 18/000229 (filed August 16, 2018), which was published as WO 2019/040094 (February 28, 2019); and several foreign counterparts.

82. In addition to the ’945 Provisional Patent Family, the ’120 Provisional Patent Family, and the ’472 Application Family described above, Ms. Sarna and nVision Medical Corporation filed several additional United States provisional patent applications, including, but not limited to, a “USPTO provisional patent application filed on or around September 29, 2009” (BSC-BC00003116), U.S. Provisional Patent Application No. 62/546,791 (filed August 17, 2017); U.S. Provisional Patent Application No. 62/578,127 (filed October 27, 2017); U.S. Provisional Patent Application No. 62/608,027 (filed December 20, 2017); U.S. Provisional Patent Application No. 62/578,168 (filed October 27, 2017); and U.S. Provisional Patent Application No. 62/599,555 (filed December 15, 2017 (collectively “the Additional Provisional Applications”). Production of documents with respect to the Additional Provisional Applications has been virtually non-existent. BioCardia is informed and believes and on that basis alleges that the Additional Provisional Applications were based on the confidential BioCardia intellectual property that Dr. Altman shared with Ms. Sarna on or around May 2009.

83. In addition to her patenting efforts, Ms. Sarna also developed the Mako catheter. Aside from sizing differences, the Mako is very similar to BioCardia’s Morph and Helix catheters, both of which Ms. Sarna worked on while at BioCardia. For example, in nVision Medical Corporation’s Instructions for Use depict the Mako 7 catheter as “comprised of a catheter and a handle.” BSC-BC00004101. The handle includes a “luer,” which attaches to an “extension tube” that provides liquid to the Mako device. The handle also includes a “drive

wheel," which, when turned by the operator, pushes the liquid provided by the extension tube to the distal end of the catheter where it expands a balloon inside the catheter tip.



Figure 1 MAKO Device

BioCardia's Morph catheter, for example, presents a similar visual appearance to, and nearly the same components as, the Mako device. Like the Mako, the Morph is comprised of a catheter and a handle. The Morph handle includes a "luer," which attaches to an "extension tube" that provides liquid, which is delivered to the heart for treatment. The Morph handle includes "drive levers," which, when pulled by the operator, push the liquid treatment provided by the extension tube to the distal end of the catheter where it is delivered to the heart.




84. In addition to her patenting efforts, and the development of the Mako catheter system, Ms. Sarna also misappropriated BioCardia intellectual property from the March 2000 lab

notebook entry by disclosing this confidential information to various medical professionals as part of the development process. BioCardia is informed and believes and on that basis alleges that Ms. Sarna divulged confidential BioCardia intellectual property to at least the following individuals to obtain funding for nVision Medical Corporation, and as part of the Mako development and clinical trial process: Anula Jayasuriya; Linda Greub; Jesus Magana; Wendy Heigel; Andrew Cleeland; Dr. Tom Shebab; Arboretum Ventures IV, LP; Astia Angel nVision LLC; Catalyst Health Ventures (PF) L.P.; Catalyst Health Ventures Follow-On Fund, L.P.; Catalyst Health Ventures III, L.P.; Catalyst Health Ventures, LP; CHV Investments, LLC; CHV Partners Fund III, L.P.; CHV-E Partners III, L.P.; Draper Associates Investments, LLC; Draper Associates Riskmaster Fund II, LLC; Draper Associates Riskmasters Fund III, LLC; Excelestar Ventures I, LLC; eXXclaim Capital Partners I, LP; Fogarty Institute for Innovation; Golden Seeds nVision Medical, LLC; Life Sciences Angel Investors VIII, LLC; LMNVC, LLC; Seraph nVision, LLC; Dr. Shamila Pramanik; Dr. Jose Garza Leal; Dr. Sarah H. Kim; Dr. Ronny Drapkin; Dr. Mark Morgan; Dr. Barry Berger; Dr. Paul Billings; Dr. Amy Garcia; Dr. Stephen Grochmal; Dr. Allison Kurian; Dr. Charles Landen; Dr. David Miller; Dr. Bethan Powell; Dr. Eric Yang; Dr. Elena Gates; Dr. Hector Chapa; Dr. Lynn Marie Westphal; Dr. William Keye; Dr. Viviane Connor; Dr. Jim Tsaltas; Dr. Douglas Hart; Dr. Andrew Brill; Dr. David Miller; Dr. Jonathan Berek; Dr. Frederick St. Goar; and various staff members of the individuals and entities.

***BioCardia's First Awareness of Ms. Sarna's Breach of Contract and Misappropriation of Trade Secrets***

85. Contrary to the allegations in the complaint, BioCardia was not aware that Ms. Sarna had founded a competing medical device company that made catheters like BioCardia's Morph and Helix catheters, and was not aware that Ms. Sarna had misappropriated BioCardia's intellectual property, until January 2019. Also contrary to the allegations in the complaint, nothing about Ms. Sarna's actions would have put BioCardia on notice that she had founded a competing company or misappropriated BioCardia's trade secrets.

86. The complaint alleges that "on information and belief, while employed at BioCardia, Ms. Sarna openly shared her interests in starting her own medical company focused

on women's health with her colleagues at BioCardia." Dkt. 1 at ¶ 28. Sharing an interest in starting a medical device company with co-workers is not the same as providing notice that this company will compete with your co-workers or that you plan to misappropriate company confidential information. While Ms. Sarna may or may not have shared the desire to start a new company, she certainly did not tell BioCardia that this company would compete with BioCardia, that it would misappropriate BioCardia's trade secrets or that it was already founded in 2009 while she was a BioCardia employee.

87. The complaint also alleges that "on information and belief, Ms. Sarna was told by Dr. Altman that she had permission to pursue her own projects relating to women's health on her own time and using her own resources, as such projects were outside the scope of BioCardia's business and research and development." *Id.* This plainly is not true. Dr. Altman never gave Ms. Sarna blanket permission to start a competing company or to pursue any independent research on women's health. Almost from the beginning of Ms. Sarna's employment at BioCardia, co-workers were concerned about her absences, her lack of focus at work, and her low productivity. The idea that Dr. Altman would have encouraged her to pursue outside research, which only would have exacerbated her poor performance at work, is illogical. Furthermore, research on women's health was not outside the scope of BioCardia's business or its research and development. BioCardia was actively pursuing women's health applications for its catheters, and Dr. Altman met with Ms. Sarna in or around May 2009 to discuss a women's health research and development project that Dr. Altman wanted Ms. Sarna to conduct on behalf of BioCardia.

88. The complaint also states, "during the 2008-2012 time period, and with BioCardia's knowledge, Ms. Sarna continued to work independently and on her own time—often at night and on weekends out of her home—researching issues in women's health and ideas for starting a medical company focused on women's health, all on her own time and without the use of BioCardia resources." Dkt. 1 at ¶ 29. Again, this is not true. At no point was BioCardia aware that Ms. Sarna was working independently on women's health issues or that she had already formed a competing company. Much of the four-year period came after Dr. Altman shared the March 2000 lab notebook entry with Ms. Sarna in or around May 2009, which would

have made Ms. Sarna's "independent research" on the topic highly suspect. As described above, Ms. Sarna did not conduct her research entirely on her own time and without the use of BioCardia resources. Ms. Sarna conducted significant work on behalf of nVision, and in furtherance of the patents she secured based on BioCardia's trade secrets, during normal business hours. Furthermore, Ms. Sarna used BioCardia's email system to at least request help conceptualizing the concepts underlying the '945 provisional patent application and to send to her personal email account the BioCardia confidential documents identified in paragraph 73 above.

89. The complaint alleges "on information and belief, Ms. Sarna provided BioCardia with written notification of the patent applications she filed in 2011—namely the '945 Provisional and the '120 Provisional." Dkt. 1 at ¶ 33. This is completely false. Ms. Sarna never informed BioCardia, either orally or in writing, that she had filed several provisional patent applications during her employment at BioCardia.

90. The complaint alleges that "after Ms. Sarna left BioCardia, she kept in touch with her BioCardia superiors and colleagues—including Dr. Altman and Mr. Mackenzie—and kept them apprised of her position as an entrepreneur in the field of women's health." Dkt. 1 at ¶ 35. This is the full extent of Ms. Sarna's appraisal of her "position as an entrepreneur" to Dr. Altman:

**From:** Surbhi Sarna
**To:** Peter Altman
**Subject:** catching up
**Date:** Wednesday, January 25, 2012 10:55:55 AM

Hi Peter,

I have some news -- I'm officially an entrepreneur! As successful and knowledgeable as you are, I would love to get together sometime soon and learn from you. But, I also know how incredibly busy you are - what is your schedule like in the coming weeks?

Looking forward to it,
Surbhi
408.655.3577

BC-BSC_0000016. Needless to say, this did not put Dr. Altman on notice that Ms. Sarna had formed a competing business, breached the Sarna Agreement or that she had misappropriated BioCardia intellectual property.

91. The complaint goes on to allege that "for example, in June 2013, BioCardia's then

COO, Mr. MacKenzie, heard Ms. Sarna speak at a conference about nVision, the ovarian cancer detection device she was developing, the design of the devices she was developing, and the patents she had filed for nVision." Dkt. 1 at ¶ 35. This again is incorrect. While Mr. MacKenzie did bump into Ms. Sarna at a conference in 2013, he did not hear her speak, and did not see Ms. Sarna's presentation. Mr. MacKenzie will testify to the effect that at the 2013 conference he did not learn anything about what nVision was doing, anything about nVision's detection device or its design, or anything about the patents Ms. Sarna had filed for nVision.

92. According to the complaint, "Mr. MacKenzie subsequently emailed Ms. Sarna to congratulate her on 'how successful [she had] been at pursuing the birth of [her] company.'" Dkt 1 at ¶ 35; see also Dkt. 1 at Ex. C. Below is what Mr. Mackenzie emailed Ms. Sarna after bumping into her at the 2013 conference:

Gmail — Surbhi Sarna <surbhiss@gmail.com>

**re: WSGR conf & happy Surbhi**
8 messages

**Andy Mackenzie** <andy@biocardia.com> — Fri, Jun 21, 2013 at 10:15 AM
To: Surbhi Sarna <surbhiss@gmail.com>

Hey Surbhi-

It was really nice to see you this week at the conference. It makes me happy to see how successful you have been at pursuing the birth of your company and how that has changed how you look standing and talking to others- you look relaxed and satisfied, and that is wonderful to see.

Please feel free to call on me if I can be helpful or if you are in the neighborhood and want to meet up for coffee or lunch.

All the best for your continued success! See you soon.

Andy

Dkt. 1 at Ex. C. All this email states is that Mr. MacKenzie ran into Ms. Sarna at the 2013 conference ("It was really nice to see you this week at the conference."), which is consistent with what he will testify to if asked about this interaction. What is missing from this email, or any other emails on this topic, is anything to corroborate Ms. Sarna's claim that Mr. MacKenzie saw her 2013 presentation or learned about nVision's products or intellectual property, which he

recalls that he did not.

93. The first time that BioCardia became aware of Ms. Sarna's breach of her employment contract, and misappropriation of BioCardia's confidential information, was in January 2019, after Boston Scientific advised Dr. Altman that it no longer wanted to pursue a business relationship with BioCardia that previously had been under discussion. Surprised by this development, and having learned that Boston Scientific had acquired the Company Ms. Sarna had founded, Dr. Altman searched the USPTO website to see what Ms. Sarna was working on as this was a way to see what parties were developing in stealth mode. It was only after conducting these searches, that Dr. Altman and BioCardia learned that Ms. Sarna had filed the '945 provisional application and '120 provisional application during her time at BioCardia, and that these applications, and several patents that claimed priority to these applications, were based on the March 2000 lab notebook entry that Dr. Altman described to Ms. Sarna in or around May 2009. Dr. Altman describes the experience of seeing the first patent in 2019 as feeling his "blood run cold" as soon as he saw the area she was working in and how closely it was related to the project he had detailed to her.

94. BioCardia subsequently learned that, in addition to the intellectual property that nVision acquired covering the intellectual property contained in the March 2000 lab notebook entry, it also had developed a product called the Mako that incorporated much of the same intellectual property described in the lab notebook.

95. After Boston Scientific acquired nVision, it engaged in efforts to rebrand the Mako with its own product name, called Cytuity. BioCardia is informed and believes and on that basis alleges that Cytuity functions the same as Mako, and, therefore, also implements BioCardia's intellectual property disclosed in the March 2000 lab notebook entry.

96. BioCardia is informed and believes and on that basis alleges that after or simultaneously with its acquisition of nVision, Boston Scientific transferred all of nVisions's patents and patent applications, and perhaps its other intellectual property as well, to Boston Scientific Scimed.

**COUNT I**

**Correction of Inventorship under 35 U.S.C. § 256**

**(Against Counterdefendants Boston Scientific, Boston Scientific Scimed and Ms. Sarna)**

97. BioCardia realleges paragraphs 1-96, inclusive.

98. BioCardia requests correction of inventorship of all domestic and foreign counterparts of all patents and applications in the '945 Provisional Application Family, the '120 Provisional Application Family, the '472 Application Family and Additional Provisional Applications against Counterdefendants Boston Scientific, Boston Scientific Scimed and Ms. Sarna to name Drs. Stertzer and Altman as additional inventors and BioCardia as the assignee.

99. "'[A] joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed.'....'People may be joint inventors even though they do not physically work on the invention together or at the same time, and even though each does not make the same type or amount of contribution.'... To be a joint inventor, one must '(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.'" *Dana-Farber Cancer Center Institute, Inc. v. Ono Pharmaceutical, Ltd.*, 964 F.3d 1365, 1371 (Fed. Cir. July 14, 2020). Here the requirements for Drs. Stertzer and Altman to be joint inventors are easily met as alleged below.

100. The March 23, 2000 entry that Dr. Altman recorded in his lab notebook disclosed and described several solutions to problems in the field diagnosing, testing, and treating ovarian cancer.

101. The inventions disclosed in the lab notebook are a novel and minimally invasive method of determining ovarian state by adding imaging, testing, and treatment functionality to the end of a catheter system, and guiding that catheter system through a uterus to the fallopian tube, where imaging, testing, and treatment can be conducted, including several different imaging, testing, and treatment options that can be available at the distal end of the catheter; how this

catheter system could be applied in different ways depending on the ovarian condition that is to be addressed; use of the catheter system in different locations in a woman's pelvis; and possible use of the catheter to facilitate pregnancies.

102. Drs. Altman and Stertzer worked collaboratively to develop the inventions disclosed in the March 23, 2000 lab notebook entry. In March 2000, Dr. Stertzer called Dr. Altman to discuss what he considered to be a good business opportunity for BioCardia. According to Dr. Stertzer, it would be possible to adapt the Helix and Morph catheters that BioCardia made for cardiovascular applications to be used in fallopian tubes to improve the ability to diagnose pre-cancerous and cancerous cysts in a less invasive way. Dr. Stertzer believed that once BioCardia's catheters were properly sized, their maneuverability made them ideal for the tortuosity of the fallopian tubes.

103. Dr. Stertzer's contributions to the inventions in the March 2000 lab notebook entry were: (1) the general idea of adapting BioCardia's catheters for gynecological applications; and (2) relevant physiological information (i.e., information about body parts with which the catheter system would interact).

104. Dr. Altman built on Dr. Stertzer's ideas by adding his conception of a catheter system that could address this problem. Dr. Altman's contribution to the March 2000 lab notebook entry's inventions related to the devices that could address the need that Dr. Stertzer identified.

105. After this initial phone call, Drs. Stertzer and Altman continued to collaborate on the inventions. In the days following the call, Dr. Altman recorded Dr. Stertzer's ideas in his lab notebook and added descriptions and details about the devices that he contributed to the inventions. Shortly after Dr. Altman had completed the disclosure in the March 2000 lab notebook entry, he reached out to Dr. Stertzer to discuss what he had contributed and further explore the inventions. This set off a series of communications over the following months and years between the joint inventors on this topic. During these communications, Dr. Stertzer suggested that Dr. Altman follow up with various practitioners to discuss the possibility of developing the inventions, including Dr. Camran Nezhat. Dr. Altman then reached out to Dr.

Nezhat and began a dialogue about the development and use of the catheter technologies for gynecological applications.

106. BioCardia has standing to bring this correction of inventorship claim because both Dr. Stertzer and Dr. Altman assigned their rights to the inventions disclosed in the March 2000 lab notebook entry to BioCardia through various agreements.

107. For example, under Section 7.1 of this agreement, Dr. Stertzer agreed that to "promptly disclose all Inventions, as defined in Section 1.3 above, to [Hippocratic Engineering]" which "shall be the owner of all Inventions, including all patent rights, trade secrets and other intellectual property rights therein." Section 1.3 of the agreement defined "Inventions" as "all discoveries, inventions, improvements, developments, products, processes, procedures, techniques, formulae, computer programs, drawings, designs, notes, documents, information and materials first made, conceived, developed or reduced to practice in, the course of Advisor's performance of Advisory Services for [Hippocratic Engineering] in the Field of Advising." Section 1.1 defined "Advisory Services" as "attending meetings of the Scientific Advisory Board, reviewing research and development projects, reviewing and criticizing technical and/or business opportunities and devising clinical trial strategies and protocols, and other services rendered to [Hippocratic Engineering] in the Field of Advising." Section 5.3 of the agreement set out how either party may terminate the agreement. Since the April 1999 signing date, neither Dr. Stertzer nor BioCardia (in its present or previous forms) ever terminated Dr. Stertzer's "Agreement for Scientific Advisor Services." As a result, Dr. Stertzer assigned his rights to the inventions disclosed in the March 2000 lab notebook entry.

108. Dr. Altman assigned his rights to the inventions disclosed in the March 2000 lab notebook entry through his July 1999 employment agreement with BioCardia, which tracks the language of Ms. Sarna's BioCardia employment agreement.

109. Under Section 3(b) of that agreement, Dr. Altman agreed to "promptly make full written disclosure to [BioCardia], will hold in trust for the sole right and benefit of [BioCardia], and hereby assign to [BioCardia], or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade

secrets." Dr. Altman's employment with BioCardia has been continuous and uninterrupted from July 1999 to the present. Thus, Dr. Altman assigned his rights to the inventions disclosed in the March 2000 lab notebook entry to BioCardia.

110. Shortly after Ms. Sarna began her full-time employment with BioCardia, Dr. Altman sought to enable her entrepreneurial efforts on behalf of BioCardia and get her to work on a skunkworks side project to further develop the inventions described in the March 2000 lab notebook entry. During a one-on-one meeting with Ms. Sarna in or around May 2009, Dr. Altman described and explained the new state of the art possibilities with gene expression profiling and the contents of the March 2000 lab notebook entry. For well over an hour, Dr. Altman explained in great detail the individual aspects of each disclosed invention, taking time to discuss the underlying technology and the significance of these developments. Dr. Altman took this time and provided this detail because he hoped that Ms. Sarna would appreciate the importance of these inventions and play an important role in driving further development, collaborating with Dr. Altman to create a successful business within BioCardia that focused on applications of these inventions.

111. BioCardia is informed and believes and on that basis alleges that Dr. Altman's May 2009 disclosure and March 2000 lab notebook entry was the only possible source of the inventive concepts that Ms. Sarna patented (either jointly or individually) on behalf of nVision Medical Corporation. The reason for this is because no one of skill in the art, both in March 2000 and when Dr. Altman disclosed the lab notebook inventions to Ms. Sarna, even realized that these inventions were technologically feasible.

112. Gene expression profiling maximized the potential for practitioners to get any useful information from the catheter approach of obtaining a biologic sample from the fallopian tube envisioned by Drs. Stertzer and Altman. This is because the sample can be amplified and it contains all of the information on the status of the cells. In 2000, gene expression profiling did not exist – and BioCardia was one of the leaders in its development. In 2008, the first gene expression assay ever was approved by the FDA, the ALLOMAP assay which was developed initially under the leadership of Dr. Altman who was CEO for both BioCardia and CareDX even

after the companies split in 2002. Only an extremely small set of people in the entire world realized that something like ovarian cancer could be tested from a small sample of cells, and how to develop these assays to guide life and death clinical decisions. With the exception of Dr. Altman, none of these people had the necessary experience developing catheter systems to understand the usefulness of combining the two technologies.

113. In fact, at the time of Dr. Altman's disclosure to Ms. Sarna, BioCardia is informed and believes and on that basis alleges that only three companies were involved in gene expression profiling as a diagnostic product. Dr. Altman was a member of this elite group of technologists because his team at BioCardia founded CareDx, one of the three gene expression profiling startups that still existed (and does as a public company to this day) at the time of his disclosure to Ms. Sarna. But even within this small group of people, Drs. Altman and Stertzer, through their work at BioCardia, were the only ones who had sufficient familiarity with catheter devices to conceive of the inventions disclosed in the March 2000 lab notebook entry. Nobody in the world of gene expression profiling for early cancer diagnosis, other than Drs. Altman and Stertzer, had any idea that samples from the fallopian tubes could be obtained which might correlate with ovarian state.

114. In addition, both in March 2000 and when Dr. Altman disclosed the lab notebook to Ms. Sarna and the potential of gene expression profiling to Ms. Sarna, BioCardia is informed and believes and on that basis alleges that those of skill in the art were not looking at fallopian tubes as a location that could yield useful information about ovarian state. The prevailing thought at the time held that determining whether a patient had ovarian cancer meant accessing and testing the ovaries themselves. This was true even as first scientific information became available in 2009 that many cases of ovarian cancer originated in the fallopian tube.

115. In the following paragraphs, BioCardia identifies the inventive contributions of Drs. Altman and Stertzer in patents and applications in the '945 Provisional Application Family, the '120 Provisional Application Family and the '472 Application Family. While BioCardia alleges that Drs. Altman and Stertzer should be named inventors on all patents and patent applications in those families, both domestic and foreign counterparts, for the sake of brevity

BioCardia will limit the analysis to comprehensive sampling from the families. While these examples focus on independent claims in the patents and patent applications, there are also several dependent claims that include additional limitations that were part of the inventions Drs. Altman and Stertzer conceived in the March 2000 lab notebook entry.

116. **U.S. Patent No. 9,173,571 (member of the '945 Provisional Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 9,173,571 ("the '571 patent"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A device for maintaining a narrow body lumen, comprising: a hydraulic propulsion mechanism and at least one of an imaging portion or a therapeutic portion, said hydraulic propulsion mechanism configured for propelling said imaging portion or said therapeutic portion relative to said hydraulic propulsion mechanism and through the narrow body lumen, said hydraulic propulsion mechanism including an elongate shaft, wherein the narrow body lumen is distal of a distal end of said elongated shaft; wherein said imaging portion or said therapeutic portion, when propelled by said hydraulic propulsion mechanism, is driven distally from said distal end of said elongated shaft and is distally spaced therefrom; and a retrieval mechanism for retrieving said imaging portion or said therapeutic portion from the narrow body lumen.

Drs. Altman and Stertzer both conceived of the "device for maintaining a narrow body lumen" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show the catheter system they invented inserted into the fallopian tubes and the spaces surrounding the inserted catheters. Drs. Altman and Stertzer both conceived of the "at least one of an imaging or a therapeutic portion" and the "wherein said imaging portion or said therapeutic portion" limitations by, for example, Dr. Stertzer's observation in the March 2000 lab notebook entry that modified BioCardia catheters could image and treat ovarian cancer and Dr. Altman's identification in the same lab notebook entry of different imaging, diagnostic, and treatment capabilities. Dr. Altman conceived of the "elongate shaft" and "is driven distally from said distal end of said elongated shaft and is distally spaced therefrom" limitations by, for example, his conception of a catheter system in the March 2000 lab notebook entry that involved a guide and a catheter that extended from the guide. Through the March 2000 lab notebook entry, Drs. Altman

and Stertzer contributed to claim 1 of the ’571 patent the inventive concepts of inserting a catheter adapted to provide imaging and therapeutic capabilities at its distal end into the fallopian tubes by extending an elongated shaft to image gynecological structures and provide required therapy.

117. **U.S. Patent No. 10,610,149 (member of the ’945 Provisional Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 10,610,149 (“the ’149 patent”). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A Fallopian tube diagnostic device, comprising: a catheter including a sensing portion and an inflatable portion, wherein one or more objects are detectable in the Fallopian tube via the sensing portion; and a solution lumen for providing a solution, the solution being disposable in the Fallopian tube for detecting the one or more objects; wherein the inflatable portion is adjacent and proximal to said sensing portion and is configured to inflate in the Fallopian tube to create a space around said sensing portion and to create a seal such that the fallopian tube can be filled with the solution.

Drs. Altman and Stertzer both conceived of the “fallopian diagnostic device” limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry explaining the catheter system they invented. Drs. Altman and Stertzer both conceived of the “catheter,” “sensing portion,” and “one or more objects are detectable in the Fallopian tube via the sensing portion” limitations, by, for example, Dr. Stertzer’s contribution to the March 2000 lab notebook entry’s disclosure that the inventive catheter could detect and diagnose pre-cancerous and cancerous structures in the fallopian tubes, and by, for example, Dr. Altman’s conception of “optional imaging capabilities” in that same lab notebook entry that could be used with the inventive catheter, including, but not limited to, fiber optics, ultrasound, and cameras. Dr. Altman conceived of the “a solution lumen for providing a solution, the solution being disposable in the Fallopian tube” through the March 2000 lab notebook entry describing catheters with lumens and the description of treatment lumen in the catheter to deliver, for example, alcohol or cytotoxic agents to the distal end of the catheter. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the ’149 patent the inventive concepts of inserting a catheter adapted to provide imaging capabilities at its distal end into the fallopian

tubes, and using this imaging capability to detect one or more objects in the fallopian tubes.

118. **PCT/US Patent Application No. 2012/022,619 (member of the '945 Provisional Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of PCT/US Patent Application No. 2012/022,619 ("the '619 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A device for maintaining a narrow body lumen, comprising: a hydraulic propulsion mechanism for propelling an imaging portion or a therapeutic portion through said narrow body lumen; and a retrieval mechanism for retrieving said imaging portion or said therapeutic portion from said narrow body lumen.

Drs. Altman and Stertzer both conceived of the "device for maintaining a narrow body lumen" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show the catheter system they invented inserted into the fallopian tubes and the spaces surrounding the inserted catheters. Drs. Altman and Stertzer both conceived of the "propelling an imaging portion or a therapeutic portion through said narrow body lumen" limitation by, for example, Dr. Stertzer's observation in the March 2000 lab notebook entry that modified BioCardia catheters could be inserted into fallopian tubes to image and treat ovarian state, and Dr. Altman's identification in that same lab notebook entry of different imaging, diagnostic, and treatment capabilities that could be used with the catheter. Drs. Altman and Stertzer both conceived of the "retrieval mechanism for retrieving said imaging portion or said therapeutic portion from said narrow body lumen" limitation, by, for example, Dr. Stertzer's conception of the catheter system being used to image, and administer treatment to, the fallopian tubes in the March 2000 lab notebook entry, and Dr. Altman's conception in the same lab notebook entry of the guide and other structures in the catheter system. Inherent in these disclosures is the requirement that the catheter system must be withdrawn from the fallopian tube. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '619 application the inventive concepts of inserting a catheter that maintains a narrow body lumen into the fallopian tube, propelling imaging and therapeutic capabilities through the lumen, and retrieving the catheter system.

119. **U.S. Patent Application No. 15/605,407 (member of the '945 Provisional Patent**

**Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent Application No. 15/605,407 ("the '407 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 19:

> **19**. A process of operating on a narrow body lumen, said process comprising: pressurizing an apparatus and configuring the apparatus to an initial configuration where an inflatable body partially extends out of a distal end of an outer shaft portion of the apparatus; inserting the partially extending inflatable body into the narrow body lumen; fully everting the inflatable body so that the inflatable body is fully deployed out of the distal end of the outer shaft portion and extends further into the narrow body lumen; and delivering at least one of a visualization instrument and therapy through an opening in the inflatable body, distally thereof and into the narrow body lumen.

Drs. Altman and Stertzer both conceived of the "process of operating on a narrow body lumen" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented operating in the narrow body lumen of the fallopian tubes. Drs. Altman and Stertzer both conceived of the "distal end of an outer shaft portion of the apparatus" and "delivering at least one of a visualization instrument and therapy" limitations through, for example, Dr. Stertzer's conception of a catheter system having a shaft with imaging and therapeutic capabilities at the distal end of the catheter, and Dr. Altman's conception, in the same lab notebook entry, of specific catheter structures, including a catheter shaft that included, at its distal end, visualization equipment in the form of a camera, and therapy in the form of an instrument lumen. Dr. Altman also conceived of alternative visualization and therapy equipment that could be delivered through the catheter shaft.




Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 19 of the '407 application the inventive concepts of a process of operating on a narrow body lumen using a catheter that has, at its distal end of the catheter shaft, visualization and therapy capabilities that

can be delivered to the fallopian tube.

120. **U.S. Patent Application No. 16/813,117 (member of the '945 Provisional Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent Application No. 16/813,117 ("the '117 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 20:

> **20**. A narrow body lumen diagnostic device, comprising: a guide wire capable of providing light for guiding a catheter to a target location, the guide wire including illuminating fibers; a catheter including a catheter shaft and imaging fibers; and an image sensor located at a proximal end of the catheter, wherein the imaging fibers extend along a length of the catheter shaft such that, during an operational state of the device, the imaging fibers facilitate imaging by sending imaging signals from a distal end of the catheter to the imaging sensor at the proximal end of the catheter.

Drs. Altman and Stertzer both conceived of the "narrow body lumen diagnostic device" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented diagnosing ovarian state in the narrow body lumen of the fallopian tubes. Drs. Altman and Stertzer conceived of the "catheter including a catheter shaft and imaging fibers" the "wherein imaging fibers extend along a length of the catheter shaft," and the "imaging fibers facilitate imaging by sending imaging signals from a distal end of the catheter to the imaging sensor at the proximal end of the catheter" limitations by, for example, Dr. Stertzer's conception in the March 2000 lab notebook entry of a catheter having a catheter shaft and imaging capability being inserted into fallopian tubes to diagnose ovarian state, and by Dr. Altman's conception in the same lab notebook entry of, for example, fiber optics in the catheter shaft that run from the distal to proximal ends of the catheter structure. *See, e.g.*, the image below where "optional imaging capabilities" are labelled at the proximal end of the catheter.




Drs. Altman and Stertzer both conceived of the "image sensor located at the proximal end of the catheter" limitation, by, for example, Dr. Stertzer's conception in the March 2000 lab notebook entry of a catheter system having imaging capability navigating and imaging fallopian tubes, and Dr. Altman's disclosure in the same lab notebook entry of catheter structures that allowed the image to be transported to the proximal end of the catheter. The concept of an image sensor at the proximal end of the catheter was both explicitly and inherently disclosed by Drs. Altman and Stertzer's contributions to the lab notebook entry. Through the March 2000 lab notebook entry Drs. Altman and Stertzer contributed to claim 20 of the '117 application the inventive concepts of a catheter system with of a narrow body lumen diagnostic device, in the form of the catheter system they invented, which included a catheter shaft, imaging fibers that ran the length of a shaft and sending an image from the distal end of the catheter to an image sensor at a proximal end.

121. **PCT/US Patent Application No. 2012/064,834 (member of the '120 Provisional Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of PCT/US Patent Application No. 2012/064,834 ("the '834 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A device to confirm intratubal occlusion in a subject of a fallopian tube having an inner diameter, said device comprising: a tubular shaft having a distal end and an interior

> lumen; an examination head joined to the distal end of said shaft; a visualization modality in said examination head for visual or acoustic imaging of the fallopian tube; a power source for said visualization modality; a handle for control of said device and for support; and an ex vivo imager of an ocular, video headgear, or a video display in communication with said visualization modality.

Drs. Altman and Stertzer both conceived of the "device to confirm intratubal occlusion in a subject of a fallopian tube having an inner diameter" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented passing through the inner diameter of fallopian tubes to image structures and diagnose ovarian state. Drs. Altman and Stertzer both conceived of the "tubular shaft having a distal end and an interior lumen" limitation, by, for example, Dr. Stertzer's conception in the March 2000 lab notebook entry of a catheter system that could be inserted into fallopian tubes to deliver treatment or even implant eggs from a donor, which necessarily would involve a tubular shaft with an interior lumen, and by Dr. Altman's conception in the same lab notebook entry of different tubular shafts that had lumens, as shown in the images below. Drs. Altman and Stertzer also both conceived of the "examination head joined to the distal end of the shaft" limitation by, for example, Dr. Sterzer's disclosure in the March 2000 lab notebook entry of a catheter system that could image and diagnose ovarian state, and by Dr. Altman's disclosure in the same lab notebook entry of examination heads in the form of cameras, fiber optics, and ultrasound at the distal end of the catheter shaft.




Dr. Altman conceived of the "visualization modality in said examination head for visual or acoustic imaging of fallopian tube" limitation, by, for example, his disclosure in the March 2000 lab notebook entry of "optional imaging capabilities" including ultrasound, fiber optic, and camera capabilities at the distal end of the catheter system he invented with Dr. Stertzer. Dr. Altman also conceived of the "handle for control of said device and for support" limitation when, for example, he drew just such a handle in the March 2000 lab notebook entry for the catheter system he helped invent.







Drs. Altman and Stertzer also both conceptualized the "ex vivo imager of an ocular, video headgear, or a video display in communication with said visualization modality" limitation by, for example, Dr. Stertzer's conceptualization in the March 2000 lab notebook entry of a catheter system that could provide imagery from inside a fallopian tube. Inherent in that disclosure, is the use of a display outside the body that was in communication with the visualization modality of the catheter system he helped invent. Dr. Altman's conception of the "ex vivo imager" limitation was explicitly disclosed in same lab notebook entry by his drawing of the entire catheter system

where he noted "optional imaging capabilities" outside the patient's vagina. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '834 application the inventive concepts of a catheter system with: (1) a tube-shaped catheter that has an interior lumen and a distal end; (2) an examination head on the distal end of the catheter for examining the interior of the fallopian tube; (3) a camera, or fiber optics, or ultrasound as part of the examination head to visualize the interior of a fallopian tube; (4) a handle to control and support the catheter system; and (5) an ex vivo monitor in communication with the camera, fiber optics, or ultrasound so that a practitioner can observe the images captured by the catheter system.

122. **U.S. Patent Application No. 14/323,859 (member of the '120 Provisional Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent Application No. 2012/064,834 ("the '834 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> **1**. A device to confirm intratubal occlusion in a subject of a fallopian tube having an inner diameter, said device comprising: a tubular shaft having a distal end and an interior lumen; an examination head joined to the distal end of said shaft; a visualization modality in said examination head for visual or acoustic imaging of the fallopian tube; a power source for said visualization modality; a handle for control of said device and for support; and an ex vivo imager of an ocular, video headgear, or a video display in communication with said visualization modality.

Drs. Altman and Stertzer both conceived of the "device to confirm intratubal occlusion in a subject of a fallopian tube having an inner diameter" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented passing through the inner diameter of fallopian tubes to image structures and diagnose ovarian state. Drs. Altman and Stertzer both conceived of the "tubular shaft having a distal end and an interior lumen" limitation, by, for example, Dr. Stertzer's conception in the March 2000 lab notebook entry of a catheter system that could be inserted into fallopian tubes to deliver treatment or even implant eggs from a donor, which necessarily would involve a tubular shaft with an interior lumen, and by Dr. Altman's conception in the same lab notebook entry of different tubular shafts that had lumens, as shown in the images below. Drs. Altman and Stertzer also both conceived of the "examination head joined to the distal end of the shaft" limitation by,

for example, Dr. Sterzer's disclosure in the March 2000 lab notebook entry of a catheter system that could image and diagnose ovarian state, and by Dr. Altman's disclosure in the same lab notebook entry of examination heads in the form of cameras, fiber optics, and ultrasound at the distal end of the catheter shaft.







Dr. Altman conceived of the "visualization modality in said examination head for visual or acoustic imaging of fallopian tube" limitation, by, for example, his disclosure in the March 2000 lab notebook entry of "optional imaging capabilities" including ultrasound, fiber optic, and camera capabilities at the distal end of the catheter system he invented with Dr. Stertzer. Dr. Altman also conceived of the "handle for control of said device and for support" limitation when, for example, he drew just such a handle in the March 2000 lab notebook entry for the catheter system he helped invent.




Drs. Altman and Stertzer also both conceptualized the "ex vivo imager of an ocular, video headgear, or a video display in communication with said visualization modality" limitation by, for example, Dr. Stertzer's conceptualization in the March 2000 lab notebook entry of a catheter system that

could provide imagery from inside a fallopian tube. Inherent in that disclosure, is the use of a display outside the body that was in communication with the visualization modality of the catheter system he helped invent. Dr. Altman's conception of the "ex vivo imager" limitation was explicitly disclosed in same lab notebook entry by his drawing of the entire catheter system where he noted "optional imaging capabilities" outside the patient's vagina. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '834 application the inventive concepts of a catheter system with: (1) a tube-shaped catheter that has an interior lumen and a distal end; (2) an examination head on the distal end of the catheter for examining the interior of the fallopian tube; (3) a camera, or fiber optics, or ultrasound as part of the examination head to visualize the interior of a fallopian tube; (4) a handle to control and support the catheter system; and (5) an ex vivo monitor in communication with the camera, fiber optics, or ultrasound so that a practitioner can observe the images captured by the catheter system.

123. **PCT/US Patent Application No. 2017/019,700 (member of the '472 Application Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of PCT/US Patent Application No. 2017/019,700 ("the '700 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A process of collecting cells from a tissue surface in a subject comprising: deploying a distal end of a catheter at a proximal end of the tissue surface; everting a balloon extendible from the distal end of the catheter to contact the tissue surface with sufficient force to dislodge the cells from the tissue surface; and withdrawing said balloon from the subject to collect the cells.

When Dr. Altman described the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in PCT/US Patent Application No. 2017/019,700. Drs. Altman and Stertzer both conceived of the "process of collecting cells from a tissue surface in a subject" limitation by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of using modified versions of BioCarida's Helix and Morph catheters inserted into a fallopian tube to collect cells to improve the diagnosis and treatment of ovarian cancer, and by Dr. Altman's disclosure in the

same lab notebook entry of a catheter system with the ability to perform fluid and material core biopsies in the fallopian tubes to diagnose ovarian state. Dr. Altman conceived of the "deploying a distal end of a catheter at a proximal end of the tissue surface" limitation by, for example, describing in the March 2000 lab notebook entry of a catheter system that had a distal end that could be steered through the tortuosity of the fallopian tube. Dr. Altman also conceived of the element that is "extendible from the distal end of the catheter to contact the tissue surface with sufficient force to dislodge the cells from the tissue surface" by, for example, describing in the March 2000 lab notebook entry of a biopsy probe that is capable of fluid or material core biopsies. Finally, both Drs. Stertzer and Altman conceived of the "withdrawing … from the subject to collect the cells" limitation by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of utilizing a catheter system inserted into a fallopian tube to collect cells to diagnose ovarian state in a less invasive fashion, and Dr. Altman's disclosure in the same lab notebook entry of an implement capable of taking a fluid or material core biopsy. Inherent in both of these disclosures is the requirement that whatever is taking the biopsy is withdrawn from the subject to test the collected cells. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '700 application the inventive concepts of a guiding the distal end of a catheter through a fallopian tube to collect cells lining the lumen and withdrawing the catheter with the collected cells from the patient.

124. **PCT/US Patent Application No. 2018/000,229 (member of the '472 Application Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of PCT/US Patent Application No. 2018/000,229 ("the '229 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A device for Fallopian tube diagnostics, comprising: a tube having a distal end; a balloon having a first end coupled to the distal end of the tube, the balloon being disposed in the tube in a first, inverted position and movable to a second, everted position, extendable a distance distal of the tube distal end, such that a surface of the balloon is contactable with an inner surface of the Fallopian tube; and a push wire having a distal end coupled to a second end of the balloon, wherein the balloon is movable from the first inverted position to the second everted position by actuation of the push wire; wherein a surface of the balloon includes a plurality of surface features for collection, retention, or both, of a tissue sample of the inner surface of the Fallopian tube.

When Dr. Altman described the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in PCT/US Patent Application No. 2018/000,229. Drs. Altman and Stertzer both conceived of the "device for fallopian tube diagnostics" limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented diagnosing ovarian state in the fallopian tubes. Both Drs. Altman and Stertzer conceived of the "tube having a distal end" limitation by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of guiding the distal end of a catheter tube through the fallopian tubes to diagnose ovarian state, and Dr. Altman's disclosure in the same lab notebook entry of diagrams of the catheter system with a distal end in fallopian tubes.




Drs. Altman conceived of the "extendable a distance distal of the tube distal end" limitation by, for example, his disclosure in the March 2000 lab notebook entry of a probe that extends beyond the distal end of the catheter to collect cells from the fallopian tubes. Drs. Altman and Stertzer both conceived of the "contactable with an inner surface of the Fallopian tube" and "plurality of surface features for collection, retention, or both, of a tissue sample of the inner surface of the Fallopian tube" limitations by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of a catheter system that could be inserted into fallopian tubes to collect cells to diagnose ovarian state, and Dr. Altman's disclosure in the same lab notebook entry of a probe for

collecting fluid and material core samples of tissue. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the ’229 application the inventive concepts of a fallopian tube diagnostic device in the form of a catheter system with a tube having a distal end that extended into, and contacted the inner surface of, the fallopian tubes to deploy a plurality of surfaces for the collection and retention of tissue samples.

125. **U.S. Patent No. 10,639,016 (member of the ’472 Application Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 10,639,016 (“the ’016 patent”). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A process of collecting cells from a tissue surface of a Fallopian tube in a subject comprising: deploying a distal end of a catheter at a proximal end of the tissue surface of the Fallopian tube; everting an inelastic balloon extendible from the distal end of the catheter to contact the tissue surface of the Fallopian tube wherein in response to everting, over-expansion of the Fallopian tube by the inelastic balloon is prevented; partially deflating said balloon to form wrinkles on an outer surface of said balloon and capturing the cells on said wrinkles; and withdrawing said balloon from the subject to collect the cells from the Fallopian tube.

When Dr. Altman described the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in U.S. Patent No. 10,639,016. Drs. Altman and Stertzer both conceived of the “process of collecting cells from a tissue surface of a Fallopian tube in a subject” limitation as shown, for example, in the figures and disclosure of the March 2000 lab notebook entry that show a catheter system they invented diagnosing ovarian state in the fallopian tubes. Both Drs. Altman and Stertzer conceived of the “deploying a distal end of a catheter at a proximal end of the tissue surface of the Fallopian tube” and “extendible from the distal end of the catheter to contact the tissue surface of the Fallopian tube” limitations by, for example, Dr. Stertzer’s disclosure in the March 2000 lab notebook entry of navigating a catheter through the fallopian tubes to collect tissue samples to diagnose ovarian state, and Dr. Altman’s disclosure in the same lab notebook entry of a catheter that includes implements at its distal end that can perform fluid

or material core biopsies in the fallopian tubes. Both Drs. Altman and Stertzer conceived of the "capturing the cells" and "collect the cells from the Fallopian tube" limitations by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of a catheter system that could diagnose ovarian state by testing tissue samples from the fallopian tubes, and Dr. Altman's disclosure in the same lab notebook entry of a catheter that has, on its distal end, implements capable of collecting, for example, fluid or material core cell samples from the fallopian tube. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '016 patent the inventive concepts of a process of collecting cells from a tissue surface of a Fallopian tube in a subject by deploying the distal end of a catheter to collect cells from the fallopian tube.

126. **<u>U.S. Patent No. 10,646,209 (member of the '472 Application Patent Family)</u>**: Drs. Altman and Stertzer are, at the very least, co-inventors of U.S. Patent No. 10,646,209 ("the '209 patent"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A catheter comprising: a tube having a distal end; a balloon having a distal end secured to the distal end of the tube at a proximal end of the balloon, the balloon having a length, a majority of the length of the balloon being inelastic, said balloon being adapted to evert from an inverted position to a longitudinally extended everted position in a Fallopian tube so as prevent over-expansion of the Fallopian tube during eversion; and an extending portion comprising a filament disposed at the distal end of said balloon moveable between the inverted position and the longitudinally extended everted position with eversion of said balloon; wherein each of said balloon and said filament has an outer surface configured to remove and retain cells from a wall of the Fallopian tube; wherein the filament is configured to curl, spread, fan, ball-up, or expand-out, or combinations thereof, in response to the balloon moving between the inverted position and the everted position.

When Dr. Altman described the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in U.S. Patent No. 10,646,209. Drs. Altman and Stertzer both conceived of the "catheter" and "tube having a distal end" limitations by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of the distal end of a catheter tube navigating the fallopian tubes to collect cells to determine ovarian state, and Dr. Altman's disclosure in the same lab

notebook entry of a catheter system having a tube with a distal end that is guided to the fallopian tubes. Drs. Altman and Stertzer also conceived of the "outer surface configured to remove and retain cells from a wall of the Fallopian tube" limitation by, for example, Dr. Stertzer's disclosure in the March 2000 lab notebook entry of using a catheter system to navigate the fallopian tubes to collect tissue samples to determine ovarian state, and Dr. Altman's disclosure of implements at the distal end of the catheter that are capable of collecting fluid and material core samples from the fallopian tubes. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the '209 patent the inventive concepts of a the distal end of a catheter tube being equipped with implements capable of collecting cells from the wall of the fallopian tube so that tests may be performed to determine ovarian state.

127. **WO 2014/121207 (member of the '472 Application Patent Family)**: Drs. Altman and Stertzer are, at the very least, co-inventors of WO 2014/121207 ("the '207 application"). For example, Drs. Altman and Stertzer conceived, or at least contributed to the conception, of the highlighted portions of claim 1:

> 1. A process of collecting cells from a Fallopian tube in a subject comprising: deploying a distal end of a catheter at the proximal end of the Fallopian tube; everting a balloon on the distal end of the catheter to urge an extending portion into the Fallopian tube with sufficient force to dislodge the cells from an inner wall of the Fallopian tube; and withdrawing said extending portion from the subject to collect the cells.

When Dr. Altman described the potential of gene expression profiling and the approach EXACT Science had taken to collect cells from a stool sample that rubs against the colon wall in combination with the contents of the March 2000 lab notebook entry to Ms. Sarna, he conveyed the conception of these highlighted limitations to Ms. Sarna, who then provided these concepts as part of her collaboration with Dr. Chin and other nVision employees and consultants that resulted in WO 2014/121207. Drs. Altman and Stertzer both conceived of the "process of collecting cells from a Fallopian tube in a subject," "deploying a distal end of a catheter at the proximal end of the Fallopian tube," "urge an extended portion into the Fallopian tube with sufficient force to dislodge the cells from an inner wall of the Fallopian tube," and "withdrawing said extended portion from the subject to collect the cells" limitations. Dr. Stertzer conceived all

of these limitations by, for example, his disclosure in the March 2000 lab notebook entry of deploying a distal end of a catheter in the fallopian tube to collect cells and then withdrawing the catheter system so that the collected cells can be tested for the presence of ovarian cancer. Dr. Altman conceived of these limitations by, for example, his disclosure in the March 2000 lab notebook entry of components on the distal end of a catheter system that could perform fluid or material core biopsies, and components of the catheter system that could be used to withdraw the catheter implements that collected the cells. Through the March 2000 lab notebook entry, Drs. Altman and Stertzer contributed to claim 1 of the ’207 application the inventive concepts of deploying the distal end of a catheter into the fallopian tube to collect cells from the inner wall of the tube and then withdrawing the catheter so that the collected cells could be tested.

128. As alleged herein, BioCardia did not discover, and could not have discovered, its correction of inventorship claims through the exercise of reasonable diligence, until December 2018 or December 2019. Ms. Sarna fraudulently concealed her wrongful acts, postponing the accrual of BioCardia’s claims and therefore the beginning of the running of the statute of limitations until BioCardia actually discovered the fraudulent acts, because among other things as herein alleged, Ms. Sarna (a) concealed her wrongdoing from BioCardia which (b) she was contractually obligated to disclose to BioCardia (c) which concealment she did with the intent to defraud BioCardia (d) of which fraudulent acts BioCardia was unaware until January 2019 and upon which BioCardia would have acted earlier had it been earlier aware of them, causing BioCardia to sustain the damage alleged herein.

129. Drs. Altman and Stertzer are omitted inventors for all members of the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications. Moreover, BioCardia is a proper assignee of the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications.

130. BioCardia requests correction of inventorship of the patents and patent applications, both domestic and foreign counterparts, in the ’945 Provisional Application Family, the ’120 Provisional Application Family, and the ’472 Application Family to name Dr. Peter

Altman and Dr. Simon Stertzer as co-inventors. Moreover, BioCardia seeks assignment of the rights in and to the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications.

**COUNT II**

**Breach of Written Contract**

**(Against All Counterdefendants)**

131. BioCardia realleges paragraphs 1-130, inclusive.

132. As alleged herein, BioCardia did not discover, and could not have discovered, its claims through the exercise of reasonable diligence, until January 2019.

133. Ms. Sarna fraudulently concealed her wrongful acts, postponing the accrual of BioCardia’s claims and therefore the beginning of the running of the statute of limitations until BioCardia actually discovered the fraudulent acts, because among other things as herein alleged, Ms. Sarna: (a) concealed her wrongdoing from BioCardia which (b) she was contractually obligated to disclose to BioCardia (c) which concealment she did with the intent to defraud BioCardia (d) of which fraudulent acts BioCardia was unaware until January 2019 and upon which BioCardia would have acted earlier had it been earlier aware of them, causing BioCardia to sustain the damage alleged herein.

134. The Sarna Agreement is a valid and enforceable contract between BioCardia and Ms. Sarna.

135. BioCardia has duly performed all the conditions, covenants, and promises it was required to perform under the Sarna Agreement.

136. Ms. Sarna breached Section 2(a) of the Sarna Agreement by, *inter alia*, using BioCardia confidential information for the benefit of someone other than BioCardia, and disclosing BioCardia confidential information without the authorization of the BioCardia Board of Directors. Under section 2(a) of the Sarna Agreement, Ms. Sarna agreed:

> at all times during the term of my employment and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of [BioCardia], or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of [BioCardia].”

Ms. Sarna also agreed that "Confidential Information" meant any BioCardia:

> proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of [BioCardia] on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering hardware configuration information, marketing, finances or other business information disclosed to me by [BioCardia] either directly or indirectly in writing, orally or by drawings or observation of parts or equipment."

Shortly after becoming a full-time employee at BioCardia, Dr. Altman met with Ms. Sarna in or around May 2009 to explain the contents of the March 2000 lab notebook entry to Ms. Sarna, in the hope that she would collaborate with Dr. Altman to further develop these inventions for the benefit of BioCardia. Ms. Sarna breached Section 2(a) when she used the BioCardia confidential information Dr. Altman shared for the benefit of her company, nVision Medical Corporation, by developing the Mako device, and filing several patent applications, and obtaining several patents, which she assigned to nVision. By filing patent applications, consulting with medical practitioners as part of the Mako development process, and conducting clinical trials, among other things, Ms. Sarna also violated Section 2(a) by disclosing BioCardia confidential information without the written authorization of the BioCardia Board of Directors.

137. Ms. Sarna breached Section 3(b) of the Sarna Agreement by, *inter alia*, failing to disclose and assign to BioCardia all right, title, and interest to all inventions, original works of authorship, developments, concepts, improvements or trade secrets she conceived of, developed or reduced to practice during her employment at BioCardia. Under Section 3(b) of the Sarna Agreement, Ms. Sarna agreed to:

> promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of [BioCardia], and hereby assign to [BioCardia], or its designee, all my right, title and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of [BioCardia].

Under Section 3(a) and Exhibit A of the Sarna Agreement, Ms. Sarna represented that she had not

made any "invention, original works of authorship, developments, improvement, and trade secrets" prior to joining BioCardia.



EXHIBIT A

LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

✓ No inventions or improvements

___ Additional Sheets Attached

Signature of Employee: [signature]

Print Name of Employee: Surbhi Sarna

Date: 10/24/2008

Highly Confidential BC-BSC_0000518

138. During her employment with BioCardia, Ms. Sarna filed at least three provisional patent applications. The first such application was a "USPTO provisional patent application filed on or around September 29, 2009" ("the 2009 provisional patent application), which Ms. Sarna assigned to nVision Medical Corporation in a "Technology Transfer Agreement" with an effective date of December 26, 2009. BSC-BC00003113-16. On January 25, 2011, Ms. Sarna filed the '945 provisional patent application, which she assigned to nVision. On November 13, 2011, Ms. Sarna filed the '120 provisional patent application, which she assigned to nVision. Ms. Sarna never informed BioCardia of the 2009 provisional patent application, the '945 provisional patent application, the '120 provisional patent application, or any other patent application she filed either during her employment with BioCardia or after. Consequently, Ms. Sarna breached Section 3(b) of the Sarna Agreement.

139. The only exception to Ms. Sarna's disclosure obligations under Section 3(a) of the Sarna Agreement were set out in Section 3(f) of that agreement, which stated:

> I understand that the provisions of this Agreement requiring assignment of Inventions to [BioCardia] do not apply to any invention which qualifies fully under

the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B)

As noted in Section 3(f), Exhibit B to the Sarna Agreement set out the provisions of California Labor Code Section 2870 ("Section 2870"):

EXHIBIT B

CALIFORNIA LABOR CODE SECTION 2870
EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Highly Confidential BC-BSC_0000519

140. There are at least four reasons why the 2009 provisional application, the '945 provisional application and the '120 provisional application do not "qualif[y] fully" under Section 2870.

a. First, an invention that qualifies fully under Section 2870 must be developed "**entirely** on [the inventor's] own time." As demonstrated in the "Factual Background" of these counterclaims, Ms. Sarna's actions to conceive of and reduce to practice the inventions she patented during her BioCardia employment often coincided with her absences during her normal work hours at BioCardia. As also demonstrated in the Factual Background of these counterclaims, Ms. Sarna at least requested the help of Linda Greub to conceptualize the invention of the '945 provisional patent application during her normal working hours at BioCardia. The complaint as much as concedes that Ms. Sarna used BioCardia company time to develop her alleged inventions when it states, that Ms. Sarna developed her technology, "often at night and on weekends out of her

home." Dkt. 1 at ¶ 29. "Often" is not "entirely," and entirely is what is required for Section 2870 to apply.

b. Second, to qualify under Section 2870, Ms. Sarna had to develop the inventions she made during her employment at BioCardia "without using the employer's equipment, supplies, facilities, or trade secret information." As demonstrated in the "Factual Background" of these counterclaims, Ms. Sarna used BioCardia equipment and facilities in the form of BioCardia's email system, and used BioCardia trade secrets in the form of Dr. Altman's disclosure of the March 2000 lab notebook entry and what was possible based on the state of the art in 2009, to develop the inventions she made during her BioCardia employment.

c. Third, inventions covered by Section 2870 also must not "relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer." BioCardia's business related directly to the inventions Ms. Sarna made during her BioCardia employment, namely catheter-based treatment of women's pelvic health conditions. Further, the inventions Ms. Sarna made during her BioCardia employment clearly related to "actual or demonstrably anticipated research or development of the employer," since the concepts underlying Ms. Sarna's inventions were disclosed to her by Dr. Altman in the hope that Ms. Sarna would conduct further research and development on behalf of BioCardia.

d. Fourth, inventions covered by Section 2870 must not result from any work performed by the employee for the employer. As noted in the "Factual Background" of these counterclaims, the only reason Ms. Sarna even knew of the concepts behind the inventions she made during her BioCardia employment was because of a meeting she had with Dr. Altman in or around May 2009 to discuss the March 2000 lab notebook entry. At the very least, Ms. Sarna's inventions resulted from the work she performed for BioCardia when she attended the meeting with Dr. Altman. Beyond this, any work Ms. Sarna performed on her inventions would have properly been for BioCardia since the

entire reason Dr. Altman made the disclosure to Ms. Sarna was so that she could further develop the ideas for BioCardia. As a result, the inventions Ms. Sarna made during her BioCardia employment do not "qualif[y] fully" under Section 2870, and should have been assigned to BioCardia under Section 3(a) of the Sarna Agreement.

141. Even if the patent applications Ms. Sarna filed during her BioCardia employment are covered by Section 2870, Ms. Sarna breached Section 3(f) of the Sarna Agreement by failing to notify BioCardia in writing that she believed those inventions were covered by Section 2870. Specifically, Ms. Sarna agreed that she:

> will advise [BioCardia] promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

None of the 2009 provisional patent application, the '945 provisional patent application, or the '120 provisional patent application were disclosed in Exhibit A to the Sarna Agreement. Ms. Sarna never informed BioCardia, in writing or otherwise, either during or after her employment, of any invention or patent application that she believed was covered by Section 2870.

142. Ms. Sarna also breached Section 3(d) of the Sarna Agreement by failing to keep and maintain adequate written records of the inventions she made during her employment with BioCardia. Under Section 3(d), Ms. Sarna agreed:

> to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with [BioCardia]. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by [BioCardia]. The records will be available to and remain the sole property of [BioCardia] at all times.

Ms. Sarna did not keep adequate written records of any of the inventions she made while employed at BioCardia. Despite repeated requests by BioCardia, Ms. Sarna did not provide BioCardia with any notes, sketches, drawings, or any other documents related to the inventions Ms. Sarna attempted to patent while working at BioCardia. This dearth of written records of the inventions Ms. Sarna made during her BioCardia employment violates Section 3(d) of the Sarna Agreement.

143. Ms. Sarna breached Section 3(e) of the Sarna Agreement by failing to assist

BioCardia to secure its rights in the inventions she patented based on BioCardia confidential information. Specifically, in Section 3(e) of the Sarna Agreement, Ms. Sarna agreed to assist BioCardia:

> in every proper way to secure [BioCardia's] rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to [BioCardia] of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which [BioCardia] shall deem necessary in order to apply for and obtain such rights **and in order to assign and convey to [BioCardia], its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions**, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.

(Emphasis supplied.) Ms. Sarna breached Section 3(e) of the Sarna Agreement in at least two ways. First, she failed to disclose to BioCardia "all pertinent information and data with respect to" Ms. Sarna's alleged inventions during her BioCardia employment. Second, Ms. Sarna refused to "assign and convey to [BioCardia] … the sole and exclusive rights, title and interest" to the inventions she made while employed by BioCardia. As a result, Ms. Sarna breached Section 3(e) of the Sarna Agreement.

144. Ms. Sarna breached Section 4(a) of the Sarna Agreement by engaging in employment, occupation, consulting, or other business activity directly related to BioCardia's business, namely by working with nVision Medical Corporation to develop the women's pelvic health intellectual property that Dr. Altman shared with her. Under Section 4(a), Ms. Sarna agreed that:

> during the term of my employment with [BioCardia], I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which [BioCardia] is now involved or becomes involved during the term of my employment, nor will I engage I any other activities that conflict with my obligations to [BioCardia].

During her employment at BioCardia, Ms. Sarna engaged in "employment, occupation,

consulting or other business activity directly related to" BioCardia's business through her actions on behalf of nVision Medical Corporation. As described in the "Factual Background" of these counterclaims, BioCardia had significant business activity in the women's pelvic health space during Ms. Sarna's employment. In fact, the conception of using a catheter system with imaging, diagnostic, and therapeutic functionalities at the distal end of the catheter to sample fallopian tube cells to determine and treat ovarian state (which is the basis of most, if not all of nVision's patents and patent applications) came from Dr. Altman's disclosure of confidential BioCardia information in the March 2000 lab notebook entry to Ms. Sarna during a meeting at BioCardia in or around May 2009. Clearly nVision's business was directly related to that of BioCardia. Ms. Sarna also engaged in activities that conflicted with her obligations to BioCardia, including, but not limited to, her misappropriation of BioCardia trade secrets for the benefit of nVision. As a result, Ms. Sarna breached Section 4(a) of the Sarna Agreement.

145. Ms. Sarna breached Section 4(b) of the Sarna Agreement by accepting and performing consulting work with nVision Medical Corporation without first reporting the nature, and proposed time commitment, of the work. Under Section 4(b), Ms. Sarna agreed that:

> During the term of my employment with [BioCardia], I will not accept or perform any outside consulting work without first reporting the nature of and proposed time commitment to any such proposed outside consulting work.

During her employment at BioCardia, Ms. Sarna engaged in consulting work for nVision. Ms. Sarna never reported the nature of her work for nVision, or the proposed time commitment of her nVision work, to BioCardia, thereby breaching Section 4(b) of the Sarna Agreement.

146. Ms. Sarna breached Section 5 of the Sarna Agreement by keeping BioCardia "devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property" after her employment with BioCardia terminated. In Section 5 of the Sarna Agreement, Ms. Sarna agreed:

> at the time of leaving the employ of [BioCardia], I will deliver to [BioCardia] (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by

> me pursuant to my employment with [BioCardia] or otherwise belonging to [BioCardia].

During her employment at BioCardia, Ms. Sarna emailed the BioCardia confidential information from her work email to her personal Gmail account as alleged in paragraph 73 of these counterclaims. These documents contain some of the most sensitive and valued information that BioCardia has. They provide technical information and details about catheters, the very devices Ms. Sarna developed at nVision, that would take substantial time, resources, and effort to determine from scratch. The documents Ms. Sarna forwarded to her personal email account also provide policies and procedures that took significant time and trial and error to develop. These documents are incredibly valuable to a medical device company, and being able to crib policies and procedures from an established medical device company confers an enormous benefit. The sheer volume of documents that Ms. Sarna forwarded to her personal Gmail account make it highly unlikely that she did not "keep in [her] possession" BioCardia documents and property. The timing of Ms. Sarna's emails forwarding BioCardia confidential information to her Gmail account also suggests wrongdoing on her part. The vast majority of these documents were sent to Ms. Sarna's personal account after she incorporated nVision Medical Corporation on September 28, 2009. One document, the "Verification Test Plan for Helix Model 02772," contained a great deal of sensitive information about BioCardia's Helix catheter, and was forwarded just a few days before Ms. Sarna left BioCardia. BioCardia is informed and believes and on that basis alleges that Ms. Sarna retained BioCardia confidential material after she ended her employment with BioCardia, and used these materials for the benefit of nVision. As a result, Ms. Sarna breached Section 5 of the Sarna Agreement.

147. Ms. Sarna breached Section 8 of the Sarna Agreement by failing to "diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D" to the agreement. Under Section 8 of the Sarna Agreement, Ms. Sarna agreed to "diligently adhere to the Conflict of Interest Guidelines attached as Exhibit D hereto." Exhibit D clarified that:

> all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of [BioCardia]. The following are potentially compromising situations

which must be avoided.

Ms. Sarna violated several of the compromising situations enumerated in Exhibit D. For example, Ms. Sarna violated Compromising Situation # 1, prohibiting "revealing confidential information to outsiders or misusing confidential information," when she misappropriated BioCardia confidential information for the benefit of nVision. Ms. Sarna also violated Compromising Situation # 6, prohibiting "investing or holding outside directorship in suppliers, customers, or competing companies," when she invested in and incorporated nVision, a competitor of BioCardia. Ms. Sarna also violated Compromising Situation # 13, prohibiting "engaging in any conduct which is not in the best interest of [BioCardia]," when, for example, she misappropriated BioCardia confidential information for the benefit of nVision. Ms. Sarna breached Section 8 of the Sarna Agreement at least by the above-described actions.

148. As a direct and proximate result of Ms. Sarna's myriad of breaches of the Sarna Agreement, BioCardia has incurred and continues to incur damages in an amount according to proof.

149. As a further direct and proximate result of Ms. Sarna's breaches of the Sarna Agreement, Counterdefendants have been unjustly enriched for example, in an amount equal to at least what Boston Scientific paid for nVision. Counterdefendants have been enriched by Ms. Sarna's breaches of contract, reaping benefits they would not otherwise have achieved in the absence of the breaches. Counterdefendants received benefits in the form of intellectual property and money based on Ms. Sarna's breaches of contract as alleged above. Counterdefendants' retention of the benefits they received from Ms. Sarna's breaches of contract are unjust as Ms. Sarna was not contractually permitted to share these benefits with anyone else. As such, BioCardia is entitled to disgorgement of Counterdefendants' profits reaped from their unjust enrichment, restitution based on the benefits received and a constructive trust over the unlawful benefits received as a result of Ms. Sarna's breaches of the Sarna Agreement.

150. Due to the breaches of contract and Counterdefendants' unjust enrichment, BioCardia is informed and believes and on that basis alleges that Counterdefendants wrongfully detained and/or gained, among other things, (1) the monetary consideration Boston Scientific paid

to Fortis for the benefit of the shareholders and Ms. Sarna (among others) for nVision, (2) title to the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications and (3) the trade secrets and other intellectual property taken by Ms. Sarna. All of the foregoing was taken in violation of California Civil Code §§ 2223 and/or 2224 as an actual and proximate result of the breaches of contract as herein alleged. Accordingly, BioCardia seeks monetary damages and imposition of a constructive trust against Counterdefendants for the money, patents and intellectual property and all other things wrongfully taken from BioCardia and wrongfully detained by Counterdefendants and to disgorge Counterdefendants’ unjust enrichment.

151. BioCardia also seeks specific performance of Ms. Sarna’s obligation to assign to BioCardia each of the forgoing patents and patent applications, including against Counterdefendants who wrongfully detained and/or gained legal title to each of the patents and patent applications within the meaning of California Civil Code §§ 2223 and/or 2224 as a proximate result of the breach of contract as herein alleged.

152. Ms. Sarna knew that nVision’s claimed technology and intellectual property actually belonged BioCardia because she knew of her contractual obligations.

153. BioCardia is informed and believes and on that basis alleges that Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders’ Representative, are sophisticated companies and investors focused on investments in or acquisitions of early-stage companies (each an “Investment Target”) and, thus, are familiar with the intellectual property issues that Investment Targets have. These include, among other things, that a former employer of a founder of an Investment Target might have a claim to ownership of the inventions claimed by the Investment Target, or that the inventions claimed by the Investment Target may be based on trade secrets misappropriated from a former employer because, among other things:

a. They had been contractually assigned by the founder to the founder’s former employer;

b. They were co-invented with an employee or employees of the founder's former employer; or

c. They were based on information learned at and/or belonging to the former employer.

154. BioCardia is informed and believes and on that basis alleges that because of, among other things, the intellectual property issues that an Investment Target might have with a founder's former employer, Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, customarily perform "due diligence" on an Investment Target focusing particularly on ferreting out any issues that might exist with the Investment Target's ownership or right to use its purported technology and intellectual property.

155. BioCardia is informed and believes and on that basis alleges that Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, focused on investments in and acquiring early-stage medical device companies and, therefore, knew, or at least should have known, that BioCardia, the company nVision's founder, Ms. Surbhi Sarna, worked for immediately prior to nVision, was also a medical device company working on the same type of medical device that nVision planned to work on: catheters for biotherapeutic delivery and diagnosis and diagnostic products.

156. BioCardia is informed and believes and on that basis alleges that, as specialists in investments in or acquisitions of early stage medical device companies, Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew or at least should have known there was a heightened risk – well beyond the risks inherent in any early stage company - that nVision's technology and intellectual property actually belonged to BioCardia.

157. BioCardia is informed and believes and on that basis alleges that, in addition to the heightened risk inherent in the fact that nVision was focused on the same type of medical device development as was BioCardia (diagnostic catheters), Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew that there was a likelihood that nVision's claimed technology and intellectual property actually belonged to or had been misappropriated from BioCardia, because they knew or at least should have known through

their due diligence of nVision that:

a. Ms. Sarna's undergraduate major was molecular and cellular biology. She does not have any graduate degrees. Her work at BioCardia dealt with tracking device failures, ensuring label compliance, and obtaining materials from vendors. While at BioCardia, Ms. Sarna's work responsibilities did not include designing or developing medical devices. On information and belief, Ms. Sarna's only other experience in the medical device space involved similar tasks as the ones she performed at BioCardia. Ms. Sarna's age, education, and work experience were highly unusual for someone who allegedly came up with a medical device and technique so revolutionary that a company like Boston Scientific Corporation would value it at hundreds of millions of dollars;

b. Ms. Sarna started consulting with BioCardia on September 15, 2008 and became a full-time employee of BioCardia on November 3, 2008, at which time she signed the Sarna Agreement, and where she worked until resigning in January 2012;

c. Ms. Sarna registered nVision as a Delaware corporation on September 28, 2009, the year after she joined BioCardia and more than two years before she left BioCardia and apparently ran it in "stealth mode" to conceal its existence from BioCardia;

d. Ms. Sarna entered into a "Technology Transfer Agreement" "effective as of December 26, 2009 between Surbhi Sarna (the 'Founder'), and nVision Medical Corporation, a Delaware corporation" more than two years before she left BioCardia.

e. In the Technology Transfer Agreement, Ms. Sarna assigned to nVision "All rights, title and interests in and to all intellectual property arising out of or related to the nVision Medical business plan, including, without limitation, all ideas, designs, techniques, processes, formulas, trade secrets, inventions, discoveries, improvements, research or development and test results, specifications, data, know-how, business methods, marketing plans, other business plans, strategies, forecasts, unpublished financial information, budgets, projections, business prospects, copyrights and trademarks (inclusive of all goodwill relate thereto), and the following trademark, copyright, and patent applications and registrations." The patent application identified in the Technology

Transfer Agreement is a " USPTO provisional patent application filed on or around September 29, 2009."

f. Ms. Sarna only registered nVision to do business in California on February 21, 2012, about a month after she left BioCardia.

g. BioCardia is informed and believes and on that basis alleges that the incorporation of nVision more than two years before Ms. Sarna left BioCardia, and the registration of nVision to do business in California only after she had left BioCardia, alone should have set off alarm bells in any competent due diligence conducted by or for anyone seeking to invest in nVision;

h. Ms. Sarna, in common with most Silicon Valley employees, was contractually obligated to assign to BioCardia inventions she made while working at BioCardia (see **Exhibit B** attached hereto-the Sarna Agreement), subject only to her proving that they were excluded by Labor Code § 2870, which BioCardia is informed and believes and on that basis alleges that anyone seeking to invest in nVision would understand was unlikely given that both nVision and BioCardia were in the same general area of medical devices (diagnostic catheters);

i. On January 25, 2011, while a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna filed U.S. Provisional application No. 61/435,945;

j. On December 3, 2010, while still a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna emailed Anula Jayasuriya, then affiliated with Defendant Astia Angels nVision LLC and later affiliated with Defendant eXXclaim Capital Partners I, L.P., and Linda Greub, then a partner at Defendant LMNVC, LLC, from her BioCardia email account requesting help conceptualizing the invention of the '945 provisional application;

k. Ms. Sarna subsequently filed three other published applications claiming priority to the '945 provisional application;

l. On November 13, 2011, also while still a BioCardia employee, Ms. Sarna filed a provisional application entitled "Device and method to confirm occlusion of the fallopian tube"; and

m. Ms. Sarna subsequently filed Application No, 14/357,875, which claimed priority to the '120 provisional application.

158. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, meant that the patent applications likely had been contractually assigned to BioCardia.

159. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, also knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, meant that there likely were unnamed BioCardia co-inventors on some or all of the patent applications.

160. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, also knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, together with the other acts alleged above while Ms. Sarna was a BioCardia employee, meant that nVision's purported technology and intellectual property had great potential to be based on misappropriated BioCardia trade secrets.

161. The risks undertaken by an investor who knows or should know that the technology and intellectual property claimed by an Investment Target likely belongs to a former employer as is with the case with the patents Ms. Sarna was contractually obligated to assign to BioCardia, or is likely based on trade secrets misappropriated from a former employer, is unlike any common investment and market risk. While common investment risks, if realized, might

operate to reduce the value of the Investment Target and, therefore, indirectly, the value of the investor's investment, an investor who knows or should know that the technology and intellectual property claimed by an Investment Target is likely based on patents rightfully owned by another or trade secrets misappropriated from another is exposed to the equitable rights of the rightful owner of the technology and intellectual property, including, as alleged below, the risk of disgorgement of all benefits of the investment.

162. Here, Counterdefendants Boston Scientific's, Boston Scientific Scimed's and Fortis, the Stockholders' Representative's, investment in nVision was made with the actual or imputed knowledge that the technology and intellectual property claimed by Ms. Sarna and nVision was likely based on patents belonging to and trade secrets misappropriated from BioCardia; accordingly, they did not undertake a common investment risk but, rather, undertook the risk of disgorgement of all benefits from their investment.

163. The Counterdefendants Boston Scientific's, Boston Scientific Scimed's and Fortis, the Stockholders' Representative's ,liability to BioCardia is direct, not vicarious, and does not require piercing nVision's corporate veil.

164. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, made a conscious decision to participate in and further the wrongful acts of nVision and Ms. Sarna by investing in nVision and providing it with the funding necessary to commit the acts as herein alleged.

165. Alternatively, BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew or should have known that nVision and Ms. Sarna had acted in violation of BioCardia's rights. Their investments in nVision were made "despite a known risk that the conduct in question violate[d] the rights of [BioCardia]." Under California law and Sections 51(3)(b) and 3 comment e, of the Restatement (Third) of Restitution and Unjust Enrichment, their decision to invest in nVision despite that known risk of liability – i.e., despite that "known unknown" – renders them "conscious wrongdoers" and places upon them the risk of liability by a

disgorgement measure.

166. BioCardia is informed and believes and on that basis alleges that the shareholders for whose benefit Counterdefendant Fortis is the Stockholders' Representative, provided funding to nVision that was a substantial factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and that Counterdefendants Boston Scientific and Boston Scientific Scimed knowingly benefited from the acts as herein alleged.

167. BioCardia is informed and believes and on that basis alleges that Counterdefendant Fortis the Stockholders' Representative, is holding in trust approximately ten percent (10%) of the amount paid by Counterdefendant Boston Scientific to nVision's shareholders resulting from their provision of funding to nVision that was a substantial factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and therefore Fortis, the Stockholders' Representative, is required to disgorge to BioCardia the amount it holds in trust for the nVision shareholders.

168. A constructive trust should be placed against Counterdefendants Surbhi Sarna and Fortis, the Stockholders' Representative, on the profits, proceeds and consequential gains resulting from Counterdefendant Surbhi Sarna's and the former nVision shareholders' sale of nVision stock to Boston Scientific, for whose benefit Fortis holds monies in trust, and Counterdefendants Surbhi Sarna and Fortis should be required to disgorge to BioCardia all of the profits, proceeds and consequential gains resulting from their sale of nVision stock to Boston Scientific (or in the case of Fortis, the investments of the nVision shareholders whose monies it holds in trust) because their enrichment from such profits, proceeds and consequential gains was unjust.

169. A constructive trust should be placed against Boston Scientific on the profits, proceeds and consequential gains resulting from Boston Scientific's acquisition of nVision stock and Counterdefendant Boston Scientific should be required to disgorge to BioCardia all of the profits, proceeds and consequential gains resulting from its acquisition of nVision stock because it was not a good faith purchaser for value and without notice, and therefore its enrichment from such profits, proceeds and consequential gains was unjust.

170. BioCardia is informed and believes and on that basis alleges the Counterdefendant

Boston Scientific Scimed is the owner of record of the 945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family and the Additional Provisional Applications that were wrongfully obtained by nVision and Ms. Sarna, for which Boston Scientific Scimed was not a good faith purchaser for value without notice, and therefore a constructive trust should be placed against Boston Scientific Scimed on the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family and the Additional Provisional Applications and it should be required to assign to BioCardia the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications and/or disgorge to BioCardia any and all profits, proceeds and consequential gains it obtained therefrom, because its acquisition and retention of such would be unjust.

## COUNT III

## Misappropriation of Trade Secrets under California Uniform Trade Secrets Act, California Civil Code Sections 3426 et seq.

**(Against All Counterdefendants)**

171. BioCardia realleges paragraphs 1-170, inclusive.

**Elements of Trade Secret Claim**

172. A trade secret is “information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.” Cal. Civ. Code § 3426.1(d).

173. To plead a claim for trade secret misappropriation, a plaintiff must allege: “(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff’s trade secret through improper means, and (3) the defendant’s actions damaged the plaintiff.” *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003); *Space Data Corp. v. X*, 2017 U.S. Dist. LEXIS 22571 at *3, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017). “Improper means” is defined as “theft, bribery, misrepresentation, breach or inducement of a breach of a duty to

maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code. § 3426.1(a).

174. Courts distinguish between "direct" and "indirect" trade secret misappropriation, the difference being whether the defendant obtained the trade secrets directly from the plaintiff or indirectly "from someone other than plaintiff." *See Heller v. Cepia, L.L.C.*, 2012 U.S. Dist. LEXIS 660 at *17, 2012 WL 13572 (N.D. Cal. Jan. 4, 2012). A claim for indirect trade secret misappropriation must allege facts showing that the counterdefendant: "(a) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret and that the disclosure was a mistake." *Cal. Police Activities League v. Cal. Police Youth Charities, Inc.*, 2009 U.S. Dist. LEXIS 20507 at *8, 2009 WL 537091 (N.D. Cal. Mar. 3, 2009).

**The Statute of Limitations Was Tolled Until BioCardia Became Aware of Ms. Sarna's Misappropriation**

175. The statute of limitations for breach of a contractual obligation to preserve a trade secret does not start until the breach was, or reasonably should have been discovered. *See, e.g.*, *April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 827, 831 (1983). The reason for this is that it is often difficult or impractical for a trade secret owner to determine whether someone has misappropriated a trade secret. It would be inequitable for the statute of limitations to be triggered by a breach, and even run, before the aggrieved party even realizes it has been harmed.

176. As more fully described in the discussion of "BioCardia's First Awareness of Ms. Sarna's Breach of Contract and Misappropriation of Trade Secrets" (¶¶ 88-99), during and after her employment with BioCardia, Ms. Sarna concealed her trade secret misappropriation from detection. For example, Ms. Sarna never informed BioCardia that she had incorporated nVision Medical Corporation during her employment, or that nVision would develop a catheter system that would compete with BioCardia's efforts to adapt its catheter offerings for use in gynecological applications. Ms. Sarna also never informed BioCardia that during her employment she filed multiple provisional patent applications covering BioCardia trade secrets described in the March 2000 lab notebook entry that Dr. Altman explained to Ms. Sarna in or

around May 2009.

177. Ms. Sarna's fraudulent concealment of her wrongful acts tolled the statute of limitations for BioCardia's misappropriation claims. Therefore, the running of the statute of limitations was delayed until January 2019, when BioCardia actually discovered the fraudulent acts, because among other things, Ms. Sarna (a) concealed her wrongdoing from BioCardia which (b) she was contractually obligated to disclose to BioCardia (c) which concealment she did with the intent to defraud BioCardia (d) of which fraudulent acts BioCardia was unaware until January 2019 and upon which BioCardia would have acted earlier had it been earlier aware of them, causing BioCardia to sustain the damage alleged herein.

**Trade Secrets Disclosed During Meeting Between Dr. Altman and Surbhi Sarna**

178. **Diagnostic method of using a catheter inserted into a fallopian tube to obtain a solid or liquid biopsy of potentially diseased ovarian tissue or cells by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter and obtaining a sample of tissue through the second catheter that is from the ovary which may be analyzed biologically:**

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade

secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:










f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the

design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). On information and belief, Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials)

for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

179. **<u>Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and sampling for biologic analysis</u>**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid as much as $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel

Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that was distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment

agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device utilizes imaging capability at the distal end of the catheter as described in this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter with imaging capability at the distal end of the catheter in a manner described in this trade secret. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. Cytuity implements imaging capability at the distal end of the catheter in the manner described in this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of

the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing imaging capability in a manner described in this trade secret). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

180. **Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capabilities to enable navigation and sampling for biologic analysis**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade

secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device utilizes imaging capability at the distal end of the catheter as described in this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter with imaging capability at the distal end of the catheter in a manner described in this trade secret. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through

improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. Cytuity implements imaging capability at the distal end of the catheter in the manner described in this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing imaging capability in a manner described in this trade secret). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

181. **Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter, using the imaging capabilities to enable navigation and imaging of ovarian cysts or tumors**:

a. This diagnostic method is a trade secret because it is a method, technique, or

process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device utilizes imaging capability at the distal end of the catheter as described in this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter with imaging capability at the distal end of the catheter in a manner described in this trade secret. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or

should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. Cytuity implements imaging capability at the distal end of the catheter in the manner described in this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing imaging capability in a manner described in this trade secret). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

182. **Diagnostic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter, using the**

**imaging capability to enable navigation and imaging of ovarian cysts or tumors**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia never has had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned

all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device utilizes imaging capability at the distal end of the catheter as described in this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter with imaging capability at the distal end of the catheter in a manner described in this trade secret. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly

misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. Cytuity implements imaging capability at the distal end of the catheter in the manner described in this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing imaging capability in a manner described in this trade secret). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

183. **Diagnostic method of inserting a catheter imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for**

**example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more

than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:








A fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst. Such a probe could also be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally.

f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since, for example, implementation of the Mako device means using imaging capability to sample tissue in the fallopian tube to characterize the ovarian state. Mako documentation, such as the instructions for

use, also disclose this trade secret since the documents describe using a catheter to collect a sample of cells in the fallopian tube to determine ovarian state. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity uses imaging capability to help collect a sample from the fallopian tube to determine ovarian state, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing Cytuity using imaging capabilities to navigate a fallopian tube to collect a sample to determine ovarian state). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper

disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

184. **Diagnostic method of inserting a catheter imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capability to enable navigation and imaging of ovarian cysts or tumors and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents

of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







A fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst. Such a probe could also be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally.

f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since, for example, implementation of the Mako device means using imaging capability to sample tissue in the fallopian tube to characterize the ovarian state. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of cells in the fallopian tube to determine ovarian state. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly

misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity uses imaging capability to help collect a sample from the fallopian tube to determine ovarian state, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing Cytuity using imaging capabilities to navigate a fallopian tube to collect a sample to determine ovarian state). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

185. **<u>Diagnostic method and devices for advancing a tissue-sampling element to the fallopian tube, fimbria, or ovary to take a solid or fluid tissue sample, by, for example,</u>**

**advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a tissue-sampling element through the guide catheter and advancing the tissue-sampling element to obtain a liquid or solid sample for biologic analysis**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an

unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







A fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst. Such a probe could also be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally.

f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia is informed and

believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

186. **Diagnostic method and devices to be used for tissue-sampling from the fallopian tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a penetrating element through the guide catheter and advancing the penetrating element consisting of a hollow helical needle into the fallopian tube, fimbria, or ovary to obtain a liquid or solid sample for biologic analysis**:

a. This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public.

Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:









f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the

fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

187. **Diagnostic method and devices to be used for tissue-sampling from the fallopian tube, fimbria, or ovary by taking a solid or fluid tissue sample, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a tissue-sampling element through the guide catheter and advancing the tissue-sampling element into the fallopian tube, fimbria, or ovary to obtain a liquid or solid sample for biologic analysis**:

This diagnostic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:










f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the

Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

188. **Therapeutic method of inserting a catheter with imaging capability, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube to advance a therapy, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with imaging capability, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) ablating regions of the ovary, (2) delivering controlled release drug delivery matrices to relevant tissue in and around the ovary, or (3) draining the tissue mass penetrated by the hollow penetrating element**:

a. This therapeutic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received,

and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:






Functional cyst



f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the

fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

189. **Therapeutic method of inserting a catheter with imaging, such as cameras, fiber optics, or ultrasound imaging, on its distal end into a fallopian tube to advance a therapy, by, for example, advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) ablating regions of the ovary using radiofrequency energy or (2) ablating the regions of the ovary by the delivery of alcohol**:

a. This therapeutic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision,

which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized..

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of PCT/US Patent Application No. 2012/022,619 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device utilizes imaging capability at the distal end of the catheter as described in this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter with imaging capability at the distal end of the catheter in a manner described in this trade secret. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna

was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. Cytuity implements imaging capability at the distal end of the catheter in the manner described in this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by implementing imaging capability in a manner described in this trade secret). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

190. **Therapeutic method and devices to be used through the vagina, uterus, and fallopian tube to advance a hollow element from a catheter to assist with tissue sampling, where, for example, the hollow element is connected to a fluid conduit within the catheter system that is connected to a reservoir outside of the body**:

a. This therapeutic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a

catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following

excerpts are examples of disclosures from the notebook that describe this trade secret:










f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that a fluid reservoir supplies fluid through a hollow element to evert a balloon at the distal end of the catheter to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a fluid reservoir supplies fluid through a hollow element to evert a balloon at the distal end of the catheter to collect cells from the fallopian tube. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade

secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. Cytuity's use of a hollow element to provide fluid to evert a balloon to collect cells practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For

example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer

191. **Therapeutic strategy for identifying precancerous and cancerous growths based on a diagnosis performed from a locally-obtained sample before evidence of metastasis has appeared by, for example, obtaining a local biological sample derived from the ovary or adjacent fluids to determine that the ovary has a significant possibility of having a malignant cancer, and using this information to determine appropriate treatments**:

a. This therapeutic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were

distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:







A fluid biopsy probe, such as a hollow helical needle may be rotated into the ovary to obtain a sample of the cyst. Such a probe could also be used to drain the cyst. Such a probe could also be used to deliver RF energy to kill tissue in the cyst, or to deliver alcohol or cytotoxic agents designed to introduce necrosis locally.

The steerable guide gains access through the vagina to the fallopian tube and may be facillited by fiber optic imaging.

CAMARA
GUDE LUMEN
Guide tube Distal END

The steerable guide once position may be used to advance imaging probes such as rotating ultrason transducers, biopsy probes, therapeutic probes, or combinations of these.

f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the

trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to obtain a local biological sample derived from the ovary or adjacent fluids to determine that the ovary has a significant possibility of having a malignant cancer, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to obtain a local biological sample derived from the ovary or adjacent fluids to determine ovarian state. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a

balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter obtain a local biological sample derived from the ovary or adjacent fluids to determine ovarian state). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

192. **Therapeutic strategy for delivering ablative compounds such as alcohol or ablative energy through a catheter system passed through a vagina, uterus, and fallopian tubes to treat disease or a condition of the ovary in which a penetrating element is advanced into the fallopian tubes, fimbria, or ovary**:

a. This therapeutic method is a trade secret because it is a method, technique, or process, that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy. As the trade secret suggests, it is a method of using a catheter, which can equally be called a technique or process.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, which BioCardia first reviewed in 2019, the addressable market for a non-invasive method for

early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only place where the secret was disclosed was in the March 2000 entry in Dr. Altman's lab notebook. Dr. Altman kept this lab notebook in a secure location in his office. Access to the notebook itself was restricted, and, prior to this litigation, only four people had seen the contents of this notebook entry related to this disclosure: Daniel Rosenman, Dr. Simon Stertzer, Dr. Peter Altman, and Ms. Sarna. Each of these people entered into a non-disclosure agreement with BioCardia, or its predecessor Hippocratic Engineering, to prevent disclosure to the public. Furthermore, BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential." For example, BioCardia employees received, and BioCardia lab notebooks came with, a BioCardia memo on "Lab Notebook Document Control" to preserve secrecy. Finally, visitors to BioCardia had to sign-in to gain access to the facilities and were escorted by a company employee at all times. BioCardia has never had more than approximately twenty employees and an appropriately sized facility, so the presence of an unauthorized person would be recognized.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. The following excerpts are examples of disclosures from the notebook that describe this trade secret:










f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of U.S. Patent No. 10,639,016 sets out all the components of this trade secret. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device, such that the everting balloon at the distal end of the catheter is used to collect cells from the fallopian tube, practices this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret since the documents describe using a catheter to collect a sample of potentially diseased cells in the fallopian tube. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade

secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secret.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample of potentially diseased cells from the fallopian tube, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing BioCardia trade secrets by showing an everted balloon at the distal end of the catheter collecting potentially diseased cells in the fallopian tube for analysis). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a

monopoly on the method, along with the financial benefits that monopoly would confer.

193. **<u>The existence of a market need to improve the ability to diagnose pre-cancerous and cancerous cysts minimally invasively with details on the ramifications for therapy with early diagnosis, and strategies for doing so that align with new biological measurement technologies in gene expression and genetic analysis that enable a small sample to identify the presence of disease, including details on the players in the gene diagnosis space looking at blood (CareDx), solid tumor tissues (Genomic health), and cells sloughing from within a body lumen conduit such as that of a bowel movement which passes through the colon (EXACT Sciences)</u>**:

a. This market need is a trade secret because it is information that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy.

b. This trade secret derived both actual and potential value from not being generally known to the public. For example, as Ms. Sarna set out in her 2013 presentation on nVision, the addressable market for a non-invasive method for early detection of ovarian cancer was $4 billion and involved roughly 8 million patients per year. Dkt 1 at Ex. B at slide 29. In addition, Boston Scientific paid $275 million to purchase nVision based in part on its commercial development of this trade secret.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The only people who were aware of this trade secret were Drs. Altman and Stertzer, and neither recorded this trade secret in the lab notebook or any other document. As a result, the secret could not be made public unless Dr. Altman or Dr. Stertzer made the conscious decision to disclose it. Both Drs. Altman and Stertzer were contractually bound to keep this BioCardia trade secret confidential by non-disclosure agreements.

d. BioCardia is the owner of this trade secret because the two individuals who conceived of and developed the trade secret, Drs. Peter Altman and Simon Stertzer, both assigned all right, title, and interest in the intellectual property to BioCardia, or its predecessor Hippocratic Engineering.

e. Dr. Peter Altman disclosed this trade secret to Ms. Sarna when he described and explained a March 2000 lab notebook entry to her during an hour-long meeting. Although this particular trade secret was not recorded in the lab notebook, Dr. Altman had extensive knowledge of the subject based on his involvement in CareDx, one of the leading gene expression profiling companies in the world. Dr. Altman shared this knowledge with Ms. Sarna during their meeting in or around May 2009, in the hopes that it would motivate her to further develop the concepts disclosed in the March 2000 lab notebook entry.

f. Ms. Sarna directly misappropriated this trade secret by disclosing and using the trade secret through improper means. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. For example, claim 1 of PCT/US Patent Application No. 2018/000,229 sets out all the components of this trade secret, by, for example covering "a device for Fallopian tube diagnostics" using tissue samples from the fallopian tubes. Ms. Sarna's efforts to develop and commercialize the Mako also misappropriated this trade secret, since implementation of the Mako device required use of gene expression technology in order to determine ovarian state, thereby practicing this trade secret. Mako documentation, such as the instructions for use, also disclose this trade secret. BioCardia is informed and believes and on that basis alleges that Ms. Sarna also misappropriated this trade secret through improper disclosure when, for example, she consulted with various physicians about the design, development, or clinical trials for the Mako device. As a result, Ms. Sarna's actions to acquire patents on this trade secret, develop and market the Mako device that implements this trade secret, and disclose the trade secret to practitioners as part of the design and development of the Mako product, all constitute misappropriation of this trade secre.

g. Boston Scientific Corporation and Boston Scientific Scimed directly and indirectly misappropriated this trade secret. For example, Boston Scientific Corporation and Boston Scientific Scimed both obtained this trade secret from Ms. Sarna and/or nVision, and knew or should have known through the due diligence process for the acquisition of nVision that the information it obtained from Ms. Sarna and/or nVision was a trade secret acquired through

improper means. Boston Scientific Corporation and Boston Scientific Scimed knew Ms. Sarna was an employee of BioCardia, a company that made catheter systems, and that Ms. Sarna filed for patents on catheter systems while still employed at BioCardia. Another example of Boston Scientific Corporation and Boston Scientific Scimed's misappropriation of this trade secret was the improper use and disclosure of this trade secret through the design, development, and documentation of their version of the Mako, a device called Cytuity. When Cytuity everts a balloon at the distal end of the catheter to collect a sample for genetic analysis or profiling, it practices this trade secret. Furthermore, documentation Boston Scientific Corporation and Boston Scientific Scimed developed for Cytuity also misappropriated this trade secret through the improper disclosure of the secret. *See, e.g.*, "Cytuity Directions For Use" Video available at https://www.bostonscientific.com/content/gwc/en-US/products/cell-collection/cytuity--cell-collection-catheter/demo-video.html (disclosing cutting the balloon/filament into pieces and storing in a cytopreservative for testing). BioCardia is informed and believes and on that basis alleges that Boston Scientific Corporation and Boston Scientific Scimed misappropriated this trade secret through improper disclosure when, for example, they consulted with various physicians about the design, development, or clinical trials (e.g., the nCYT trials) for the Cytuity device.

h. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia. For example, because of Ms. Sarna's misappropriation, BioCardia missed out on the $275 million valuation Boston Scientific placed on the intellectual property. Furthermore, Ms. Sarna's and Boston Scientific's commercialization of this trade secret prevented BioCardia from having a monopoly on the method, along with the financial benefits that monopoly would confer.

**Trade Secrets Disclosed by BioCardia Testing Equipment**

194. **A catheter system which includes a distal spring element on its end and having a round spherical ball mounted on the spring to avoid damage to the lumen through which it is passed, by, for example, having of a catheter shaft with a hollow lumen, containing a fluid conduit, which passes through a helical metal spring on its distal end attached to a small ball attached to the distal most end**:

a. This ball-and-spring structure is a trade secret because it is a device that derives actual or potential economic value from not being known, and is subject to reasonable efforts to maintain its secrecy.

b. This trade secret derived both actual and potential value from not being generally known to the public. It presents a novel way of preventing the tip of a catheter from damaging tissue as it is advanced in a body. This presents a competitive advantage to BioCardia in that it has a useful safety feature that other catheter companies do not have.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. The spring-and-ball structure was part of testing equipment that BioCardia developed and built internally and was never shown to anyone outside the company. Even within the company, only a small subset of employees actually saw this testing equipment. Everyone who came into contact with the testing equipment was under a non-disclosure agreement.

d. BioCardia is the owner of this trade secret because the testing equipment was developed on behalf of BioCardia and the people who made the equipment assigned all rights, title, and interest to the equipment to BioCardia.

e. The testing equipment was disclosed to Ms. Sarna as part of her work at BioCardia. Ms. Sarna used this particular piece of equipment to ensure that catheters had the proper internal diameter to function properly.

f. Ms. Sarna directly misappropriated this trade secret by disclosing it in patent applications that she assigned to nVision. For example, Section 2 of Ms. Sarna's employment agreement with BioCardia required her to hold confidential information in the strictest confidence and not to use the information except for the benefit of BioCardia. Ms. Sarna disclosed this trade secret as part of a disclosure for a patent application she assigned to nVision.

g. Ms. Sarna's and Boston Scientific's misappropriation damaged BioCardia.

**Trade Secrets Disclosed by BioCardia Template Documents**

195. **BioCardia template documents sent to Ms. Sarna's personal email account, consisting of the following templates: Risk Analysis, Product Specification, Labelling Verification, and Document Change Order procedures**:

a. These template documents are trade secrets because they are information about how to effectively handle medical device tasks, that derive actual or potential economic value from not being known, and are subject to reasonable efforts to maintain its secrecy.

b. This trade secret derived both actual and potential value from not being generally known to the public. The knowledge and experience inherent in the documents, and the time and resources saved from using the documents, confer a competitive advantage that makes medical device development more profitable. Because BioCardia's competitors do not have this information, BioCardia has an advantage in the form of better products made at lower cost.

c. BioCardia undertook reasonable efforts to preserve the secrecy of this trade secret. BioCardia internal documents containing confidential information were labelled "confidential" and all documents containing BioCardia confidential information that were distributed externally were marked "confidential."

d. BioCardia is the owner of this trade secret because the individuals who created these documents assigned all right, title, and interest in the intellectual property to BioCardia.

e. These trade secrets were disclosed to Ms. Sarna when they were shared with her as part of her work for BioCardia.

f. Ms. Sarna directly misappropriated this trade secret by forwarding the documents to her personal account. BioCardia is informed and believes and on that basis alleges that Ms. Sarna incorporated the structure, format, and even language of the documents into nVision's corresponding documents.

g. Ms. Sarna's misappropriation damaged BioCardia because it meant that nVision had this valuable information to assist it in making competing catheter products. In addition, these template documents helped nVision's transition from a start-up to an established organization, which meant they increased the competence of BioCardia's competition, and did so at a faster rate than normally would happen.

196. The BioCardia trade secrets were subject to efforts that are reasonable under the circumstances to maintain their secrecy, including but not limited to, requiring all employees to execute the BioCardia standard Employment Agreement in the same form as the Sarna

Agreement attached hereto as **Exhibit B**, restricting access to BioCardia's information to employees who have executed the BioCardia standard Employment Agreement, locking BioCardia's facilities and restricting access to BioCardia's facilities to employees who had signed the standard Employment Agreement and to visitors who are escorted by someone who had signed the standard Employment Agreement.

197. As a further direct and proximate result of Ms. Sarna and nVision's misappropriation of BioCardia trade secrets, Counterdefendants have been unjustly enriched for example, in an amount equal to at least what Boston Scientific paid for nVision. Counterdefendants have been enriched and benefited by the misappropriations in a manner that they would not otherwise have achieved in the absence of the misappropriations. Counterdefendants received benefits in the form of intellectual property and money based on Ms. Sarna and nVision's misappropriations as alleged above. Counterdefendants' retention of the benefits they received from Ms. Sarna and nVision's misappropriations are unjust as Ms. Sarna and nVision were not permitted to misappropriate BioCardia's trade secrets and share the benefits with anyone else. As such, BioCardia is entitled to disgorgement of Counterdefendants' profits reaped from their unjust enrichment, restitution based on the benefits received and a constructive trust over the unlawful benefits received as a result of Ms. Sarna and nVision's misappropriation of BioCardia's trade secrets.

198. Due to the misappropriation of BioCardia's trade secrets and Counterdefendants' unjust enrichment, BioCardia is informed and believes and on that basis alleges that Counterdefendants wrongfully detained and/or gained, among other things, (1) the monetary consideration Boston Scientific paid to Fortis for the benefit of the shareholders and Ms. Sarna (among others) for nVision, (2) title to the '945 Provisional Application Family, the '120 Provisional Application Family, the '472 Application Family, and the Additional Provisional Applications and (3) the trade secrets and other intellectual property taken by Ms. Sarna. All of the foregoing was taken in violation of California Civil Code §§ 2223 and/or 2224 as an actual and proximate result of the breaches of contract as herein alleged. Accordingly, BioCardia seeks monetary damages and imposition of a constructive trust against Counterdefendants for the

money, patents and intellectual property and all other things wrongfully taken from BioCardia and wrongfully detained by Counterdefendants and to disgorge Counterdefendants' unjust enrichment from the misappropriation of BioCardia's trade secrets.

199. Ms. Sarna and nVision misappropriated BioCardia's trade secrets by, among other things, disclosing and/or using such information to patent inventions without BioCardia's consent, despite Ms. Sarna having a duty to limit the use of the BioCardia's trade secrets only for BioCardia's benefit. nVision took advantage of the misappropriated BioCardia Trade Secrets by having Ms. Sarna disclose and/or use such information for the advancement and benefit of nVision despite being aware of Ms. Sarna's duties and obligations to BioCardia to limit the disclosure and use of such information only for the benefit of BioCardia and that such disclosure was in violation of the Sarna Agreement.

200. As a direct and proximate result of Ms. Sarna, Boston Scientific's and nVision's misappropriation of the BioCardia trade secrets, BioCardia has incurred and continues to incur damages in an amount according to proof.

201. Counterdefendants' misappropriation of the BioCardia Trade Secrets was willful and malicious and thereby entitles BioCardia to an award of exemplary damages.

202. BioCardia is informed and believes and on that basis alleges that Counterdefendants Ms. Sarna and Fortis, the Stockholders' Representative, wrongfully detained and/or gained the consideration Boston Scientific paid for nVision in violation of California Civil Code §§ 2223 and/or 2224 as a proximate result of the misappropriation of trade secrets as herein alleged. Accordingly, BioCardia seeks imposition of a constructive trust against Ms. Sarna and Fortis for the benefit of BioCardia on the consideration Boston Scientific paid for nVision.

203. BioCardia is informed and believes and on that basis alleges that Counterdefendants Ms. Sarna and Boston Scientific Scimed wrongfully detained and/or gained legal title to each of the patents and patent applications in the '945 Provisional Application Family, the '120 Provisional Application Family, the '472 Application Family, and the Additional Provisional Applications within the meaning of California Civil Code §§ 2223 and/or 2224 as a proximate result of the misappropriation of trade secrets as herein alleged.

204. Accordingly, BioCardia seeks imposition of a constructive trust against Ms. Sarna and Boston Scientific Scimed for the benefit of BioCardia on each of the patents and patent applications in the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications.

205. Ms. Sarna and nVision knew that nVision’s trade secrets actually belonged to BioCardia because she knew of her contractual obligations.

206. BioCardia is informed and believes and on that basis alleges that Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders’ Representative, are sophisticated companies and investors focused on investments in or acquisitions of early-stage companies (each an “Investment Target”) and, thus, are familiar with intellectual property issues that Investment Targets have. These include, among other things, that a former employer of a founder of an Investment Target might have a claim to ownership of the trade secrets by the Investment Target, or that the inventions claimed by the Investment Target may be based on trade secrets misappropriated from a former employer because, among other things.

a. They had been contractually assigned by the founder to the founder’s former employer;

b. They were co-invented with an employee or employees of the founder’s former employer; or

c. They were based on information learned at and/or belonging to the former employer.

207. BioCardia is informed and believes and on that basis alleges that because of, among other things, the intellectual property issues that an Investment Target might have with a founder’s former employer, Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders’ Representative, customarily perform “due diligence” on an Investment Target focusing particularly on ferreting out any issues that might exist with the Investment Target’s ownership or right to use its purported technology and intellectual property.

208. BioCardia is informed and believes and on that basis alleges that Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders’

Representative, focused on investments in and acquiring early-stage medical device companies and, therefore, knew, or at least should have known, that BioCardia, the company nVision's founder, Ms. Surbhi Sarna, worked for immediately prior to nVision, was also a medical device company working on the same type of medical device that nVision planned to work on: diagnostic catheters.

209. BioCardia is informed and believes and on that basis alleges that, as specialists in investments in or acquisitions of early stage medical device companies, Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew or at least should have known there was a heightened risk – well beyond the risks inherent in any early stage company - that nVision's technology and intellectual property actually belonged to BioCardia.

210. BioCardia is informed and believes and on that basis alleges that, in addition to the heightened risk inherent in the fact that nVision was focused on the same type of medical device as was BioCardia (diagnostic catheters), Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew that there was a likelihood that nVision's claimed technology and intellectual property actually belonged to or had been misappropriated from BioCardia, because they knew or at least should have known through their due diligence of nVision that:

a. Ms. Sarna's undergraduate major was molecular and cellular biology. She does not have any graduate degrees. Her work at BioCardia dealt with tracking device failures, ensuring label compliance, and obtaining materials from vendors. While at BioCardia, Ms. Sarna's work responsibilities did not include designing or developing medical devices. BioCardia is informed and believes and on that basis alleges that Ms. Sarna's only other experience in the medical device space involved similar tasks as the ones she performed at BioCardia. Ms. Sarna's age, education, and work experience were highly unusual for someone who allegedly came up with a medical device and technique so revolutionary that a company like Boston Scientific Corporation would value it at hundreds of millions of dollars

b. Ms. Sarna started consulting with BioCardia on September 15, 2008 and became a full-time employee of BioCardia on November 3, 2008, at which time she signed the Sarna Agreement and where she worked until resigning in January 2012;

c. Ms. Sarna registered nVision as a Delaware corporation on September 28, 2009, the year after she joined BioCardia and more than two years before she left BioCardia and apparently ran it in "stealth mode" to conceal its existence from BioCardia;

d. Ms. Sarna entered into a "Technology Transfer Agreement" "effective as of December 26, 2009 between Surbhi Sarna (the 'Founder'), and nVision Medical Corporation, a Delaware corporation" more than two years before she left BioCardia.

e. In the Technology Transfer Agreement, Ms. Sarna assigned to nVision "All rights, title and interests in and to all intellectual property arising out of or related to the 'nVision Medical; business plan, including, without limitation, all ideas, designs, techniques, processes, formulas, trade secrets, inventions, discoveries, improvements, research or development and test results, specifications, data, know-how, business methods, marketing plans, other business plans, strategies, forecasts, unpublished financial information, budgets, projections, business prospects, copyrights and trademarks (inclusive of all goodwill relate thereto), and the following trademark, copyright, and patent applications and registrations." The patent application identified in the Technology Transfer Agreement is a " USPTO provisional patent application filed on or around September 29, 2009."

f. Ms. Sarna only registered nVision to do business in California on February 21, 2012, about a month after she left BioCardia.

g. BioCardia is informed and believes and on that basis alleges that the incorporation of nVision more than two years before Ms. Sarna left BioCardia, and the registration of nVision to do business in California only after she had left BioCardia, alone should have set off alarm bells in any competent due diligence conducted by or for anyone seeking to invest in nVision;

h. Ms. Sarna, in common with most Silicon Valley employees, was contractually obligated to assign to BioCardia inventions she made while working at BioCardia, (see **Exhibit B**-the Sarna Agreement) subject only to her proving that they were excluded by Labor Code § 2870, which BioCardia is informed and believes and on that basis alleges that anyone seeking to invest in nVision would understand was unlikely given that both nVision and BioCardia were in the same general area of medical devices (diagnostic catheters);

i. On January 25, 2011, while a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna filed U.S. Provisional application No. 61/435,945;

j. On December 3, 2010, while still a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna emailed Anula Jayasuriya, then affiliated with Defendant Astia Angels nVision LLC and later affiliated with Defendant eXXclaim Capital Partners I, L.P., and Linda Greub, then a partner at Defendant LMNVC, LLC, from her BioCardia account requesting help conceptualizing the invention of the ’945 provisional application;

k. Ms. Sarna subsequently filed three other published applications claiming priority to the ’945 provisional application;

l. On November 13, 2011, also while still a BioCardia employee, Ms. Sarna filed a provisional application entitled “Device and method to confirm occlusion of the fallopian tube”; and

m. Ms. Sarna subsequently filed Application No, 14/357,875, which claimed priority to the ’120 Provisional.

211. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders’ Representative, knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, meant that the patent applications likely had been contractually assigned to BioCardia. Furthermore, BioCardia is informed and believes and on that basis alleges that the

Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew, or at least should have known, that Ms. Sarna and nVision were also making use of BioCardia trade secrets.

212. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, meant that there likely were unnamed BioCardia co-inventors on some or all of the patent applications and/or use BioCardia technology and/or trade secrets.

213. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, also knew, or at least should have known, that the filing of all of these patent applications while Ms. Sarna was employed by BioCardia, but which were assigned to nVision, together with the other acts alleged above while Ms. Sarna was a BioCardia employee, meant that nVision's purported technology and intellectual property likely was based on misappropriated BioCardia trade secrets.

214. The risks undertaken by an investor who knows or should know that the technology and intellectual property claimed by an Investment Target likely belongs to a former employer as is with the case with the patents Ms. Sarna was contractually obligated to assign to BioCardia, or is likely based on trade secrets misappropriated from a former employer, is unlike any common investment and market risk. While common investment risks, if realized, might operate to reduce the value of the Investment Target and, therefore, indirectly, the value of the investor's investment, an investor who knows or should know that the technology and intellectual property claimed by an Investment Target is likely based on patents rightfully owned by another or trade secrets misappropriated from another is exposed to the equitable rights of the rightful owner of the technology and intellectual property, including, as alleged below, the risk of disgorgement of all benefits of the investment.

215. Here, Counterdefendants Boston Scientific's, Boston Scientific Scimed's and

Fortis, the Stockholders' Representative's, investment in nVision was made with the actual or imputed knowledge that the technology and intellectual property claimed by Ms. Sarna and nVision was likely based on patents belonging to and trade secrets misappropriated from BioCardia; accordingly, they did not undertake a common investment risk but, rather, undertook the risk of disgorgement of all benefits from their investment.

216. The Counterdefendants Boston Scientific's, Boston Scientific Scimed's and Fortis, the Stockholders' Representative's, liability to BioCardia is direct, not vicarious, and does not require piercing nVision's corporate veil.

217. BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and the Fortis, the Stockholders' Representative, made a conscious decision to participate in and further the wrongful acts of nVision and Ms. Sarna by investing in nVision and providing it with the funding necessary to commit the acts as herein alleged.

218. Alternatively, BioCardia is informed and believes and on that basis alleges that the Counterdefendants Boston Scientific, Boston Scientific Scimed and Fortis, the Stockholders' Representative, knew or should have known that nVision and Ms. Sarna had acted in violation of BioCardia's rights. Their investments in nVision were made "despite a known risk that the conduct in question violate[d] the rights of [BioCardia]." Under California law and Sections 51(3)(b) and 3 comment e, of the Restatement (Third) of Restitution and Unjust Enrichment, their decision to invest in nVision despite that known risk of liability – i.e., despite that "known unknown" – renders them "conscious wrongdoers" and places upon them the risk of liability by a disgorgement measure.

219. BioCardia is informed and believes and on that basis alleges that the shareholders for whose benefit Fortis, the Stockholders' Representative, provided funding to nVision that was a substantial factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and that Counterdefendants Boston Scientific and Boston Scientific Scimed knowingly benefited from the acts as herein alleged.

220. BioCardia is informed and believes and on that basis alleges that Counterdefendant

Fortis, the Stockholders' Representative, is holding in trust approximately ten percent (10%) of the amount paid by Counterdefendant Boston Scientific to nVision's shareholders resulting from their provision of funding to nVision that was a substantial factor in enabling nVision and Ms. Sarna to commit the acts as herein alleged, and therefore Fortis is required to disgorge to BioCardia the amount it holds in trust for the nVision shareholders.

221. A constructive trust should be placed against Counterdefendants Surbhi Sarna and Fortis, the Stockholders' Representative, on the profits, proceeds and consequential gains resulting from Counterdefendant Surbhi Sarna's and the former nVision shareholders' sale of nVision stock to Boston Scientific, for whose benefit Fortis holds monies in trust, and Counterdefendants Surbhi Sarna and Fortis, the Stockholders' Representative, should be required to disgorge to BioCardia all of the profits, proceeds and consequential gains resulting from their sale of nVision stock to Boston Scientific (or in the case of Fortis, the investments of the nVision shareholders whose monies it holds in trust) because their enrichment from such profits, proceeds and consequential gains was unjust.

222. A constructive trust should be placed against Boston Scientific on the profits, proceeds and consequential gains resulting from Boston Scientific's acquisition of nVision stock and Counterdefendant Boston Scientific should be required to disgorge to BioCardia all of the profits, proceeds and consequential gains resulting from its acquisition of nVision stock because it was not a good faith purchaser for value and without notice, and therefore its enrichment from such profits, proceeds and consequential gains was unjust.

223. BioCardia is informed and believes and on that basis alleges Counterdefendant Boston Scientific Scimed is the owner of record of the 945 Provisional Application Family, the '120 Provisional Application Family, the '472 Application Family and the Additional Provisional Applications that were wrongfully obtained by nVision and Ms. Sarna, for which Boston Scientific Scimed was not a good faith purchaser for value without notice, and therefore a constructive trust should be placed against Boston Scientific Scimed on the '945 Provisional Application Family, the '120 Provisional Application Family, the '472 Application Family and the Additional Provisional Applications and it should be required to assign to BioCardia the '945

Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family, and the Additional Provisional Applications and/or disgorge to BioCardia any and all profits, proceeds and consequential gains it obtained therefrom, because its acquisition and retention of such would be unjust. As set forth above, these patents and applications relied upon BioCardia trade secrets.

**PRAYER FOR RELIEF**

WHEREFORE, BioCardia prays for judgment and relief follows:

1. That Plaintiffs take nothing by reason of their complaint;

2. Damages in an amount to be proven on BioCardia’s breach of contract claim;

3. Damages in an amount to be proven on BioCardia’s misappropriation of trade secret claim;

4. Exemplary damages in an amount of twice BioCardia’s actual damages for Counterdefendants’ willful and malicious misappropriation of the BioCardia Trade Secrets;

5. Attorneys’ fees for Counterdefendants’ willful and malicious misappropriation of BioCardia Trade Secrets;

6. Damages and disgorgement in an amount to be proven for the Counterdefendants’ unjust enrichment;

7. An order correcting the inventorship of the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family and the Additional Provisional Applications to name Dr. Peter Altman and Dr. Simon Stertzer as co-inventors.

8. An order compelling the assignment to BioCardia of each of the patents and patent applications in the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472 Application Family and the Additional Provisional Applications;

9. Disgorgement to BioCardia by Counterdefendants Ms. Sarna and Fortis of the consideration Boston Scientific paid for nVision;

10. Imposition of a constructive trust against Ms. Sarna, Boston Scientific and Boston Scientific Scimed for the benefit of BioCardia on each of the patents and patent applications in the ’945 Provisional Application Family, the ’120 Provisional Application Family, the ’472

Application Family, and the Additional Provisional Applications;

11. Pre-judgment and post-judgment interest; and

12. Such further and other relief as the Court may deem proper and just.

Dated: September 14, 2020

By */s/ Ian N. Feinberg*
Ian N. Feinberg

FEINBERG DAY KRAMER ALBERTI LIM TONKOVICH & BELLOLI LLP
Ian N. Feinberg
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Telephone: 650.825.4300
Ifeinberg@feinday.com

Attorneys for Defendant and Counterclaimant BioCardia, Inc.

**DEMAND FOR JURY TRIAL**

BioCardia demands trial by jury on all claims and issues so triable.

Dated: September 14, 2020

By */s/ Ian N. Feinberg*
Ian N. Feinberg

FEINBERG DAY KRAMER ALBERTI LIM TONKOVICH & BELLOLI LLP
Ian N. Feinberg
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Telephone: 650.825.4300
Ifeinberg@feinday.com

Attorneys for Defendant and Counterclaimant BioCardia, Inc.